UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> ACUTUS RX, LLC, <br> JOHN STREET PHARMACY, LLC <br>　　　d/b/a "ACUTUS RX," <br> ALIGHT RX LLC, <br> HARPREET K. DUGGAL, <br> ATUL K. SHARMA, <br> KETUBEN RAVJI PATEL <br>　　　a/k/a "KETU PATEL," <br> LAURA WALSH, <br> FIRSTSERV HEALTHCARE MANAGEMENT, INC., AND <br> KAPREE HOLDINGS, LLC, <br><br> Defendants. | No. |

## <u>PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.　　**INTRODUCTION**

1.　　The Defendants damaged Allstate by seeking and collecting payments on fraudulent claims submitted through Acutus Rx, LLC ("Acutus") and its successors John Street

Pharmacy, LLC d/b/a Acutus Rx ("John Street Pharmacy") and Alight Rx LLC ("Alight Rx") (together, "Pharmacy Defendants").

2.    The Pharmacy Defendants were owned, managed, and supervised by Defendants Harpreet K. Duggal ("Duggal"), Atul K. Sharma ("Sharma"), Ketuben Ravji Patel a/k/a Ketu Patel ("Patel"), Laura Walsh ("Walsh"), Firstserv Healthcare Management, Inc. ("Firstserv"), and Kapree Holdings, LLC ("Kapree") who conspired to exploit New York's No-Fault laws.

3.    New York was an ideal venue for this scheme because persons ("claimants") involved in automobile accidents are eligible for at least $50,000.00 in coverage for necessary medical and pharmacy expenses, and because claimants can assign their No-Fault benefits to pharmacies, which then seek payment directly from the claimant's insurer.

4.    As detailed below, the Pharmacy Defendants billed Allstate for medically unnecessary topical pain-relief products, including diclofenac sodium 3% gel, lidocaine 5% ointment, and lidocaine 5% patches (collectively referred to herein as "Topical Pain Products").

5.    The claims submitted by the Defendants were fraudulent because the Pharmacy Defendants were not eligible to collect payments under New York's No-Fault laws.

6.    Pharmacies are not eligible to collect No-Fault payments if they fail to comply with applicable New York licensing laws.

7.    Pharmacies are prohibited from billing for unnecessary drugs.  Here, the Pharmacy Defendants billed Allstate for Topical Pain Products that were medically unnecessary—the claimants did not need the Topical Pain Products, and the drugs were ineffective to treat the claimants' reported musculoskeletal conditions.

8.    Pharmacies also are prohibited from providing payments or other inducements in exchange for prescription orders.  Here, the Defendants secured a steady stream of prescriptions

for unnecessary drugs because of the arrangements made between the Pharmacy Defendants and the prescribers in violation of New York law.

9.    The Topical Pain Products were ordered for claimants as part of fraudulent predetermined treatment protocols that required prescriptions for all claimants regardless of medical need.

10.    Numerous prescriptions were generated by clinics that specifically catered to No-Fault patients.  Several of these clinics have been implicated in other No-Fault fraud actions filed in this District.

11.    The prescriptions were steered to the Pharmacy Defendants so the Defendants could bill Allstate.

12.    Pharmacies must also comply with a specific schedule of fees when submitting No-Fault claims, which are paid using rates that are calculated based on the drug's average wholesale price—a rate that is often many times greater than a drug's actual acquisition cost.

13.    The Defendants purposely targeted the Topical Pain Products because the drugs could be acquired at a low cost and then charged at a high price.

14.    The Defendants enriched themselves at the expense of patients.  The scheme generated vast numbers of prescriptions for the Pharmacy Defendants, but the billing for unnecessary drugs placed claimants at risk because the Topical Pain Products were prescribed indiscriminately, without regard for actual medical need.

15.    Overall, the Pharmacy Defendants operated in violation of New York law by billing for drugs that were medically unnecessary, unneeded, excessively charged, and prescribed by corrupt providers pursuant to unlawful referral arrangements with the Defendants.

16.    The Defendants knew that the Pharmacy Defendants were ineligible to collect No-Fault payments, yet they still created bills (i.e., CMS-1500 forms), which falsely certified the Pharmacy Defendants' eligibility to collect No-Fault payments under New York law.

17.    Allstate reasonably relied on the facial validity of the records and bills submitted by the Pharmacy Defendants—and the representations contained therein—when making payments on the Pharmacy Defendants' No-Fault claims.

18.    The Defendants knew that the Pharmacy Defendants' No-Fault claims were false and fraudulent because the bills and documents submitted to Allstate in support of the claims misrepresented or omitted material facts about the Pharmacy Defendants' rights to be paid under New York's No-Fault laws.

19.    The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail and interstate wires, of invoices, bills, and other No-Fault claim documents warranting the Pharmacy Defendants' eligibility to collect No-Fault payments under New York law.

20.    Allstate reasonably relied on the facial validity of the records and bills that were faxed or mailed by the Pharmacy Defendants—and the representations contained therein—when making payments on the Pharmacy Defendants' No-Fault claims.

21.    By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

22.    This action seeks actual damages in excess of $525,188.00, which represent No-Fault payments that Allstate was wrongfully induced to make to the Pharmacy Defendants during the course of this scheme.

23. Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to the Pharmacy Defendants (or their agents) in connection with any No-Fault claims submitted to Allstate.

24. All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

25. The Defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to the Pharmacy Defendants for the benefit of the Defendants.

26. In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for medical services that were not compensable under New York's No-Fault laws.

27. The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

28. Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of the Pharmacy Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II. PARTIES

### A. PLAINTIFFS

29. Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

30.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company were authorized to conduct business in New York.

**B.     DEFENDANTS**

**1.     Acutus Rx, LLC**

31.     Acutus is a limited liability corporation organized under the laws of the State of Delaware.

32.     Acutus is authorized as a foreign limited liability corporation in the State of New York.

33.     Acutus became a registered pharmacy in New York on February 15, 2017.

34.     Acutus's principal place of business was 385 West John Street, Suite 100, Hicksville, NY 11801.

35.     Acutus is an enterprise whose activities affect interstate commerce.

36.     Duggal, Sharma, Patel, and Firstserv participated in the operation and management of the Acutus enterprise during the relevant period.

37.     Acutus billed for pharmacy services in connection with Allstate claimants.

38.     Acutus dispensed medically unnecessary topical medications without regard for patient care and in disregard of its duties under New York law.

39.     Acutus's bills are fraudulent because the pharmacy services were unnecessary and prescribed pursuant to a predetermined prescription protocol designed to maximize the Defendants' profits at the expense of patient safety and well-being.

40.     Accordingly, Acutus was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 2.    **John Street Pharmacy, LLC d/b/a Acutus Rx**

41.    John Street Pharmacy is a limited liability corporation organized under the laws of the State of Delaware.

42.    John Street Pharmacy is authorized as a foreign limited liability corporation in the State of New York.

43.    John Street Pharmacy became a registered pharmacy in New York on January 22, 2020.

44.    John Street Pharmacy's principal place of business was 290 Duffy Street, Suite F, Hicksville, NY 11801.

45.    John Street Pharmacy is an enterprise whose activities affect interstate commerce.

46.    Duggal, Sharma, Patel, Firstserv, and Kapree participated in the operation and management of the John Street Pharmacy enterprise during the relevant period.

47.    John Street Pharmacy billed for pharmacy services in connection with Allstate claimants.

48.    John Street Pharmacy dispensed medically unnecessary topical medications without regard for patient care and in disregard of its duties under New York law.

49.    John Street Pharmacy's bills are fraudulent because the pharmacy services were unnecessary and prescribed pursuant to a predetermined prescription protocol designed to maximize the Defendants' profits at the expense of patient safety and well-being.

50.    Accordingly, John Street Pharmacy was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 3.    Alight Rx LLC

51.    Alight Rx is a limited liability corporation organized under the laws of the State of Delaware.

52.    Alight Rx is authorized as a foreign limited liability corporation in the State of New York.

53.    Alight Rx became a registered pharmacy in New York on September 30, 2022.

54.    Alight Rx's principal place of business was 120 Bethpage Road, Ste 209, Hicksville, NY 11801.

55.    Alight Rx is an enterprise whose activities affect interstate commerce.

56.    Duggal, Sharma, Firstserv, and Walsh participated in the operation and management of the Alight Rx enterprise during the relevant period.

57.    Alight Rx billed for pharmacy services in connection with Allstate claimants.

58.    Alight Rx dispensed medically unnecessary topical medications without regard for patient care and in disregard of its duties under New York law.

59.    Alight Rx's bills are fraudulent because the pharmacy services were unnecessary and prescribed pursuant to a predetermined prescription protocol designed to maximize the Defendants' profits at the expense of patient safety and well-being.

60.    Accordingly, Alight Rx was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 4.    Harpreet K. Duggal

61.    Duggal resides in and is a citizen of the State of New York.

62.    Duggal is not a licensed pharmacist, and Duggal is not authorized to practice pharmacy in the State of New York.

63.    Duggal owns Acutus.

64.    Duggal is a member of Firstserv.

65.    Duggal participated in the operation and management of the Acutus enterprise, individually and/or through Firstserv, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with claimants at issue in this Complaint.

66.    Duggal participated in the operation and management of the John Street Pharmacy enterprise, individually and/or through Firstserv, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

67.    Duggal participated in the operation and management of the Alight Rx enterprise, individually and/or through Firstserv, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 5.    Atul K. Sharma

68.    Sharma resides in and is a citizen of the State of New York.

69.    Sharma is not a licensed pharmacist, and Sharma is not authorized to practice pharmacy in the State of New York.

70.    Sharma is a member of Firstserv.

71.    Sharma participated in the operation and management of the Acutus enterprise, individually and/or through Firstserv, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

9

72.     Sharma participated in the operation and management of the John Street Pharmacy enterprise, individually and/or through Firstserv, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

73.     Sharma participated in the operation and management of the Alight Rx enterprise, individually and/or through Firstserv, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 6.     Ketuben Ravji Patel a/k/a Ketu Patel

74.     Patel resides in and is a citizen of the State of New York.

75.     Patel is a licensed pharmacist in the State of New York.

76.     Patel is the sole member of Kapree.

77.     Patel was the supervising pharmacist at Acutus during the relevant period.

78.     Patel was the supervising pharmacist at John Street Pharmacy during the relevant period.

79.     Patel participated in the operation and management of the Acutus enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

80.     Patel participated in the operation and management of the John Street Pharmacy enterprise, individually and/or through Kapree, during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 7. **Laura Walsh**

81. Walsh resides in and is a citizen of the State of New York.

82. Walsh is not a licensed pharmacist, and Walsh is not authorized to practice pharmacy in the State of New York.

83. Walsh is the sole member of Alight Rx.

84. Walsh participated in the operation and management of the Alight Rx enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 8. **Firstserv Healthcare Management, LLC**

85. Firstserv is a limited liability company organized under the laws of the State of Delaware.

86. Firstserv is authorized as a foreign limited liability company in the State of New York.

87. Firstserv's principal place of business was 399 West John Street, Hicksville, NY 11801.

88. Duggal and Sharma are members of Firstserv.

89. Firstserv participated in the operation and management of the Acutus enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

90. Firstserv participated in the operation and management of the John Street Pharmacy enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

91. Firstserv participated in the operation and management of the Alight Rx enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 9. Kapree Holdings, LLC

92. Kapree is a limited liability company organized under New York law.

93. Kapree's principal place of business was at 159 Yale Street, Roslyn Heights, NY 11577.

94. Patel is the sole member of Kapree.

95. Kapree is the sole member of John Street Pharmacy.

96. Kapree participated in the operation and management of the John Street Pharmacy enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

## III. JURISDICTION AND VENUE

97. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

98. Supplemental jurisdiction over the Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

99. Venue is proper under 28 U.SC. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

100. At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

101.    The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

102.    As the allegations and causes of action in the within Complaint arise from (a) the Defendants' unlawful acts committed in the State of New York, and (b) the fraudulent and non-compensable billing that Defendants generated and submitted from within the State of New York seeking payment under New York's No-Fault laws, there is no question that there exists a substantial relationship between the transactions at issue and Allstate's causes of action.

## IV.    NO-FAULT LAWS AND RELEVANT LICENSING STATUTES

### A.    GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

103.    Allstate underwrites automobile insurance in the State of New York.

104.    New York's No-Fault laws are designed to ensure that injured victims of automobile accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services, including prescription drugs.

105.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

106.    Under New York's No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of an automobile.

107.    "Basic economic loss" is defined to include "all necessary expenses" for prescription drug services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

108.    No-Fault benefits include at least $50,000.00 per Allstate Claimant for necessary expenses that are incurred for healthcare goods and services, including prescription drugs.

**B.    ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS**

109.    Pharmacies are not eligible to collect payment under New York's No-Fault laws if they fail to meet **any** applicable New York State or local licensing requirements necessary to perform these services in New York. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

110.    New York's Education Law applies to pharmacies. *See* N.Y. Educ. Law § 6800, *et seq.*

111.    Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

**1.    Duties of Pharmacies and Their Owners**

112.    Pharmacy owners and supervising pharmacists "shall be responsible for the proper conduct of [the] pharmacy." N.Y. Educ. Law § 6808(2)(e).

113.    "No pharmacist shall have personal supervision of more than one pharmacy at the same time." *Id.*

114.    Only a licensed pharmacist or pharmacy intern may perform professional pharmacy services. *See* 8 N.Y.C.R.R. § 63.6; 8 N.Y.C.R.R. § 29.7(21).

115.    Pursuant to 8 N.Y.C.R.R. § 63.6(b)(7), "[p]harmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed or delivered to the patient," which "review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-

14

counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

116.    With regard to both off-premises and on-premises deliveries of drugs and medications, nothing in either delivery scenarios "shall prevent a pharmacist or pharmacy intern from refusing to dispense a prescription if, in his or her professional judgment, potential adverse effects, interactions or other therapeutic complications could endanger the health of the patient." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(e), § 63.6(b)(8)(ii)(d)(5).

117.    For a drug or medication that is delivered on the pharmacy's premises, before dispensing a medication to a new patient or a new medication to an existing patient, the pharmacist or pharmacy intern must personally counsel the patient by telephone or in person on appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications. 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)-(b).

118.    When dispensing a drug or medication to a patient off of pharmacy premises, the pharmacist or pharmacy intern must "include with each prescription a written offer to counsel the patient" regarding the drug or medication, including its "known indications" and "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)(1), (4), § 63.6(b)(8)(ii)(a).

119.    The written offer of counseling for drugs dispensed off of pharmacy premises "shall provide a telephone number at which a licensed pharmacist or pharmacy intern may be readily reached." 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(a).

120.    When dispensing a drug or medication to a patient off of pharmacy premises, if a pharmacist or pharmacy intern determines that the prescription(s) present "potential drug therapy problems which could endanger the health of the patient," such as "therapeutic duplications, drug-

drug interactions and drug-allergy interactions," the pharmacist or pharmacy intern "shall personally contact the patient" either by telephone or in person to "offer counseling on the identified potential drug therapy problems" and other issues that the pharmacist or pharmacy intern deems appropriate in their judgment. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(1).

121. The responsibility of offering counseling to patients in the case of potential drug therapy problems "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit." 8 N.Y.C.R.R. § 68.6(b)(8)(ii)(d)(2).

122. If the patient refuses to accept such counseling, such refusal must be documented. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

123. An individual who is not a licensed pharmacist is not authorized to perform functions requiring professional judgment, and thus cannot, among other things, "receive oral prescriptions from prescribers," "interpret and evaluate a prescription for conformance with legal requirements, authenticity, accuracy and interaction of the prescribed drug with other known prescribed and over-the-counter drugs," cannot "sign or initial any record of dispensing required to be maintained by law," and cannot "counsel patients." 8 N.Y.C.R.R. § 29.7(21)(ii)(b)(1), (2), (6), (7).

124. Aiding and abetting an unlicensed person to practice a profession, including pharmacy, is considered a crime. N.Y. Educ. Law § 6512.

### 2. Unlawful Prescription Referral Arrangements

125. New York law prohibits registered pharmacies from exploiting patients for financial gain. 8 N.Y.C.R.R. § 29.1(b)(2) (prohibiting registered pharmacies from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods,

appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party").

126.    New York law prohibits registered pharmacies from engaging in unlawful referral relationships. *Id.* at § 29.1(b)(3) (prohibiting registered pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.").

127.    New York Education Law § 6509-a prohibits a professional licensee, including a licensed pharmacist, from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

128.    Likewise, under New York Public Health Law § 238-a, a practitioner authorized to order pharmacy services may not make a referral for such services to a healthcare provider authorized to provide such services, including to pharmacies, where such practitioner has a financial relationship with such healthcare provider. A financial relationship includes a compensation agreement and includes an arrangement with a healthcare provider that is in excess of fair market value or that provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties. N.Y. Pub. Health Law § 238-a(1), (5); *see also* N.Y. Educ. Law § 6530(18) (defining professional misconduct of physicians and physician assistants to include "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services").

### 3. Electronic Prescription Mandate

129. As of March 27, 2016, New York law requires electronic prescriptions for both controlled and non-controlled substances.  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

130. New York's electronic prescription mandate was intended to reduce prescription drug fraud and misuse because "E-prescribing is a secure method of transmitting prescriptions from practitioners to pharmacists. Since an e-prescription cannot be physically altered, forged, or stolen …, it curtails prescription fraud." N.Y. Senate Bill S7637 (2011-2012 Leg. Session).

131. There are few exceptions to the electronic prescription mandate, such as when electronic prescribing is not available due to temporary technological or electrical failure, where the prescribing provider has obtained a waiver, or where drugs cannot be prescribed electronically in a timely manner (and such delay would adversely impact the patient's medical condition).  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

132. If a prescription is not issued electronically, then the prescribing provider must indicate in the patient's health record the reason that the prescription was not issued electronically. N.Y. Educ. Law § 6810(11)-(12).

133. If the prescriber has obtained a waiver from the New York Department of Health because of "exceptional circumstances," then the prescriptions must be issued using an Official New York State Prescription Form or an oral prescription in accordance with New York law. *Id.*

134. Absent one of these limited exceptions, prescribing providers must prescribe all drugs and medications electronically.

**C.** **CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS**

135. Claimants can assign their No-Fault benefits directly to pharmacies; in turn, a claimant's pharmacy may submit claims directly to an insurance company and receive payment for necessary pharmacy services rendered. 11 N.Y.C.R.R. § 65.3-11(a).

136. Pharmacies can submit claims using the claim form required by the New York State Department of Financial Services f/k/a New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3 form"). 11 N.Y.C.R.R. § 65.3-11(b).

137. Alternatively, pharmacies may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

138. NF-3 and CMS-1500 forms are important because they certify that the pharmacy's request for payment is not materially false, misleading, or fraudulent subject to the following warning:

> "Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime[.]"

N.Y. Ins. Law § 403(d).

139. Pharmacies make material misrepresentations when they submit NF-3 or CMS-1500 forms that omit or misrepresent material information about the billed-for services or the pharmacies' eligibility to collect No-Fault payments.

140. It is a material misrepresentation to submit NF-3 or CMS-1500 forms for prescription drugs that (a) are never provided, (b) are not necessary, (c) are referred to the

pharmacy pursuant to unlawful arrangements with prescribing providers, (d) are dispensed without required supervision or regard for patient safety and well-being, and/or (e) are billed at a greater monetary charge than is permitted under the applicable fee schedule.

### D. REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER NEW YORK'S NO-FAULT LAWS

141. A pharmacy's misrepresentations regarding compliance with the applicable fee schedule is material because the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

142. The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

143. The Fee Schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq*.

144. In terms of charges submitted by pharmacies prior to October 1, 2019, 12 N.Y.C.R.R. § 440.5(a)(1)(i) states that a provider may charge no more than the Average Wholesale Price ("AWP") for the national drug code ("NDC") for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00, for brand name drugs or medicines, and minus 20 percent of the average wholesale price, plus a dispensing fee of $5.00, for generic drugs or medicines.

145. The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged. Each NDC number has a corresponding AWP, which identifies the price.

146. AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug

Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed. 12 N.Y.C.R.R. § 440.2(a).

147.    For charges submitted by pharmacies for brand name and generic prescription drugs or medicines on or after October 1, 2019, 12 N.Y.C.R.R. § 440.5(a)(1)(ii) states that a provider may charge no more than, as applicable here, the lesser of the calculated cost or the usual and customary price for the prescription drug or medication.

148.    "Calculated cost means the average wholesale price for the national drug code of the prescription drug or medicine on the day it was dispensed plus a dispensing fee. For brand name drugs the calculated cost shall be AWP minus 12 percent of the average wholesale price plus a dispensing fee of $ 4. For generic drugs the calculated cost shall be AWP minus 20 percent plus a dispensing fee of $ 5." 12 N.Y.C.R.R. § 440.2(c).

149.    "Usual and customary price means the retail price charged to the general public for a prescription drug." 12 N.Y.C.R.R. § 440.2(s).

150.    Under New York's No-Fault Laws, healthcare providers, including pharmacies, are prohibited from submitting charges that exceed the amounts set forth in the Fee Schedule.

151.    Additionally, New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet **any** applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

152.    Accordingly, if a professional healthcare service provider, including a pharmacy, fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

21

153. As alleged herein, the Defendants failed to meet several laws and regulations when providing pharmacy services to claimants during the course of this scheme; therefore, the Pharmacy Defendants were never eligible to collect No-Fault payments from Allstate.

## V.    SPECIFIC FACTS ABOUT THE DEFENDANTS' SCHEME TO DEFRAUD

### A.    OVERVIEW OF SCHEME

154. Sharma and Duggal are not licensed pharmacists, but they operated and managed registered pharmacies in the State of New York during the relevant period.

155. Sharma and Duggal devised a scheme in which the Pharmacy Defendants collected payment on fraudulent and non-compensable No-Fault claims.

156. The Pharmacy Defendants were not eligible to collect No-Fault payments because they billed for medically unnecessary, ineffective, and expensive drugs and medications prescribed pursuant to unlawful referral arrangements with prescribing providers.

157. Sharma and Duggal recruited Patel and Walsh to participate in the operation and management of the Pharmacy Defendants as a supervising pharmacist and/or record owner.

158. The success of Sharma and Duggal's scheme to defraud relied on the collaboration of a complicit pharmacist, Patel, who was willing to disregard her duties as a licensed pharmacist, which involved ensuring that Acutus and John Street Pharmacy complied with applicable New York law governing the operation of registered pharmacies.

159. As detailed below, the Pharmacy Defendants failed to comply with New York law governing pharmacies and were not eligible to seek or receive payments under New York's No-Fault laws.

22

## 1.    Nexus Among the Defendants

160.    The scheme started when Duggal and Sharma opened Acutus, and began collecting No-Fault payments.

161.    Patel joined the scheme later by becoming the supervising pharmacist at Acutus.

162.    In January 2020, Acutus was transferred to John Street Pharmacy.

163.    John Street Pharmacy was a mere continuation of Acutus.

164.    Duggal and Sharma remained involved in the operation and management of John Street Pharmacy despite Patel's nominal ownership.

165.    The change of business name (i.e., Acutus to John Street Pharmacy) and ownership (i.e., Duggal to Patel), plus the moving of location (i.e., 385 W. John Street, Hicksville, NY to 290 Duffy Ave, Hicksville, NY) were intended to conceal the Defendants' scheme.

166.    The Defendants' actions were consistent with their prior actions involving different pharmacies.  For example. Sharma previously owned a non-party pharmacy named Sunquest Pharmaceuticals Inc. ("Sunquest"), which, upon information and belief, was also known as "Acutus."  When Sunquest closed, the business was transferred to a new pharmacy named Acutus, which opened at a new location and under new ownership (i.e., Duggal).

167.    Although Acutus was registered as a new pharmacy, Sunquest's prescription files were transferred to Acutus right before it began operating:

> **Prescription Files:** In accordance with Section 6810(5) of the New York State Education Law, prescription files must be maintaine years and must be available for refill or official review if requested.
>
> ☑ Pharmacy patient records and prescription files were transferred to (identify below)
> ☐ Drug and device transaction records have been transferred to (identify below)
>
> **New York Registration Number:**    035227
>
> **Registered Name and Address:**    Acutus Rx, LLC.
> (as printed on the Registration Certificate)    385 W John St, Hicksville NY, 11801

168. Indeed, Acutus began submitting bills to Allstate for dates of service on May 2, 2017, just 1 day after Sunquest discontinued its registration with the Board of Pharmacy on May 1, 2017.

169. Patients who were referred to Sunquest for Topical Pain Products were then billed for them by Acutus instead.

170. For example, in connection with claimant J.R. (claim no. 0449233550), Sunquest billed Allstate for lidocaine 5% ointment on April 25, 2017, which had been prescribed on April 24, 2017.

171. After Sunquest stopped operations, Acutus took over and began billing Allstate for lidocaine 5% ointment in connection with J.R.; in fact, Acutus billed Allstate for lidocaine 5% ointment for J.R. on June 9, 2017 and July 10, 2017.

172. The Defendants are linked together in several other ways. Sharma owns Firstserv, which was an entity that helped him exert control over the operation and management of the Pharmacy Defendants. Firstserv was located at 150 Eileen Way, Ste 1, Syosset, NY during the relevant period, which was the location of Sunquest. The 150 Eileen Way location was also the site of Acutus's first organizational meeting, which was attended by Acutus's membership (i.e., Duggal).

173. Firstserv was the tenant at 385 W. John Street, Ste 100, Hicksville, NY 11801 and agreed to pay the landlord $1,200 per month for 60 months under a lease agreement dated November 11, 2016.

174. However, Firstserv purported to assign this lease to Acutus the following month, which assignment obligated Acutus to pay Firstserv $15,000 per month during the term of the lease.

175.     The original lease between the landlord at 385 W. John Street and Firstserv expressly allowed Firstserv to assign the lease to "Tenant related and/or commonly owned and/or controlled entities," including Acutus, thus illustrating Firstserv's control over Acutus:

176.     Eventually, Duggal and Sharma sought to close Acutus and open a new pharmacy in its place to conceal the scheme to defraud perpetrated at the 385 W. John Street location.

177.     To make it appear as though the successor pharmacy to Acutus was independent from Duggal and Sharma, they recruited Patel to form a new entity to take Acutus's place (i.e., John Street Pharmacy).

178.     Patel formed John Street Pharmacy in March 2019 and applied for authority for John Street Pharmacy to operate in New York as a foreign LLC under the name "Acutus Rx."

179.     John Street Pharmacy originally reported its address as 385 W. John Street, Ste 100, Hicksville, NY (i.e., Acutus's location).

180.     John Street Pharmacy was to replace Acutus at the 385 W. John Street location under the ownership of non-party Divyesh Patel while Patel continued to serve as the supervising pharmacist.

181.    Patel and Divyesh Patel entered into a membership purchase agreement that transferred Patel's interest in Kapree to Divyesh Patel so that Divyesh Patel would be the sole member of Kapree as the sole member of John Street Pharmacy.

182.    Acutus, through Duggal, and John Street Pharmacy, through Divyesh Patel, purported to enter into an asset purchase agreement on July 1, 2019 whereby John Street Pharmacy would purchase Acutus's assets for $450,000.

183.    Firstserv, through Sharma, then purported to assign its lease with the landlord of 385 W. John Street to John Street Pharmacy as it had to Acutus.

184.    However, the plan to continue the scheme at the 385 W. John Street location with John Street Pharmacy hit a roadblock when, in September 2019, before it could approve John Street Pharmacy for inspection, the Board of Pharmacy required the assignment of lease agreement between Firstserv and John Street Pharmacy to be signed by the landlord.

185.    The Defendants then abandoned their plan to operate John Street Pharmacy at 385 W. John Street and found a new location to continue the scheme approximately 1 mile away at 290 Duffy Ave, Hicksville, NY.

186.    Acutus first sought approval from the Board of Pharmacy to change its location to 290 Duffy Ave on or about November 11, 2019.

187.    John Street Pharmacy purported to assign its lease dated September 12, 2019 for the premises at 290 Duffy Ave, Suite F, Hicksville, NY to Acutus with Firstserv as the "Good Guy Guarantor." Ultimately, however, Acutus did not move to the 290 Duffy Ave location.

188.    Rather, Divyesh Patel transferred his membership interest in Kapree back to Patel, and Patel became the sole member of Kapree, which was the sole member of John Street Pharmacy.

189.    As part of this transfer, Kapree, through Patel, and non-party Soar Holdings Syndicate, LLC, through Duggal, executed a release in favor of Divyesh Patel "in connection with and/or relating to" Kapree, Firstserv, and/or Soar Holdings Syndicate, LLC, thus showing the connection between Kapree and Firstserv as entities used by the Defendants to operate and control John Street Pharmacy.

190.    Acutus, through Duggal, and John Street Pharmacy, through Patel, again entered into a second asset purchase agreement dated November 20, 2019.

191.    Under the terms of this second asset purchase agreement, the purchase price increased by $150,000 from $450,000 to $600,000 from the previous asset purchase agreement executed in July 2019 even though the other material terms of the agreement did not change.

192.    John Street Pharmacy began operating from 290 Duffy Ave, Suite F, Hicksville, NY in or about January 2020.

193.    However, during the relevant period, John Street Pharmacy operated under the trade name "Acutus Rx" and even held itself out as "Acutus Rx, LLC" with an address of 385 W. John Street, Suite 100, Hicksville, NY in correspondence and documents submitted to Allstate.

194.    For example, John Street Pharmacy submitted an assignment of benefits form under the name and address of Acutus in October 2020, months after the transfer from Acutus to John Street Pharmacy in January 2020, as to claimant W.P. (claim no. 0606582310):



195.    Firstserv, through Sharma and Duggal as its members, continued to operate from 290 Duffy Ave, Suite F, Hicksville, NY to effectuate their control over John Street Pharmacy during the relevant period.

196.    Indeed, Firstserv reported the 290 Duffy Ave, Suite F, Hicksville, NY address in connection with a Paycheck Protection Program (PPP) loan that it received on February 13, 2021.

197.    A Michigan pharmacy owned by Duggal, non-party Pharma Rx Services, LLC d/b/a NationwideRx, also represented its mailing address as 290 Duffy Ave, Suite F, Hicksville, NY in a 2022 annual statement.

198.    On April 15, 2022, Firstserv, using the address 290 Duffy Ave, Suite F, Hicksville, NY 11801, filed an Application for Authority with the New York State Department of State on behalf of Alight Rx.

199.    Upon information and belief, Duggal and Sharma recruited Walsh—whom they knew through her professional background in pharmaceutical sales, but who is not a registered pharmacist—to serve as the sole member of Alight Rx.

200.    However, Walsh's LinkedIn profile reflects that Walsh holds the position of "Director of Dermatology Sales" at Alight Rx.

201.    Alight Rx, like both Acutus and John Street Pharmacy, is also located in Hicksville, NY approximately 2 miles from 290 Duffy Ave.

202.    Alight Rx also shares connections to another pharmacy associated with John Street Pharmacy and Firstserv: non-party Duffy Rx LLC ("Duffy Rx").

203.    The record owner of Duffy Rx is non-party Michael Cronin ("Cronin") who formerly purportedly served in the role of "Senior Executive Business Development" at Acutus and now purportedly holds this same role at Alight Rx.

204.    Duffy Rx originally was intended to replace John Street Pharmacy and an application to transfer ownership from John Street Pharmacy to Duffy Rx was submitted to the Board of Pharmacy in August 2022. However, on September 16, 2022, Cronin requested that the application be canceled and that John Street Pharmacy continue to operate.

205.    Another application for Duffy Rx to operate in John Street Pharmacy's place again was filed in December 2022. In January 2023, this application also was withdrawn due to "leasing issues" and John Street Pharmacy continued operations.

206.    Duffy Rx applied for an initial registration on January 18, 2023, which was approved.

207.    Duffy Rx shares an address with Firstserv: 399 W John Street, Hicksville, NY.

208.    Alight Rx and Duffy Rx reported nearly identical descriptions—in the same handwriting—of the pharmacy operations in "Pharmacy Information Forms" submitted to the State Board of Pharmacy:

**Alight Rx**

> 5.  Pharmacy Description: Provide a brief detailed explanation of expected day to day pharmacy operations for this establishment.
>
> DAY TO DAY:  Pharmacist opens → Receive DRUG Delivery → Stock inventory (Control Rx) → → Receive RX'S (Fax, ERx phone, drop off) → Counsel → Need Allergy, DME, ALL info, demographic for p7, → Answer phone calls, Set up pick-up/delivery Process ERx → print Label, Fill Rx (count) → pack for pick-up/delivery Order RXS, Counsel patient, Ring Register (get ALL signatures for copay, cash + Hippa) Follow ALL operations According To NY State Board of Pharmacy. Fill ALL Prescriptions To Service our Neighborhood Community

**Duffy Rx**

> 5.  Pharmacy Description: Provide a brief detailed explanation of expected day to day pharmacy operations for this establishment.
>
> Retail Pharmacy Day to DAY → Receive Drug deliveries → stock inventory (Control Rx) Fill Rxs via ERx, Fax, Verbal, etc. → Dispense Rx As required by Law. → ALL inhouse Counsel, PACK Rx for pickup/Delivery, ALL Register transactions, Signature, HIPPA, Delivery Logs. Follow ALL Retail Pharmacy Operations According to NY State Board of Pharmacy, to Service our Neighborhood Community.

209.    Duffy Rx's current supervising pharmacist, non-party Syed Jamaluddin ("Jamaluddin"), was Alight Rx's supervising pharmacist until May 2023.

210.    Jamaluddin also was Duffy Rx's reported supervising pharmacist in its initial application to replace John Street Pharmacy and became Alight Rx's supervising pharmacist on September 27, 2022, soon after Duffy Rx withdrew that application on September 16, 2022.

211.    John Street Pharmacy discontinued pharmacy operations on April 28, 2023.

212.    John Street Pharmacy transferred its patient records and prescription files, along with drug transaction records, to Alight Rx.

213.    John Street Pharmacy sold its prescription drugs to Alight Rx.

214.     Even though John Street Pharmacy discontinued operations on April 28, 2023, it continued to submit bills to Allstate, including charges for the same date of service, same claimant, and same medication also billed by Alight Rx.

215.     For example, John Street Pharmacy submitted a CMS-1500 form regarding diclofenac sodium 1.5% solution purportedly dispensed to claimant P.F. (claim no. 0699803309) on May 15, 2023:

216.     However, Alight Rx also billed for diclofenac sodium 1.5% solution purportedly dispensed to claimant P.F. on May 15, 2023:



217. John Street Pharmacy and Alight Rx submitted other duplicate charges demonstrating the connections between these pharmacies:

| Claimant | Date of Service | Billed-For Medication | John Street Pharmacy Charges | Alight Rx Charges |
|---|---|---|---|---|
| S.R. (claim no. 0714424322) | 5/22/2023 | Naproxen | $58.56 | $58.56 |
| S.D. (claim no. 0713913846) | 5/17/2023 | Cyclobenzaprine; Naproxen | $178.05; $56.07 | $178.05; $56.07 |
| A.M. (claim no. 0713913846) | 5/18/2023 | Cyclobenzaprine; Naproxen | $178.05; $90.58 | $178.05; $90.58 |
| S.J. (claim no. 0709615305) | 5/5/2023 | Methyl salicylate 25% cream | $168.58 | $168.58 |
| J.P. (claim no. 0703638221) | 5/15/2023 | Methyl salicylate 25% cream; Lidocaine 4% film | $332.17; $1,109.00 | $332.17; $1,109.00 |
| L.C. (claim no. 0677425290) | 5/24/2023 | Cyclobenzaprine | $44.36 | $44.36 |

32

218.    Overall, each of the Defendants played a crucial role in the overarching scheme to defraud perpetrated through the Pharmacy Defendants.

**2.    Pharmacy Defendants Did Not Operate as Legitimate Pharmacies**

219.    Unlike typical community pharmacies, the Pharmacy Defendants did not require any advertising, stock of items for retail sale, or easy access for customers because they were fueled by unlawful referral relationships for a predetermined protocol of drugs and medications and did not have to attract a customer base.

220.    Instead of operating from a store front in a high traffic area, John Street Pharmacy and Acutus were tucked away in industrial parks, which meant they did not attract walk-in customers or advertise their services to the general public.

221.    Alight Rx is similarly situated on the second floor of an office building without any conspicuous signage on the exterior of the building advertising Alight Rx's services to the public.

222.    The Board of Pharmacy—citing Acutus's setup and location—had questions about the pharmacy's "business practice model," which was supposedly intended to provide "walk-in servicing" to customers:

From: PHARMBD [mailto:PHARMBD@nysed.gov]
Sent: Wednesday, February 1, 2017 11:00 AM
To: vsone@acutusrx.com
Subject: RE: Acutus Rx LLC

Good morning,

We have received and reviewed the pharmacy photos and some clarification is required. On the application you checked off that you are going to be a community pharmacy however your establishment appears to be designed more for mail-order than walk-in servicing. Please clarify your business practice model and submit amended documents if required. And explanation and any required documents may be submitted electronically in a reply to this email.

223.    In reply, Acutus represented to the Board of Pharmacy that patients would "have the ability to come in and pick up their prescriptions."

224.    As explained below, however, despite any technical ability to visit the Pharmacy Defendants' locations in person, the Pharmacy Defendants' delivery receipts show that patients rarely picked up their drugs and medications at the Pharmacy Defendants' premises; rather, to ensure that the Pharmacy Defendants could charge for the medications, the Defendants prevented patients from choosing a pharmacy by causing prescribing providers to send the prescriptions specifically to the Pharmacy Defendants, who then directly delivered the medications to the patient at their home or the prescribing clinic, including through the use of a courier service.

225.    By registering as a pharmacy department rather than a full store, Acutus and John Street Pharmacy did not offer any other products or services to their customers and it was unnecessary for patients to make the trip to their locations in Hicksville, NY.

226.    Likewise, although it was registered as a full pharmacy, the floor plan provided by Alight Rx to the Board of Pharmacy does not identify any areas of retail space to offer other products or services to customers.

227.    The Pharmacy Defendants are located in Nassau County, but the majority of the claimants at issue in this Complaint reside outside of Nassau County, which means that the Pharmacy Defendants would not have received the prescriptions absent the steering agreements with prescribers.

228.    The Pharmacy Defendants did not need to advertise their services, sell other products to attract customers, or be located in a convenient area to attract customers because the Pharmacy Defendants obtained the necessary steady stream of prescriptions through unlawful referral arrangements with corrupt prescribing providers and No-Fault clinics.

3.    **Unlawful Referral Relationships with Prescribing Providers and Clinics**

229.    The Defendants' scheme to defraud required a high volume of facially valid prescriptions to permit the Pharmacy Defendants to submit charges for prescription Topical Pain Products.

230.    To maintain a steady flow of prescriptions for a particular set of expensive Topical Pain Products, the Defendants colluded with prescribing providers and clinics who specialized in No-Fault and had large available patient bases for the Defendants to take advantage of.

231.    These prescribing providers and/or No-Fault clinics generated prescriptions for Topical Pain Products and other drugs and medications in accordance with the Defendants' predetermined prescription protocol regardless of whether the patients needed, or even wanted, the drugs and medications.

232.    Upon information and belief, the Defendants paid kickbacks or other financial incentives to the prescribing providers and/or No-Fault clinics in exchange for these unlawful prescriptions in violation of New York law.

233.    These unlawful referral relationships were crucial to the success of the Defendants' scheme to defraud and resulted in false and fraudulent charges for medically unnecessary and expensive drugs and medications, including Topical Pain Products.

234.    John Street Pharmacy was accused of fraudulent pharmacy billing in *GEICO v. John Street Pharmacy, LLC*, No. 22-cv-05651-EK-JMW (E.D.N.Y.) where it was alleged that John Street Pharmacy maintained unlawful relationships with prescribing providers to obtain fraudulent prescriptions in exchange for unlawful kickbacks and financial incentives.

235.    John Street Pharmacy and Acutus billed for numerous prescriptions from providers working for non-party Metro Pain Specialists, P.C. ("Metro Pain") and its successor, Tri-borough

NY Medical Practice, P.C. ("Tri-borough"), which have been named as defendants in cases involving fraudulent No-Fault claims. *See GEICO v. John Street Pharmacy, LLC d/b/a Acutus Rx*, No. 22-cv-05651-EK-JMW (E.D.N.Y.) ("The Prescribing Providers who steered the highest number of prescriptions for the Fraudulent Pharmaceuticals to [John Street Pharmacy] were associated with Metro Pain …, a professional corporation operating at multiple No-Fault Clinics that has been named as a defendant in recent affirmative fraud cases involving fraudulent services billed to No-fault insurers[.]"); *Allstate Ins. Co. v. Metro Pain Specialists Professional Corporation*, No. 21-cv-05586-DG-RER (E.D.N.Y.); *State Farm Mut. Ins. Co. v. Metro Pain Specialists Professional Corporation*, No. 21-cv-05523-MKB-PK (E.D.N.Y.) (alleging that "Tri-Borough operates at many of the locations at which Metro Pain had operated, treats the same patients that Metro Pain had treated through physicians previously employed by Metro Pain, and performs the same types of treatment and makes the same types of referrals as Metro Pain.").

236.    John Street Pharmacy and Acutus billed for drugs and medications purportedly prescribed by providers treating patients at Metro Pain and Tri-borough, including, but not limited to, non-parties William Elton, M.D., Leonid Shapiro, M.D., Theodros Seyoum, M.D., Delys St. Hill, M.D., Hong Pak, M.D., Camari Wallace, M.D., and Inna Levtsenko, NP.

237.    Metro Pain providers have been the subject of allegations that they participated in unlawful referral relationships with pharmacies whereby the providers funneled prescriptions for medically unnecessary drugs and medications to pharmacies in exchange for payments. *See Liberty Mut. Ins. Co. v. AVK Rx, Inc.*, No. 22-cv-07329-GRB-SIL (E.D.N.Y) (alleging that Hong Pak, M.D. prescribed medically unnecessary medications pursuant to an unlawful kickback arrangement with a pharmacy).

238.    Metro Pain providers also have admitted that Metro Pain required its doctors and nurses to prescribe medically unnecessary Topical Pain Products as a condition of their employment.

239.    One such provider, non-party Michael Alleyne, M.D. stated in a sworn affidavit that he was required as part of his continued employment at Metro Pain and Tri-borough to authorize prescriptions for Topical Pain Products using a pre-printed prescription form. *See GEICO v. Avonora, Inc. d/b/a Avonora Pharmacy*, No. 23-cv-03409 (E.D.N.Y.). He described how the staff at the Metro Pain/Tri-borough clinics enforced this requirement:

> 6. The administrative staff at the various clinics from where I worked for Metro Pain would also continuously insist that I authorize these prescriptions. In the event I did not consistently authorize prescriptions for Topical Pain Products to Metro Pain's patients, I would get persistent reminders or admonishing phone calls from clinic staff about not prescribing in accordance with the prescription regimen. I was once yelled at by one of these individuals for not issuing prescriptions for Topical Pain Products to patients. At times, I was asked to sign blank pre-printed prescription forms so that the clinics' staff could fill in the medications that Dr. Shapiro required be prescribed to Metro Pain's patients. I also learned that Metro Pain obtained a stamp of my signature without my consent or authorization, but I do not know what they use the stamp for or if it has ever been used on prescriptions for pharmaceuticals.

240.    Likewise, non-party Patricia Kelly, D.O. ("Kelly"), allegedly has stated under oath "that the No-Fault Clinic locations where she worked [i.e., Metro Pain and Tri-borough clinics] 'were controlled by layperson managers and each of the locations ha[d] treatment protocols in place' and that she 'was instructed to prescribe certain medications to all patients even if [she] felt

they were not warranted.'" *GEICO v. SMS Therapy Supply, Inc.*, No. 1:23-cv-07862 (E.D.N.Y.); *Liberty Mut. Ins. Co. v. Nu Age Med Solutions, Inc.*, No. 1:23-cv-07985 (E.D.N.Y.).

241. The controllers of Metro Pain clinics also routinely generated and/or caused the submission of forged and altered prescriptions without the prescribing providers' knowledge or consent.

242. As explained further below, Metro Pain providers have revealed that they did not actually authorize prescriptions for Topical Pain Products purportedly issued by them. Rather, these prescriptions in the Metro Pain providers' names for Topical Pain Products were altered or forged to increase billing opportunities for the pharmacies, including Acutus and John Street Pharmacy.

243. For instance, both Acutus and John Street Pharmacy regularly billed for diclofenac sodium 3% gel disproportionately prescribed by a Metro Pain provider, non-party William Elton, M.D. ("Elton").

244. The prescriptions submitted under the name and credentials of Elton are significant because Elton was required as a condition of his employment at Metro Pain to prescribe medications and DME as part of a predetermined treatment protocol.

245. Elton has also disclosed that the clinic controllers forged and fabricated prescriptions under his name to facilitate pharmacy billing, including for one or more of the Pharmacy Defendants. *See GEICO v. John Street Pharmacy, LLC*, No. 22-cv-05651-EK-JMW (E.D.N.Y.) (alleging that Elton "testified under oath that he resigned from Metro Pain when he discovered they were <u>fraudulently prescribing medications in his name for diclofenac 3% gel and sending them to [John Street Pharmacy]</u>" (emphasis in original)).

246. Elton testified that prescriptions issued in his name were forged or altered to include drugs that he did not prescribe to patients.

247. The forms were designed to look like electronic prescription forms, but they were not:



*C.L. (claim no. 0497564047)*



*D.K. (claim no. 0591785639)*



248.    The telephone prescription forms were nothing more than unsigned copies.

249.    Upon information and belief, the "Oksana" referenced in the above telephone prescription as the individual transmitting the prescription information is non-party Oksana Niyakov, the manager of the Metro Pain clinic located at 90-16 Sutphin Blvd, Jamaica, NY where Elton frequently treated patients.

250.    Elton has testified that a woman with the first name "Oksana" was the manager of Metro Pain's Jamaica location:

```
        Q       Okay.  And do you recall the name
of the site manager at any of the locations?
        A       At Jamaica it was a woman Oksana,
O-K-S-A-N-A, I do not recall the last name.
```

251.    Upon information and belief, Oksana transmitted prescriptions for drugs and medications, including Topical Pain Products, over the telephone to pharmacies, including Acutus and John Street Pharmacy, without the knowledge or authority of the prescribing provider, including Elton.

252.    Upon information and belief, Oksana steered the unauthorized prescriptions for specific Topical Pain Products, including diclofenac sodium 3% gel, to Acutus and John Street Pharmacy pursuant to an unlawful referral relationship between Metro Pain and the Defendants.

253.    Another referring provider, non-party Colin Clarke M.D. ("Clarke") has also been linked to other No-Fault schemes involving fraudulent claims for unnecessary drugs. *Liberty Mut. Ins. Co. v. Korge Prods. Corp*, No. 23-cv-05053-NGG-RER (E.D.N.Y.) (alleging that Clarke referred identical prescriptions for durable medical equipment (DME) according to a fraudulent predetermined protocol pursuant to an unlawful referral relationship with a DME company); *GEICO v. Clarke*, No. 23-cv-04605-FB-SJB (E.D.N.Y.) (alleging that Clarke ceded control of a

PC registered in his name and caused the PC to bill for medically unnecessary treatment performed pursuant to the dictates of a layperson and unlawful kickback arrangements); *GEICO v. Caplet Pharmacy Inc.*, No. 23-cv-04472-ARR-SJB (E.D.N.Y.) (alleging that Clarke prescribed medically unnecessary Topical Pain Products billed under New York's No-Fault laws by an illegitimate pharmacy); *Allstate Ins. Co. v. Rose*, No. 22-cv-00279-WFK-MMH (E.D.N.Y.) (alleging that Clarke ceded control of a PC registered in his name to a non-physician and caused this PC to bill for medically unnecessary treatment); *GEICO v. Exon Med. Equipment, Inc.*, No. 20-cv-02457-MKB-JRC (E.D.N.Y.) (alleging that Clarke prescribed unnecessary medical equipment pursuant to a predetermined protocol). Additionally, Clarke was disciplined by the New York State Board for Professional Medical Conduct in October 2009 after he entered into a consent order on the basis that he could not defend against at least 1 of the charges of professional misconduct brought against him, which stemmed from his failure to adequately supervise his staff in the performance, evaluation, and documentation of examinations and electrodiagnostic testing.[1]

254. Notably, Clarke worked with an unlicensed person, non-party Svetlana Kovaleva a/k/a Melana Kay ("Kay"), to operate a medical practice named Colin Clarke M.D., P.C. *See* Exhibit 1.

255. According to Kay, Clarke's practice started at a clinic located at 214-29 Jamaica Avenue in Jamaica, NY, but eventually expanded "to at least 10 different clinic locations in Brooklyn, Queens, and the Bronx." *Id*. at ¶ 44.

256. At each clinic location, Kay arranged leases for Clarke's practice, which involved specific requirements such as writing prescriptions for pharmaceuticals:

---

[1] Clarke's penalty included a 36-month stayed suspension of his medical license, 36 month term of probation, and a $10,000 fine. Clarke further is prohibited from ordering, performing, or interpreting electrodiagnostic nerve and muscle studies or forming, owning, controlling, or practicing under more than 1 professional corporation as long as Clarke is a licensed physician in New York

> 29.    Another condition of Dr. Clarke's work at each clinic – and one that I negotiated on behalf of the practice – was that he would be required to write certain prescriptions – namely, for physical therapy (to be provided by the physical therapist at the clinic), DME (to be provided by the DME companies affiliated with the clinic), MRIs (to be provided by the radiology companies affiliated with the clinic), and pharmaceuticals (to be provided by the pharmacies affiliated with the clinic).

257.    Compliance with the requirements was mandatory, according to Kay:

> 30.    I understood from my negotiations with the clinic managers that if Dr. Clarke refused to write these prescriptions, our practice would not gain access to each clinic's patient base.

258.    Here, the Pharmacy Defendants billed for numerous prescriptions generated by Clarke's practice, which were the product of fraudulent treatment protocols.

259.    Another frequent source of referrals for John Street Pharmacy was non-party Jonathan Simhaee, M.D. ("Simhaee"), a provider treating patients of non-party FJ Orthopaedics and Pain Management, PLLC ("FJ Ortho") under the umbrella of "Brooklyn Premier Orthopedics" who allegedly participated in a scheme to defraud fueled by unlawful referrals among a network of interrelated facilities. *See Allstate Ins. Co. v. Advanced Recovery Equipment & Supplies, LLC*, No. 22-cv-05232-HG (E.D.N.Y.).

260.    The below chart contains representative examples of unnecessary Topical Pain Products billed to Allstate pursuant to prescriptions referred to John Street Pharmacy by Simhaee:

| Claimant | Date of Prescription(s) | Billed-For Drugs and Medications |
|---|---|---|
| R.C. (claim no. 0538218017) | 11/10/2020 | Diclofenac sodium 1.5% solution; Lidocaine 5% ointment |
| H.W. (claim no. 0597667518) | 9/17/2020 | Diclofenac sodium 3% gel; Medx patch 0.0375-20-4.5% |
| S.S. (claim no. 0563236629) | 8/21/2020 | Medx patch 0.0375-20-4.5%; Fenoprofen calcium tab |
| R.N. (claim no. 0605524628) | 11/12/2020 | Diclofenac sodium 1.5% solution; Cyclobenzaprine HCL tab; Diclofenac sodium 3% gel; Fenoprofen calcium 400mg cap |
| L.N. (claim no. 0605524628) | 11/12/2020 | Diclofenac sodium gel 3%; Cyclobenzaprine HCL tab; Lidocaine 4% patch |
| D.S. (claim no. 0597558329) | 11/2/2020 | Diclofenac sodium 1.5% solution |
| D.S. (claim no. 0597558329) | 6/15/2021 | Diclofenac sodium 1.5% solution; Cyclobenzaprine HCL tab |
| D.S. (claim no. 0597558329) | 7/9/2021 | Tizanidine HCL tab; Lidocaine 5% ointment |

261. Non-party provider Ranga Krishna, M.D. ("Krishna") also sent numerous prescriptions to John Street Pharmacy and Alight Rx for topical products.

262. Krishna pleaded guilty in 2012 to 1 count of tax fraud in violation of New York criminal law resulting from his submission of false documents regarding business expenses for his medical practice, Total Neuro Care P.C. ("Total Neuro").

263. Krishna was sanctioned by 4 state medical boards as a result of his conviction, including the New York State Board for Professional Medical Conduct. *See Tardif v. City of N.Y.*, No. 13-CV-4056 (KMW), 2022 U.S. Dist. LEXIS 112295, *4 (S.D.N.Y. 2022) (holding that "Krishna's May 2012 conviction for felony tax fraud" was admissible to impeach his trustworthiness as an expert witness, particularly where he had "not shown signs of reforming his

ways" and because "[a] willingness to submit false information to enrich one's medical practice is highly relevant to a doctor's credibility…").

264.   The below chart contains representative examples of unnecessary Topical Pain Products billed to Allstate pursuant to prescriptions referred to John Street Pharmacy and Alight Rx by Krishna for patients of Total Neuro:

| Claimant | Pharmacy Defendant | Date of Prescription(s) | Billed-For Drugs and Medications |
|---|---|---|---|
| R.K. (claim no. 0672513397) | John Street Pharmacy | 6/30/2022 | Diclofenac potassium 50mg tab; Diclofenac sodium 1.5% solution |
| P.D. (claim no. 0632043824) | John Street Pharmacy | 1/14/2022 | Diclofenac sodium 1.5% solution |
| O.S. (claim no. 0632473970) | John Street Pharmacy | 7/25/2022 | Diclofenac sodium 1.5% solution |
| E.F. (claim no. 0618233233) | John Street Pharmacy | 3/19/2021 | Diclofenac sodium 1.5% solution |
| D.A. (claim no. 0600455398) | John Street Pharmacy | 8/30/2021 | Diclofenac sodium 1.5% solution |
| L.L. (claim no. 0598424588) | John Street Pharmacy | 2/16/2021 | Diclofenac sodium 1.5% solution |
| L.J. (claim no. 0580272698) | John Street Pharmacy | 1/29/2021 | Diclofenac sodium 1.5% solution |
| A.B. (claim no. 0696686336) | Alight Rx | 5/26/2023 | Diclofenac sodium 1.5% solution |
| T.M. (claim no. 0707763249) | Alight Rx | 4/8/2023 | Diclofenac sodium 3% gel |
| J.C. (claim no. 0714436607) | Alight Rx | 8/7/2023 | Diclofenac sodium 3% gel |
| N.R. (claim no. 0721330520) | Alight Rx | 8/15/2023 | Diclofenac sodium 2% solution |
| P.F. (claim no. 0719811191) | Alight Rx | 8/11/2023 | Lidocaine 4% film |

## B.     FRAUDULENT PHARMACY BILLING

265.   The Pharmacy Defendants only billed for a limited slate of drugs.

266. The Defendants deliberately pushed the Topical Pain Products through the Pharmacy Defendants because they could acquire the drugs at a low cost and then bill Allstate for them at high prices.

267. The prescriptions were phony or fabricated in certain cases, such as those transmitted via telephone by Metro Pain and Tri-borough. Other prescriptions were generated as the result of fraudulent treatment protocols, such as the prescriptions issued by non-party Clarke's practice.

268. Even if the prescriptions were needed (they were not), the claimants still had no choice of where to obtain the medications, which were purportedly delivered to the claimants at their homes or at the prescribing clinics.

269. The Defendants devised and executed their scheme knowing that (a) the prescriptions were issued pursuant to a predetermined protocol of medically unnecessary and ineffective drugs and medications, including Topical Pain Products, which elevated profits over genuine patient care, (b) the prescriptions were invalid under New York law, (c) the prescriptions were issued in exchange for unlawful kickbacks or other incentives, and (d) the No-Fault claim documents submitted to Allstate falsely represented the Pharmacy Defendants' eligibility to collect No-Fault payments.

### 1.    Predetermined Prescription Protocol

270. The Defendants limited the prescribers and clinic controllers to certain predetermined drugs and medications, including topical gels, ointments, topical pain patches, and NSAIDs, regardless of whether patients needed, or even wanted, these drugs and medications.

271.    The Pharmacy Defendants billed Allstate for the same recurring set of Topical Pain Products that were unnecessary, unwarranted, and ineffective, including: diclofenac sodium 3% gel, lidocaine 5% ointment, and lidocaine 5% patches.

272.    The Pharmacy Defendants billed Allstate for several of the same drugs and medications, including the same Topical Pain Products:

| Specific Drugs Billed by All Pharmacy Defendants |
|---|
| Lidocaine 5% Patch (NDC No. 00591-3525-30) |
| Diclofenac sodium 3% gel (NDC No. 51672-1363-07) |
| Diclofenac sodium 1.5% solution (NDC No. 65162-0911-74) |
| Ibuprofen tablets (NDC No. 67877-0320-05) |

273.    The Defendants focused on billing for these expensive Topical Pain Products even though substantially similar products were available over-the-counter at a fraction of the cost.

274.    The Defendants intentionally based their fraudulent scheme on steering providers to prescribe these specific Topical Pain Products to be billed for by the Pharmacy Defendants, in place of other less expensive products, to maximize the amounts collected by the Defendants in violation of New York's No-Fault laws.

275.    The same Topical Pain Products were ordered for different claimants on the same day by the same prescriber, which is evidence that these medications were prescribed as part of a predetermined treatment protocol without any regard for whether the Topical Pain Product was necessary or effective.

276.    Different patients, with unique injuries and physical characteristics, should not be prescribed identical courses of drugs and medications that are not tailored to an individualized treatment plan.

277.    For example, claimants A.M. (claim no. 0622440089) and J.P. (claim no. 0622440089) were involved in a motor vehicle accident on April 5, 2021 and both sought treatment at Metro Pain on April 16, 2021.

278.    According to the reports of these initial examinations, Metro Pain provider Alleyne prescribed both A.M. and J.P. Flexeril, Naprosyn, and lidocaine 5% ointment:

*A.M. (claim no. 0622440089)*



*J.P. (claim no. 0622440089)*

279.    Notably, despite Alleyne specifically **not** marking the initial examination report to prescribe diclofenac sodium 3% gel, both A.M. and J.P. were prescribed diclofenac sodium 3% gel by another Metro Pain provider, Inna Levtsenko, NP, on April 20, 2021, along with cyclobenzaprine (i.e., Flexeril), a muscle relaxant, which medications were billed to Allstate by John Street Pharmacy.

280. Non-party provider Inna Levtsenko, NP allegedly has represented "that the medical clinic where she worked was run and controlled by unlicensed laypersons and that she was instructed to issue prescriptions for medically unnecessary DME." *Liberty Mut. Ins. Co. v. Nu Age Med Solutions, Inc.*, No. 1:23-cv-07985 (E.D.N.Y.).

281. A.M. and J.P. were subjected to a predetermined, identical, and indiscriminate protocol of medications that was not tailored to their individual and distinct needs.

282. As demonstrated by the following examples, the Pharmacy Defendants routinely submitted No-Fault claims for different claimants that were prescribed the same drug, by the same provider, on the same day:

| Claim Number | Claimant | Date of Prescription | Medication(s) Prescribed | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|
| 0609336994 | A.B. | 12/11/2020 | Diclofenac sodium 3% gel | Camari Wallace, M.D. | John Street Pharmacy |
| 0609336994 | M.B. | 12/11/2020 | Diclofenac sodium 3% gel | Camari Wallace, M.D. | John Street Pharmacy |
| 0444550735 | K.S. | 5/17/2017 | Diclofenac 1.5% solution; Lidocaine 5% ointment | Charles Hindz, DO | Acutus |
| 0444550735 | K.M. | 5/17/2017 | Diclofenac 1.5% solution; Lidocaine 5% ointment | Charles Hindz, DO | Acutus |
| 0620469825 | R.K. | 4/2/2021 | Diclofenac sodium 3% gel | Inna Levtsenko, NP | John Street Pharmacy |
| 0620469825 | A.D. | 4/2/2021 | Diclofenac sodium 3% gel | Inna Levtsenko, NP | John Street Pharmacy |
| 0555868462 | D.R. | 7/30/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| 0555868462 | C.B. | 7/30/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| 0566947909 | S.M. | 11/6/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| 0566947909 | L.J. | 11/6/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |

| Claim Number | Claimant | Date of Prescription | Medication(s) Prescribed | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|
| 0575054985 | J.H. | 1/14/2020 | Diclofenac sodium 3% gel | William Elton, M.D. | John Street Pharmacy |
| 0575054985 | R.C. | 1/14/2020 | Diclofenac sodium 3% gel | William Elton, M.D. | John Street Pharmacy |
| 0713913846 | S.D. | 5/17/2023 | Cyclobenzaprine 7.5mg; Naproxen 375mg | John Vlattas, M.D. | Alight Rx |
| 0713913846 | A.M. | 5/17/2023 | Cyclobenzaprine 7.5mg; Naproxen 550mg | John Vlattas, M.D. | Alight Rx |
| 0712776152 | A.M. | 7/26/2023 | Cyclobenzaprine 7.5mg; Naproxen 375mg | John Vlattas, M.D. | Alight Rx |
| 0712776152 | G.M. | 7/26/2023 | Cyclobenzaprine 7.5mg; Naproxen 375mg | John Vlattas, M.D. | Alight Rx |
| 0706665998 | S.T. | 6/9/2023 | Diclofenac sodium 3% gel | Ranga Krishna, M.D. | Alight Rx |
| 0706665998 | O.T. | 6/9/2023 | Diclofenac sodium 3% gel | Ranga Krishna, M.D. | Alight Rx |

283.    In numerous other cases, the Pharmacy Defendants billed for Topical Pain Products that were prescribed during the initial visit, often within days of the reported accidents, as illustrated in the chart below:

| Claimant | Date of Loss | Date of Initial Exam | Date of Rx | Medication | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|---|
| S.B. (claim no. 0546563859) | 5/15/2019 | 5/16/2019 | 5/16/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| H.K. (claim no. 0555868462) | 7/22/2019 | 7/30/2019 | 7/30/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| E.B. (claim no. 0516914942) | 9/12/2018 | 9/18/2018 | 9/18/2018 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| K.S. (claim no. 0578444713) | 2/14/2020 | 3/5/2020 | 3/5/2020 | Diclofenac sodium 3% gel | William Elton, M.D. | John Street Pharmacy |

| Claimant | Date of Loss | Date of Initial Exam | Date of Rx | Medication | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|---|
| M.B. (claim no. 0609336994) | 12/10/2020 | 12/11/2020 | 12/11/2020 | Diclofenac sodium 3% gel | Camari Wallace, M.D. | John Street Pharmacy |
| A.B. (claim no. 0609336994) | 12/10/2020 | 12/11/2020 | 12/11/2020 | Diclofenac sodium 3% gel; Lidocaine 5% ointment | Camari Wallace, M.D. | John Street Pharmacy |
| T.H. (claim no. 0518597199) | 9/6/2018 | 9/25/2018 | 9/25/2018 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| M.T. (claim no. 0602158362) | 10/2/2020 | 10/8/2020 | 10/8/2020 | Lidocaine 5% ointment | William Elton, M.D. | John Street Pharmacy |
| T.G. (claim no. 0505827261) | 6/14/2018 | 7/9/2018 | 7/9/2018 | Lidocaine 5% patch; Naproxen tab; Diclofenac sodium 3% gel | Theodros Seyoum, M.D. | Acutus |
| J.M. (claim no. 0585912538) | 5/3/2020 | 5/14/2020 | 5/14/2020 | Lidocaine 5% ointment; Cyclobenzaprine tab | Hong Pak, M.D. | John Street Pharmacy |
| J.G. (claim no. 0553466632) | 7/8/2019 | 7/23/2019 | 7/23/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| D.R. (claim no. 0555868462) | 7/27/2019 | 7/30/2019 | 7/30/2019 | Diclofenac sodium 3% gel | William Elton, M.D. | Acutus |
| M.P. (claim no. 0610306409) | 12/12/2020 | 8/30/2021 | 8/30/2021 | Lidocaine 5% ointment; Cylobenzaprine tab; Naproxen tab; Diclofenac sodium 1.5% solution | Jonathan Simhaee, M.D. | John Street Pharmacy |
| S.A. (claim no. 0706952421) | 3/17/2023 | 4/4/2023 | 4/4/2023 | Lidocaine 4% film | Matthew Valvo, PA | Alight Rx |
| S.J. (claim no. 0709615305) | 4/9/2023 | 5/2/2023 | 5/2/2023 | Methyl salicylate 25% topical cream | Kevin Frison, M.D. | Alight Rx |

| Claimant | Date of Loss | Date of Initial Exam | Date of Rx | Medication | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|---|
| S.R. (claim no. 0714424322) | 5/14/2023 | 5/18/2023 | 5/18/2023 | Naproxen 375mg; Lidocaine 4% patch; Methyl salicylate 25% topical cream | Kevin Frison, M.D. | Alight Rx |
| C.A. (claim no. 0715162806) | 5/23/2023 | 5/30/2023 | 5/30/2023 | Duexis 800mg-26.6mg; Lidocaine 4% patch; Cyclobenzaprine 10mg | Kevin Frison, M.D. | Alight Rx |

284.    Topical Pain Products were prescribed pursuant to a predetermined protocol, often at the outset of treatment, without regard for the patients' actual unique clinic needs.

285.    The Defendants' scheme focused on particular Topical Pain Products that could be acquired at a low cost, but then billed to Allstate at a massive mark-up, which allowed the Defendants to realize a substantial profit for every prescription at Allstate's and the claimants' expense.

286.    The charts attached hereto as Exhibits 2-4 illustrate the Pharmacy Defendants' disproportionate focus on billing for Topical Pain Products, including the following most commonly billed-for products:

| Drug Name | NDC | Pharmacy Defendant(s) |
|---|---|---|
| Diclofenac sodium 3% gel (Amneal) | 00115-1483-61 | Acutus; John Street Pharmacy |
| Diclofenac sodium 3% gel (Sandoz) | 00168-0844-01 | Acutus |
| Diclofenac sodium 3% gel (Taro) | 51672-1363-07 | Acutus; John Street Pharmacy |
| Diclofenac sodium 3% gel (Glenmark) | 68462-0355-94 | John Street Pharmacy; Alight Rx |
| Lidocaine 5% ointment (Akorn) | 50383-0933-35 | Acutus; John Street Pharmacy |

| Drug Name | NDC | Pharmacy Defendant(s) |
|---|---|---|
| Lidocaine 5% ointment (Amneal) | 65162-0918-38 | Acutus; John Street Pharmacy |
| Lidocaine 5% ointment (Ascend) | 67877-0473-80 | Acutus; John Street Pharmacy |
| Lidocaine 5% ointment (Sandoz) | 00168-0204-37 | Acutus |
| Lidocaine 5% ointment (Taro) | 51672-3008-03 | Acutus |
| Lidocaine 5% ointment (Teligent) | 52565-0008-55 | Acutus; John Street Pharmacy |
| Lidocaine 5% ointment (Glenmark) | 68462-0418-27 | John Street Pharmacy |
| Lidocaine 5% ointment (Strides) | 64380-0789-33 | John Street Pharmacy; Alight Rx |
| Lidocaine 5% ointment (Taro) | 51672-3008-05 | John Street Pharmacy |
| Lidocaine 5% patch (Mylan) | 00378-9055-93 | Acutus |
| Lidocaine 5% patch (Par) | 00603-1880-16 | Acutus |
| Lidocaine 5% patch (Teva) | 00591-3525-30 | Acutus |
| 1st Medx Patch with lidocaine | 72137-0113-15 | Alight Rx |
| Diclofenac sodium 1.5% sol. (Amneal) | 65162-0911-74 | John Street Pharmacy; Alight Rx |
| Diclofenac sodium 1.5% sol. (Sircle) | 51021-0250-05 | John Street Pharmacy |
| Diclofenac sodium 1.5% sol. (Sola) | 70512-0025-05 | John Street Pharmacy |
| Lidocaine 4% patch (Alexso) | 50488-2004-01 | John Street Pharmacy; Alight Rx |
| Lidocaine 4% patch (USPharma) | 71594-0602-05 | John Street Pharmacy |

287.    One of the most popular drugs pushed by the Defendants was the generic form of lidocaine 5% ointment.

288.    Acutus and John Street Pharmacy billed for generic lidocaine 5% ointment with NDC No. 52565-0008-55.

289.    John Street Pharmacy and Alight Rx billed for generic lidocaine 5% ointment with NDC No. 64380-0789-33.

290.    The published AWP of lidocaine 5% ointment (NDC Nos. 52565-0008-55 and 64380-0789-33) is $380.93 per 50-gram package.

291.    Under the Defendants' predetermined prescription protocol, claimants routinely were prescribed 200 grams of lidocaine 5% ointment, which inflated the total AWP of the prescription to $1,523.72 for a 200-gram supply.

292.    The Defendants deliberately billed for lidocaine 5% ointment under NDC Nos. 52565-0008-55 and 64380-0789-33 to exploit the spread between the AWP and the actual market price.

293.    The wholesale acquisition price (WAC) of lidocaine 5% ointment sold under NDC No. 52565-0008-55 is only $25.00 for a 50-gram supply.

294.    The wholesale acquisition price (WAC) of lidocaine 5% ointment sold under NDC No. 64380-0789-33 is only $15.00 for a 50-gram supply.

295.    The WAC is an important metric because it generally stands for what the pharmacy actually paid for the drug.

296.    However, the Pharmacy Defendants have not provided documents evidencing the actual acquisition cost for the billed-for drugs and medications; any wholesale invoices provided by the Pharmacy Defendants are redacted of the price paid for the drug.

297.    For example, a copy of the wholesale invoice from American Pharmaceutical Distributors to John Street Pharmacy for lidocaine 5% ointment concealed the unit price and total amount paid by John Street Pharmacy for this product:



298.    The WAC of lidocaine 5% ointment billed under NDC No. 52565-0008-55 was especially important because the Defendants knew that they could charge approximately $1,218.97 for a 200-gram supply (after application of the 20% reduction required under applicable New York law).

299.    Acquiring the lidocaine 5% ointment at or around a WAC of $25.00 per 50 grams meant that the Defendants realized a profit of over $1,100.00 each time that Acutus and John Street Pharmacy billed for a 200-gram supply of lidocaine 5% ointment under NDC No. 52565-0008-55.

300.    Acquiring the lidocaine 5% ointment at or around a WAC of $15.00 per 50 grams meant that the Defendants realized a profit of over $1,100.00 each time that John Street Pharmacy and Alight Rx billed for a 200-gram supply of lidocaine 5% ointment under NDC No. 64380-0789-33.

301.    The Pharmacy Defendants also took advantage of the steep divide between the AWP and WAC for the diclofenac sodium 3% gel under certain NDCs.

302.    The Pharmacy Defendants billed Allstate for diclofenac sodium 3% gel with NDC No. 00115-1483-61 and/or NDC No. 68462-0355-94.

303.    The published AWP of a 100-gram package of diclofenac sodium 3% gel sold under NDC No. 00115-1483-61 was $1,132.28 during the relevant period.

304.    The published AWP of a 100-gram package of diclofenac sodium 3% gel sold under NDC No. 68462-0355-94 was $1,179.46 during the relevant period.

305.    Claimants routinely were prescribed a 200-gram supply of diclofenac sodium 3% gel under the Defendants' predetermined protocol, which meant that the Pharmacy Defendants could charge between approximately $1,811.64 and $1,887.14 for each patient that received the drug (after application of the 20% reduction required under applicable New York law).

306.    The WAC for diclofenac sodium 3% gel under NDC No. 00115-1483-61 as of February 24, 2020 was $92.97 per 100 grams.

307.    The WAC for diclofenac sodium 3% gel under NDC No. 68462-0355-94 as of January 1, 2021 was $92.97 per 100 grams.

308.    Acquiring diclofenac sodium 3% gel at or around this WAC of $92.97 per 100 grams meant that the Defendants realized a profit of between over $1,600.00 and $1,700.00 each time that the Pharmacy Defendants billed for a 200-gram supply of diclofenac sodium 3% gel under NDC No. 00115-1483-61 or NDC No. 68462-0355-94.

309.    The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

310.    Even though the Defendants concealed their acquisition costs in documents submitted to Allstate, wholesale price histories during the relevant period for many of the Topical Pain Products billed for by the Pharmacy Defendants, including, but not limited to, lidocaine 5% ointment (NDC No. 67877-0473-80), diclofenac sodium 3% gel (NDC No. 68462-0355-94), and diclofenac sodium 1.5% solution (NDC No. 71085-0002-05), reflect per-unit costs that were far below the amounts billed by the Pharmacy Defendants.

311.    For example, during the relevant period, a 50-gram tube of lidocaine 5% ointment billed under NDC No. 67877-0473-80 was available for purchase at wholesale by pharmacies for $7.00 per unit; this product has an AWP of $380.50.

312.    John Street Pharmacy billed Allstate a total of  $613.80 for a 100-gram supply of lidocaine 5% ointment under NDC No. 67877-0473-80 in connection with claimant M.T. (claim no. 0602158362), which means that 1 order of lidocaine 5% ointment yielded a profit of nearly $600:



313.    Likewise, Acutus billed Allstate a total of $613.80 for a 100-gram supply of lidocaine 5% ointment under NDC No. 67877-0473-80 in connection with claimant P.T. (claim

no. 0466300860), which was similarly intended to yield a profit of almost $600 for a singular

prescription:



314. Similarly, diclofenac sodium 3% gel under NDC No. 68462-0355-94 was available

for purchase at wholesale during the relevant period at a cost of $18.35 per 100 grams and has an

AWP of $1,179.46.

315. For example, John Street Pharmacy billed Allstate a total of $1,892.20 for a 200-

gram supply of diclofenac sodium 3% gel purportedly dispensed to claimant H.W. (claim no.

0597667518), which represents a potential profit of over $1,850.00 for 1 prescription of diclofenac

sodium 3% gel:



316. Likewise, Alight Rx billed Allstate a total of $948.57 for a 100-gram supply of diclofenac sodium 3% gel purportedly dispensed to claimant J.C. (claim no. 071436607), which represents a total profit of over $930.00 for 1 prescription of diclofenac sodium 3% gel:



317. Diclofenac sodium 1.5% solution under NDC No. 71085-0002-05 was available to pharmacies at wholesale during the relevant period at a cost of $22.00 per 150ml; this product has an AWP of $1,350.00 per 150ml.

318.    Acutus also submitted charges totaling the full AWP of $1,350.00—without the required 20% reduction—for 150ml of diclofenac sodium 1.5% solution under NDC No. 71085-0002-05 purportedly dispensed to claimant F.A. (claim no. 0472973296):



319.    The spread between the acquisition cost for the billed-for drugs and the amounts charged reveals the Defendants' motivation to pursue the scheme to defraud to bill for a predetermined protocol of unnecessary and ineffective drugs and medications, which placed profits above patient care.

## 2.    Billing for Non-Prescription Drugs

320.    New York's No-Fault laws provide coverage for prescription drugs, but over-the-counter drugs, which can be dispensed without a prescription, are not covered.

321.    Despite this prohibition, John Street Pharmacy and Alight Rx knowingly and intentionally demanded payment from Allstate, under New York's No-Fault laws, for over-the-counter medications, specifically lidocaine 4% patches, purportedly dispensed and delivered to Allstate Claimants.

59

322.    Lidocaine 4% patches under NDC No. 50488-2004-01, a product classified as over-the-counter, have an AWP of $460.00 for a package of 10 patches.

323.    Therefore, John Street Pharmacy and Alight Rx could charge $1,104.00 for a 30 day supply of lidocaine 4% patches under NDC No. 50488-2004-01 (after the required 20% reduction).

324.    A package of 15 lidocaine 4% patches available over-the-counter at a neighborhood drug store (e.g., Salonpas patches) can be purchased for approximately $25.00.

325.    Therefore, John Street Pharmacy and Alight Rx were motivated to bill for lidocaine 4% patches in terms of the AWP in place of lower-cost alternatives.

326.    While John Street Pharmacy and Alight Rx could charge $1,104.00 for a 30-day supply of lidocaine 4% patches under NDC No. 50488-2004-01 (after the required 20% reduction), they could only charge $246.62 for lidocaine 5% patches under NDC Nos. 00378-9055-93 and 00603-1880-16 (after the required 20% reduction), which carry an AWP of $308.27 per package of 30 patches.

327.    John Street Pharmacy deliberately steered prescribing providers to prescribe lidocaine 4% patches rather than lidocaine 5% patches to take advantage of the lidocaine 4% patches' higher AWP.

328.    For instance, prescribing provider Colin Clarke, M.D. ("Clarke") purported to prescribe lidocaine 5% patches for claimant P.R. (claim no. 0624612297), even though the report of his initial examination of P.R. on May 14, 2021 does not list lidocaine patches among the prescribed medications, including "lidocaine ointment" and "diclofenac patch":



MRI left hip for further evaluation.

Physical therapy for treatment of injuries.

Acupuncture for treatment of injuries.

Two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad for home use.

Lidocaine ointment tid prn*

Diclofenac patch bid prn*

Meloxicam 15mg ipo qd prn*

Cyclobenzaprine 7.5mg ipo hs prn*

Disability:    At this time, the patient has a partial disability.

Follow-up:    The patient has been scheduled for follow-up on 6/18/2021.

Colin Clarke, M.D.

329. However, John Street Pharmacy noted on Clarke's prescription for lidocaine 5% patches that "due to ins[urance] plan limitations[,] MD authorized switch to" lidocaine 4% patches:

330. As indicated in the notation "No Fault" on the prescription, John Street Pharmacy recognized that claimant P.R. was a No-Fault claimant, and thus induced the prescribing provider

to agree to switch the prescription to lidocaine 4% patches under the pretext of "insurance plan limitations" because billing for lidocaine 4% patches was more lucrative than billing for the prescribed lidocaine 5% patches.

331. There is also evidence that "Oksana," a clinic manager at Metro Pain's 90-16 Sutphin Blvd clinic, telephoned in unauthorized prescriptions for lidocaine 4% patches to John Street Pharmacy.

332. For instance, claimant D.W. (claim no. 0616660767) purportedly underwent an examination at Metro Pain at 90-16 Sutphin Blvd, Jamaica, NY.

333. The report of this initial examination of D.W. indicated the prescription of certain medications by circling preprinted topical pain products, including lidocaine 5% patches and diclofenac sodium 3% gel:

334. Lidocaine 4% patches were not among the medications purportedly prescribed at this February 17, 2021 initial examination of D.W.

335. However, John Street Pharmacy billed Allstate for lidocaine 4% patches supposedly prescribed by non-party Leonid Shapiro, M.D. ("Shapiro"), the record owner of Metro Pain, on February 17, 2021:



336.    Despite no indication in the initial examination report of any reason why electronic prescribing was not available to Metro Pain or of any prescription for lidocaine 4% patches, Oksana purportedly telephoned in the prescription for lidocaine 4% patches for D.W. to John Street Pharmacy.

337.    However, this prescription was merely an unsigned copy that, upon information and belief, was not authorized by Shapiro—who did not examine or treat D.W. on February 17, 2021—but, rather, transmitted by Oksana by telephone to John Street Pharmacy as a result of Metro Pain's unlawful referral relationship with John Street Pharmacy.

338.    Likewise, claimant G.A.A. (claim no. 0620232355) was examined by Inna Levtsenko, NP ("Levtsenko") at Tri-borough (the successor to Metro Pain) at the clinic located at 90-16 Sutphin Blvd, Jamaica, NY on June 22, 2021.

339.    The report of this June 22, 2021 examination shows that Levtsenko did not prescribe any medications at this encounter:

63

**Medication Prescribed:**

Flexeril  Skelaxin  Ibuprofen 800 mg Celecoxib Capsules 200 mg  Naprosyn 500 mg

LIDOCAINE/LIDODERM 5 % PATCHES or OITMENT 5 %    100-GRAMS/200-GRAMS
1 patch transdermally daily remove after 12 hours to most painful area

DICLOFENAC 3% GEL  Qty: _____ (1 application topically to affected area 2 times per day)
AAA 3-4 TIMES DAILY  100-Grams  200-Grams  300-Grams
Flector 1.3 % Transdermal Patch_____Dispense_____ Days Supply
1 patch transdermally 2 times per day to most painful area

340.    However, on June 28, 2021 and July 26, 2021, John Street Pharmacy billed Allstate for lidocaine 4% patches purportedly prescribed by Levtsenko on June 22, 2021 and transmitted via telephone to John Street Pharmacy by Oksana:



341.    On July 21, 2021, Levtsenko again examined G.A.A. at Tri-borough.

342.    The report of this examination recorded that G.A.A. did not have any current medication despite Levtsenko purportedly having prescribed lidocaine 4% patches to G.A.A. the previous month:



343.    The report of this examination of G.A.A. also shows that Levtsenko did not prescribe any medications; indeed, the section of the report labeled "Medication Prescribed" is struck out entirely:

**Medication Prescribed:**

Flexeril  Skelaxin  Ibuprofen 800 mg  Celecoxib Capsules 200 mg  Naprosyn 500 mg

LIDOCAINE/LIDODERM 5 % PATCHES or OITMENT 5 %    100-GRAMS/200-GRAMS
1 patch transdermally daily remove after 12 hours to most painful area

DICLOFENAC 3% GEL   Qty: _____ (1 application topically to affected area 2 times per day)
AAA 3-4 TIMES DAILY  100-Grams  200-Grams  300-Grams
Flector 1.3 % Transdermal Patch____Dispense_____ Days Supply
1 patch transdermally 2 times per day to most painful area

344.    On September 20, 2021, John Street Pharmacy billed Allstate for lidocaine 4% patches purportedly prescribed by Levtsenko 2 months earlier on July 21, 2021 via telephone:



345.    Despite no indication in the examination reports of any reason why electronic prescribing was not available to Tri-borough or of any prescription for lidocaine 4% patches, Levtsenko purportedly telephoned in the prescriptions for lidocaine 4% patches to John Street Pharmacy on July 21, 2021.

346.    However, these prescriptions were merely unsigned copies that, upon information and belief, were not authorized by Levtesenko but, rather, transmitted by telephone to John Street Pharmacy as a result of Tri-borough's unlawful referral relationship with John Street Pharmacy.

347.    The prescribing providers never recommended that patients use readily available over-the-counter lidocaine 4% patches, such as Salonpas, which may be purchased at a fraction of the cost of the lidocaine 4% patches billed to Allstate by John Street Pharmacy and Alight Rx.

348.    John Street Pharmacy and Alight Rx's purported dispensing of these over-the-counter and non-prescription products to Allstate Claimants was a major component of the Defendants' scheme to defraud Allstate.

66

349.    Indeed, because lidocaine 4% patches do not actually require a prescription, they are not covered drug items under New York's No-Fault laws.

350.    Even though charges for the lidocaine 4% patches are not reimbursable under New York's No-Fault laws, John Street Pharmacy and Alight Rx purportedly dispensed these products to Allstate Claimants, and have sought—pursuant to assignment of benefit agreements with these claimants—No-Fault benefit reimbursement from Allstate.

351.    By advancing charges for lidocaine 4% patches in terms of the product's AWP, John Street Pharmacy and Alight Rx took purposeful steps to make it appear that the products were eligible for coverage under the No-Fault laws.

352.    The charges for these products are false and fraudulent because the products are not covered under New York's No-Fault laws.

353.    However, even if they were covered, the charges for these products are still false because, as explained above, the products are medically unnecessary and unwarranted.

354.    To the extent that Allstate was caused to make payments related to any lidocaine 4% patches purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, John Street Pharmacy and Alight Rx in connection with these falsely-charged, over-the-counter items.

355.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, John Street Pharmacy and Alight Rx in connection with these lidocaine 4% patches remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these lidocaine 4% patches are not eligible for reimbursement under New York's No-Fault laws, and even if these over-the-counter items were eligible for reimbursement,

these items were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries.

### 3.   Billing for Medications That Were Unwanted and Unused

356.   In addition to being wholly medically unnecessary, the drugs and medications prescribed to claimants and billed for by the Pharmacy Defendants were not wanted by the claimants.

357.   There is evidence that claimants did not use certain medications purportedly dispensed by the Pharmacy Defendants.

358.   For example, a Metro Pain provider, non-party Hong Pak, M.D. ("Pak") prescribed claimant J.M. (claim no. 0585912538) with a 30 day supply of cyclobenzaprine tablets on May 14, 2020, along with lidocaine 5% ointment, which prescriptions were transmitted to John Street Pharmacy.

359.   According to the delivery receipt pertaining to this May 14, 2020 prescription, the cyclobenzaprine tablets were not delivered to J.M. until June 2, 2020 along with the lidocaine 5% ointment and diclofenac sodium 3% gel prescribed by Pak on May 19, 2020.

360.   Pak ordered urine drug testing for J.M.

361.   J.M.'s sample for the testing was collected on June 23, 2020, within the time period of the 30 day supply of cyclobenzaprine tablets that he purportedly received on June 2, 2020.

362.   However, the results of J.M.'s urine drug test were negative for cyclobenzaprine:

| | | |
|---|---|---|
| (6-hydroxbutyl) metabolite | Negative | 100 ng/mL |
| **MUSCLE RELAXANTS** | | |
| Carisoprodol | Negative | 100 ng/mL |
| Cyclobezaprine HCl | Negative | 50 ng/mL |
| Meprobamate | Negative | 100 ng/mL |

363.    Therefore, J.M. did not take the cyclobenzaprine as prescribed by Pak and dispensed by John Street Pharmacy, if he received the medication at all.

364.    J.M.'s failure to take the prescribed cyclobenzaprine underscores that this medication was not medically necessary or even wanted by J.M.

365.    Upon information and belief, other drugs and medications, including Topical Pain Products, dispensed by the Pharmacy Defendants likewise were not wanted or used by the claimants purportedly receiving them as part of the Defendants' predetermined protocol.

### 4.    Billing for Medically Worthless Topical Pain Products

366.    The Pharmacy Defendants billed Allstate for topical NSAIDs, including diclofenac sodium 3% gel, lidocaine 5% ointment, and lidocaine 4% or 5% patches, that were medically unnecessary and not indicated for musculoskeletal injuries.

367.    Topical pain medications, including topical NSAIDs, lack proven effectiveness for the treatment of widespread musculoskeletal pain.

368.    In limited circumstances, topical NSAIDs may be indicated where the patient failed a trial of oral medications, has specific allergies to certain oral medications, has an intolerance for commercially available products or their side effects, or is incapable of swallowing pills.

369.    None of these circumstances are present here: The Pharmacy Defendants' claimants were prescribed topical agents before they even tried oral medications or other commercially available agents

370.    Indeed, Allstate claimants were prescribed concurrent topical and oral NSAIDs billed to Allstate by the Pharmacy Defendants soon after the purported underlying motor vehicle accident without any medical indication, clinical rationale, or documented reasoning.

371.    The rapid use of concurrent oral and topical NSAIDs without medical rationale is not medically necessary and, significantly, potentially injurious to the patients' health and well-being.

372.    Additionally, the claimants' responses and reactions to the drugs were not recorded, and the claimants' individual treatment plans were not changed or altered.

### a.    *Unnecessary Lidocaine 5% Ointment*

373.    The Pharmacy Defendants billed Allstate for lidocaine 5% ointment. *See* Exhibits 2-4.

374.    Lidocaine 5% ointment is not a first-line treatment for musculoskeletal pain, but, rather, is used for temporary pain relief for minor burns, skin abrasions, insect bites, and as a topical anesthetic.

375.    The drug label for lidocaine 5% ointment indicates that it is not effective when applied on intact skin.

376.     Lidocaine 5% ointment is incapable of sufficiently penetrating intact skin.

377.    Although topical lidocaine is sometimes used to treat neuropathic pain in adults, high concentrates must be used because topical lidocaine crosses the skin poorly.

378.    The patients prescribed lidocaine 5% ointment billed to Allstate by the Pharmacy Defendants did not have any documented minor skin conditions or true neuropathic pain warranting lidocaine 5% ointment.

379.    The Pharmacy Defendants' bills for lidocaine 5% ointment are fraudulent and non-compensable, and Allstate is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibits 2-4.

**b.    *Unnecessary Lidocaine 4% and 5% Patches***

380.    The Pharmacy Defendants billed Allstate for topical lidocaine 4% and/or 5% patches ("Lidocaine Patches"). *See* Exhibits 2-4.

381.    Lidocaine Patches are topical analgesics, which can be used to temporarily relieve minor muscle and joint aches and pains.

382.    The efficacy of these patches is very doubtful; they are not supported for use in patients with deep joint injuries (e.g., shoulder and spine injuries), or injuries in multiple areas.

383.    Lidocaine 5% patches are indicated for post-herpetic neuralgia, which is a condition causing nerve pain after shingles.

384.    Lidocaine Patches also increase the risk of lidocaine toxicity because the patch continuously exposes the skin to lidocaine.

385.    An overdose of topical lidocaine can cause serious side effects if too much of the medicine is absorbed through the skin.

386.    The Lidocaine Patches billed by the Pharmacy Defendants were ineffective and unnecessary for the treatment of the claimants because the drug is not proven effective or safe for treating deep joint pain in areas such as the shoulders or back.

387.    The Pharmacy Defendants' bills for the ineffective and medically unnecessary Lidocaine Patches are fraudulent and non-compensable, and Allstate is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibits 2-4.

**c.    *Unnecessary Diclofenac Sodium 3% Gel and 1.5% Solution***

388.    The Pharmacy Defendants billed Allstate for diclofenac sodium 3% gel and/or diclofenac sodium 1.5% solution. *See* Exhibits 2-4.

389.    Diclofenac sodium 3% gel and 1.5% solution are not effective or approved for the topical treatment of a patient's musculoskeletal pain as a result of injuries supposedly sustained in a motor vehicle accident.

390.    Diclofenac sodium 3% gel is FDA-approved for the topical treatment of a skin condition called actinic keratosis, which is characterized by rough, scaly lesions caused by long-term sun exposure.

391.    Diclofenac sodium 3% gel thus is designed for minimal depth of absorption to keep the drug in the skin to optimize treatment of actinic keratosis.

392.    The use of diclofenac sodium 3% gel in patients without actinic keratosis exposes the patients to increased and unnecessary risks for skin irritation, hypersensitivity, and photosensitivity.

393.    Diclofenac also exists in forms of 1% gel and 1.5% solution; it is a NSAID that may be effective in the treatment of pain in the peripheral joints, such as the hand or knee, but it has no proven efficacy for pain relief for larger and deeper joints, such as the spine or shoulder.

394.    Like diclofenac sodium 3% gel, diclofenac sodium 1% gel and diclofenac sodium 1.5% solution are not effective to treat complaints of pain to multiple areas of the body.

395.    Merely because diclofenac sodium 3% gel is triple the concentration of diclofenac sodium 1% gel does not mean that diclofenac sodium 3% gel has triple the effectiveness for the treatment of joint pain, for which condition diclofenac sodium 3% gel is not indicated.

396.    Thus, not only does diclofenac sodium 3% gel lack proven efficacy for pain relief, but diclofenac sodium 3% gel is substantially more toxic topically and systematically than diclofenac sodium 1% gel.

397.    The Fee Schedule calls for reimbursement of diclofenac sodium 3% gel at a much higher rate than generic diclofenac sodium 1% gel.

398.    The generic diclofenac sodium 3% gel billed to Allstate by the Pharmacy Defendants had an AWP of approximately $1,132.00 to $1,179.00 per 100-gram package.

399.    Generic diclofenac sodium 1.5% solution (NDC No. 51021-0250-05) had an AWP of $1,459.52 per 150ml.

400.    Generic diclofenac sodium 1% gel (NDC No. 65162-0833-66) had an AWP of less than $55.00 per 100-gram package during the relevant period.

401.    Therefore, the Pharmacy Defendants could charge no more than $88.00 for each prescription of 200 grams of generic diclofenac sodium 1% gel.

402.    The Pharmacy Defendants could charge over $1,800.00 for each prescription of 200 grams of generic diclofenac sodium 3% gel.

403.    The Pharmacy Defendants also could charge over $1,160.00 for 150ml of diclofenac sodium 1.5% solution.

404.    Since May 2020, diclofenac sodium 1% gel has been available over the counter; a 100-gram tube of Voltaren topical 1% gel may be purchased at retail without a prescription for less than $20.00.

405.    Accordingly, the Defendants were motivated by profit to ensure that prescribers ordered diclofenac sodium 3% gel or diclofenac sodium 1.5% solution for their patients instead of the less expensive diclofenac sodium 1% gel even though the 3% and 1.5% preparations are neither approved nor effective at treating deep joint pain affecting multiple areas.

406. The Pharmacy Defendants were not eligible for No-Fault reimbursement for the diclofenac sodium 3% gel and 1.5% solution billed to Allstate because these drugs were not medically necessary or effective in treating the claimants' musculoskeletal conditions.

407. The Defendants induced healthcare providers to prescribe diclofenac sodium 3% gel and 1.5% solution to permit the Defendants to submit inflated and/or excessive charges for this product.

408. The Pharmacy Defendants' bills for diclofenac sodium 3% gel and 1.5% solution are fraudulent and non-compensable, and Allstate is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibits 2-4.

5. **Specific Examples of Fraudulent Billing for Medically Unnecessary Topical Pain Products**

a. *Exemplar Claim—Claimant C.L. (0497564047)*

409. Claimant C.L. was purportedly involved in a motor vehicle accident on March 14, 2018.

410. Beginning on or about March 26, 2018, C.L. was subjected to treatment and services at the Metro Pain clinic at 90-16 Sutphin Boulevard.

411. On September 18, 2018, non-party physician William Elton, M.D. ("Elton") examined C.L. at Metro Pain for complaints of mild to moderate back pain and intermittent right shoulder pain.

412. Elton has admitted that Metro Pain required its providers to adhere to a predetermined treatment protocol.

413. Elton's report of the September 18, 2018 follow-up examination of C.L. contained a pre-printed checklist for "Medication Prescribed" that was left blank:

Medication Prescribed:

Flexeril_____mg_____ Dispense_____ Days Supply

Skelaxin_____mg_____ Dispense_____ Days Supply

Tramadol_____mg_____ Dispense_____ Days Supply

Ibuprofen _____ mg_____ Dispense_____ Days Supply

Celecoxib Capsules 200 mg _____ Dispense_____ Days Supply

Naprosyn 500 mg_____ Dispense_____ Days Supply

Other_____

LIDOCAINE/LIDODERM 5 % PATCHES or OITMENT 5 %  100-GRAMS/200-GRAMS
1 patch transdermally daily remove after 12 hours to most painful area

_____Dispense_____ Days Supply

DICLOFENAC 3% GEL _____Dispense_____ Days Supply
AAA 3-4 TIMES DAILY
100-GRAMS
200-GRAMS
300-GRAMS

Flector 1.3 % Transdermal Patch____Dispense_____ Days Supply
1 patch transdermally 2 times per day to most painful area

Other_____

414.    However, on October 26, 2018, Elton purportedly prescribed C.L. with ibuprofen 600mg tablets and diclofenac sodium 3% gel even though there is no record of Elton examining C.L. on October 26, 2018.

415.    C.L. had already been prescribed diclofenac sodium 3% gel by other Metro Pain providers on March 26, 2018 and June 11, 2018, which prescriptions were billed to Allstate by another pharmacy.

416.    However, there was no indication in Metro Pain's records that C.L. had experienced any beneficial effect from the diclofenac sodium 3% gel, which is not effective at treating musculoskeletal pain to the shoulders and back, such as that complained of by C.L., because these areas are covered by large muscle masses and thus not amenable to pain relief from Topical Pain Products, including diclofenac sodium 3% gel.

417. Rather, C.L.'s complaints of pain generally remained at the same levels throughout his treatment at Metro Pain.

418. Further, there was no documented justification for the duplicative prescriptions of both oral and topical NSAIDs for C.L., which duplication carries risks of cardiovascular complications.

419. There also was no documentation that C.L. suffered from actinic keratosis, the skin condition for which diclofenac sodium 3% gel is FDA-approved, which condition would not be causally related to the underlying motor vehicle accident.

420. Therefore, there was no clinical justification for Elton's prescription of diclofenac sodium 3% gel for C.L., particularly after C.L. had already been prescribed this Topical Pain Product to no avail.

421. The prescriptions under Elton's name and credentials for these drugs for C.L. were transmitted to Acutus by telephone due to a supposed "glitch" in the electronic prescribing system.

422. However, upon information and belief, Elton did not authorize these prescriptions for C.L., including for the diclofenac sodium 3% gel, which he has testified was prescribed under his name by the manager of the 90-16 Sutphin Boulevard clinic without his knowledge or consent.

423. Acutus charged Allstate for these medically unnecessary medications purportedly dispensed to C.L. on November 2, 2018, including a charge of $1,887.20 for the diclofenac sodium 3% gel.

424. Elton again examined C.L. on January 24, 2019 at the Metro Pain clinic located at 90-16 Sutphin Boulevard for complaints of moderate back pain, intermittent right knee pain, and right shoulder pain after C.L. had undergone right shoulder arthroscopic surgery on October 5, 2018.

425.    Again, the portion of Elton's report of the January 24, 2019 follow-up examination containing a checklist for "Medication Prescribed" was left blank:

Medication Prescribed:

Flexeril____mg _____ Dispense_____ Days Supply

Skelaxin_____mg ___'_ Dispense_____ Days Supply

Tramadol_____mg _____ Dispense_____ Days Supply

Ibuprofen _____ mg _____ Dispense_____ Days Supply

Celecoxib Capsules 200 mg _____ Dispense_____ Days Supply

Naprosyn 500 mg_____ Dispense_____ Days Supply

Other_____-_____—

LIDOCAINE/LIDODERM 5 % PATCHES or OITMENT 5 %   100-GRAMS/200-GRAMS
1 patch transdermally daily remove after 12 hours to most painful area

____Dispense_____ Days Supply

DICLOFENAC 3% GEL   ____Dispense_____ Days Supply       .
AAA 3-4 TIMES DAILY
100-GRAMS
200-GRAMS
300-GRAMS

Flector 1.3 % Transdermal Patch____Dispense_____ Days Supply
1 patch transdermally 2 times per day to most painful area

426.    However, on February 7, 2019, Elton again prescribed ibuprofen 600mg tablets and 200 grams of ineffective and unnecessary diclofenac sodium 3% gel to C.L.

427.    Acutus billed Allstate for these medically unnecessary medications, which purportedly were not dispensed to C.L. until March 7, 2019, including a charge of $1,897.20 for the diclofenac sodium 3% gel.

428.    The month-long delay between the date when Elton purportedly prescribed the medications to C.L. and the date that they were delivered to C.L. further underscores the lack of medical necessity for the medications in treatment of C.L.'s complaints of musculoskeletal pain.

429. To the extent that Allstate paid Acutus in reliance on the documents created and submitted in connection with the drugs and medications for C.L., Allstate is entitled to recover all payments made to Acutus in connection with these services, including, but not limited to, the payments listed in Exhibit 5.

430. To the extent that any of Acutus's charges for the drugs and medications for C.L. remain unpaid, Allstate has no further obligation to make payment because C.L.'s charges are not compensable under New York's No-Fault laws.

### b. Exemplar Claim—A.N. (0501860050)

431. Claimant A.N. reportedly was involved in an automobile accident on May 4, 2018.

432. On May 17, 2018, A.N. was examined at Metro Pain's 90-16 Sutphin Boulevard clinic for complaints of pain to the neck and back.

433. At that initial visit at Metro Pain, A.N. was prescribed diclofenac sodium 3% gel, which was billed to Allstate by another pharmacy.

434. There was no indication in Metro Pain's records for A.N. that the diclofenac sodium 3% gel had any meaningful effect on A.N.'s pain levels and Metro Pain continued to bill for treatments and services for A.N.

435. On December 13, 2018 and February 12, 2019, Elton examined A.N. at Metro Pain's 90-16 Sutphin Boulevard clinic for complaints of moderate neck and back pain and shoulder pain.

436. The reports of Elton's follow-up examinations of A.N. do not call for the prescription of any drugs or medications.

437. However, on April 2, 2019, Elton purportedly prescribed medically unnecessary diclofenac sodium 3% gel and naproxen 500mg tablets to A.N. despite no record of Elton examining A.N. on April 2.

438. There was no clinical justification for the prescription of both an oral NSAID (naproxen) and topical NSAID (diclofenac sodium 3% gel) for A.N., particularly where there was no documentation that A.N. suffered from actinic keratosis, the skin condition for which diclofenac sodium 3% gel is FDA-approved, which condition would not be causally related to the underlying motor vehicle accident.

439. These prescriptions for the medically unnecessary and unjustified medications for A.N. were transmitted to Acutus.

440. The prescription for diclofenac sodium 3% gel under Elton's name and credentials contains a note dated April 3, 2019 that the Acutus pharmacist "spoke to Oksana" at Elton's office and she purportedly communicated Elton's specific instructions for the Topical Pain Product "due to software limitations."

441. Oksana is the office manager of Metro Pain's 90-16 Sutphin Boulevard clinic who was identified by Elton as transmitting prescriptions under his name for diclofenac sodium 3% gel without his authorization.

442. Acutus billed Allstate for these medications purportedly dispensed to A.N. on April 3, 2019, including a charge of $1,892.20 for the unnecessary diclofenac sodium 3% gel alone.

443. Elton purportedly examined A.N. again on May 16, 2019 at Metro Pain for continued musculoskeletal complaints, including mild neck pain, moderate back pain, and moderate shoulder pain.

444.    Elton discharged A.N. from treatment at Metro Pain on May 16, 2019, which illustrates the lack of medical necessity for the diclofenac sodium 3% gel purportedly prescribed by Elton the month prior.

445.    Significantly, despite Elton's April 2, 2019 prescription for diclofenac sodium 3% gel, his report of the May 16 follow-up examination of A.N. specifically indicates that A.N. had no "Current Medication":



446.    Elton's lack of knowledge of the medications prescribed under his credentials on April 2, 2019 that served as the basis for charges submitted by Acutus to Allstate shows that these prescriptions were not valid.

447.    In reliance on this false and fraudulent claim documentation, Allstate paid Acutus $2,364.00 for the medically unnecessary diclofenac sodium 3% gel purportedly dispensed by Acutus to A.N.

448.    To the extent that Allstate paid Acutus in reliance on the documents created and submitted in connection with the drugs and medications for A.N., Allstate is entitled to recover all payments made to Acutus in connection with these services, including, but not limited to, the payments listed in Exhibit 5.

449.    To the extent that any of Acutus's charges for the drugs and medications for A.N. remain unpaid, Allstate has no further obligation to make payment because A.N.'s charges are not compensable under New York's No-Fault laws.

*c.*        *Exemplar Claim—T.G. (0505827261)*

450.    Claimant T.G. purportedly was involved in a motor vehicle accident on June 14, 2018.

451.    T.G. was examined by non-party Metro Pain provider Theodros Seyoum, M.D. ("Seyoum") on July 9, 2018 for complaints of neck and back pain as well as knee and shoulder pain.

452.    Seyoum diagnosed T.G. with sprains at this July 9, 2018 examination.

453.    Using a checklist in the report of the initial examination, Seyoum prescribed T.G. with lidocaine 5% patches, 200 grams of diclofenac sodium 3% gel, and naproxen 500mg tablets.

454.    The Topical Pain Products prescribed for T.G. were not necessary to treat her complaints of musculoskeletal pain over several areas, including the spine and shoulder, which are deep joints covered by large muscle masses and are not amenable to treatment with Topical Pain Products.

455.    The prescription of both oral and topical NSAIDs (i.e., oral naproxen and topical diclofenac) for T.G. represented unnecessary therapeutic duplication that placed T.G. at increased risk for side effects, including cardiovascular complications.

456.    Additionally, Seyoum needlessly prescribed T.G. with multiple Topical Pain Products without justification before T.G. had the opportunity to undergo a full course of conservative care.

457.    There was no evidence that T.G. suffered from post-herpetic neuralgia, which is a neurological condition associated with shingles that may be treated with lidocaine patches.

458. Moreover, there was no documentation that T.G. suffered from actinic keratosis, the skin condition for which diclofenac sodium 3% gel is FDA-approved, which condition would not be causally related to the underlying motor vehicle accident.

459. The prescriptions for medically unnecessary drugs and medications, including Topical Pain Products, were transmitted to Acutus, which billed Allstate over $1,500 for these unnecessary medications purportedly dispensed to T.G.

460. Allstate paid Acutus over $1,250.00 for these lidocaine 5% patches, 200 grams of diclofenac sodium 3% gel, and naproxen 500mg tablets in reliance on the fraudulent claim documentation regarding T.G. submitted by Acutus.

461. Acutus again submitted charges to Allstate for lidocaine 5% patches for T.G. on August 22, 2018 even though Seyoum's July 9 prescription did not call for any refills:

ACUTUS RX LLC
385 W. JOHN STREET STE #100     HICKSVILLE, NY 11801
Phone: (855)830-6666  Fax: (855)444-0059   Prnt Dt: 7/9/2018  2:40:11PM

Rx Pres: Theodros Seyoum ,060                    Ord: 07/09/2018
          Rector PL 19D                          NPI# 1558672428
New York, NY 10280      Phn: (415)786-4472       LIC#:
Addresss                Fax: (718)766-9783       DEA#: FS5563095
                                                 SPI# 6731922170013

Patient:
DOB:                                             Rx# 121880
Addre:
Phone
Qty:      60.000    (Sixty)
Days: 30  Refills: 0     PH/TH: KP/RPR   Class:
Potency UnitCd:   Patch
Drug: Lidocaine 5 % External Patch 5 Patch

Sig:   USE AS DIRECTED PER PACKAGE INSTRUCTIONS DO NOT USE MORE
       THAN 1 PATCH EVERY 12 TO 24 HOURS.

Signature                          Date
This Prescription Will be Filled Generically Unless     N
      Prescriber Writes "DAW" in the Box
                                           Dispense As Written
7/9/2018        2:00 PM      MessageType:   New Prescription

Electronic Rx

462. Acutus's August 22, 2018 bill for the lidocaine 5% patches purported to re-fill prescription number 121880, which was Seyoum's original prescription with no refills:



463. Moreover, another Metro Pain provider—and not Seyoum—examined T.G. on August 14, 2022 and the report of this follow-up examination does not indicate that any medications were prescribed.

464. Therefore, the lidocaine 5% patches charged to Allstate by Acutus on August 22, 2018 were not legitimately prescribed.

465. Even if the patches had been charged pursuant to a valid prescription (they were not), a report of a pain management evaluation of T.G. at Metro Pain on August 31, 2018 specifically documented that T.G. was not using any other medications other than NSAIDs; therefore, there was no evidence that T.G. used—or even received—these lidocaine 5% patches on August 22, 2018:

> **Treatments tried/Effect:**
>
> Medications Other than NSAIDS: none
> NSAIDS: partial relief

466. Allstate was induced to pay Acutus over $250.00 for these medically unnecessary lidocaine 5% patches billed on August 22, 2018 pursuant to an invalid prescription.

467. To the extent that Allstate paid Acutus in reliance on the documents created and submitted in connection with the drugs and medications for T.G., Allstate is entitled to recover all payments made to Acutus in connection with these services, including, but not limited to, the payments listed in Exhibit 5.

468. To the extent that any of Acutus's charges for the drugs and medications for T.G. remain unpaid, Allstate has no further obligation to make payment because T.G.'s charges are not compensable under New York's No-Fault laws.

### d.    Exemplar Claim—D.H. (0524691318)

469. Claimant D.H. purportedly was involved in a motor vehicle accident on October 23, 2018.

470. On November 29, 2018, D.H. underwent an initial examination with Elton at Metro Pain's 90-16 Sutphin Boulevard clinic for complaints of lower back pain and left elbow pain.

471. At this initial visit, Elton immediately prescribed D.H. with diclofenac sodium 3% gel even though the report of this initial examination does not indicate that D.H. suffered from actinic keratosis, the condition for which diclofenac sodium 3% gel is FDA approved.

472. Further, Elton prescribed this medically unnecessary Topical Pain Product to D.H. at this initial visit the month after the underlying motor vehicle accident before D.H. had an opportunity to complete a course of conservative treatment.

473. Elton prescribed this diclofenac sodium 3% gel to D.H. under a fraudulent predetermined protocol of treatment in which claimants received pain medications regardless of medical need.

474. Elton transmitted the prescription for diclofenac sodium 3% gel to Acutus, which dispensed the unnecessary Topical Pain Product to D.H. 2 weeks later on or about December 12, 2018.

475. Acutus charged Allstate $1,887.20 for the unnecessary diclofenac sodium 3% gel prescribed by Elton for D.H. at the initial examination.

476. Elton re-examined D.H. on February 5, 2019.

477. Elton's report of this February 5, 2019 follow-up visit does not discuss the diclofenac sodium 3% gel previously prescribed to D.H. or any relief or side effects experienced by D.H.

478. Despite again offering no justification for this Topical Pain Product to treat D.H.'s musculoskeletal injuries, Elton again prescribed 200 grams of diclofenac sodium 3% gel to D.H. on February 5, 2019, along with cyclobenzaprine and ibuprofen tablets.

479. The diclofenac sodium 3% gel and ibuprofen prescribed by Elton are both NSAIDs and thus the simultaneous prescription of these medications represented therapeutic duplication that placed D.H. at increased risk of serious side effects.

480. However, there is no evidence that Acutus offered D.H. any counseling on these risks posed by therapeutic duplication before a courier delivered these medications to D.H.'s residence on February 6, 2019.

481. Acutus charged Allstate over $2,000.00 for these unnecessary medications prescribed to D.H. on February 5, 2019.

482. Elton again examined D.H. on March 14, 2019.

483. The report of this March 14, 2019 follow-up examination continued to omit any discussion of D.H.'s response to the medications prescribed on February 5, 2019.

484. Elton attempted to again prescribe 200 grams of diclofenac sodium 3% gel to D.H. as a matter of course by marking a pre-printed checklist on the evaluation form; however, D.H. declined the prescription:



485. D.H. thus did not want or need the diclofenac sodium 3% gel that was previously prescribed by Elton and dispensed by Acutus to D.H. on 2 previous occasions.

486. In reliance on this false and fraudulent claim documentation, Allstate paid Acutus $3,962.16 for the medically unnecessary diclofenac sodium 3% gel and other medications dispensed by Acutus to D.H.

487. To the extent that Allstate paid Acutus in reliance on the documents created and submitted in connection with the drugs and medications for D.H., Allstate is entitled to recover all payments made to Acutus in connection with these services, including, but not limited to, the payments listed in Exhibit 5.

488. To the extent that any of Acutus's charges for the drugs and medications for D.H. remain unpaid, Allstate has no further obligation to make payment because D.H.'s charges are not compensable under New York's No-Fault laws.

### e. Exemplar Claim—C.U. (0555478956)

489. Claimant C.U. reportedly was involved in a motor vehicle accident on July 11, 2019.

490. On July 16, 2019, C.U. was examined by Elton at Metro Pain's 90-16 Sutphin Boulevard clinic for complaints of neck pain and lower back pain.

491. At this initial visit less than a week after the underlying motor vehicle accident, Elton prescribed C.U. with 200 grams of diclofenac sodium 3% gel before C.U. was given the opportunity to undergo conservative care.

492. Moreover, there is no indication in Elton's report of this initial examination of C.U. that C.U. suffered from the skin condition actinic keratosis, which is the condition that diclofenac sodium 3% gel is FDA-approved to treat and which would not be causally related to the underlying motor vehicle accident.

493. Therefore, diclofenac sodium 3% gel was wholly unwarranted to treat C.U.'s complaints of pain caused by deep joint injuries, such as to C.U.'s spine.

494. Elton prescribed this Topical Pain Product to C.U. unnecessarily as part of a predetermined treatment protocol.

495. Acutus did not even dispense the diclofenac sodium 3% gel to C.U. until nearly 1 month later on August 13, 2019, which emphasizes that this Topical Pain Product was not necessary to relieve C.U.'s complaints of pain.

496. To the extent that Allstate paid Acutus in reliance on the documents created and submitted in connection with the drugs and medications for C.U., Allstate is entitled to recover all payments made to Acutus in connection with these services, including, but not limited to, the payments listed in Exhibit 5.

497. To the extent that any of Acutus's charges for the drugs and medications for C.U. remain unpaid, Allstate has no further obligation to make payment because Acutus's charges are not compensable under New York's No-Fault laws.

**f.  *Exemplar Claim—R.C. (0575054985)***

498. Claimant R.C. purportedly was involved in a motor vehicle accident on January 12, 2020.

499. Just 2 days after the underlying motor vehicle accident, on January 14, 2020, R.C. was examined by Elton at Metro Pain's clinic located at 90-16 Sutphin Boulevard for complaints of pain to the spinal axis, right shoulder, and right knee.

500. At this initial visit, Elton prescribed R.C. with 200 grams of diclofenac sodium 3% gel before R.C. had any opportunity to receive conservative care.

501. This Topical Pain Product was wholly unjustified to treat R.C.'s complaints of musculoskeletal pain to multiple areas or deep joint pain of the spine and shoulder.

502. R.C. did not have any reported condition that would warrant the use of topical diclofenac sodium 3% gel (i.e., actinic keratosis).

503. Notably, John Street Pharmacy inaccurately described the dispensed diclofenac sodium 3% gel as "generic for Voltaren gel" even though Voltaren gel, which is available over the counter for the treatment of arthritis pain, only has a 1% concentration of diclofenac sodium:



504.   Acutus dispensed the diclofenac sodium 3% gel to R.C. and billed Allstate $1,887.20 for this unnecessary medication on January 29, 2020 even though it was discontinued as a registered pharmacy on January 22, 2020 when it was transferred to John Street Pharmacy.

505.   In reliance on this false and fraudulent claim documentation, Allstate paid Acutus $1,821.65 for the medically unnecessary diclofenac sodium 3% gel purportedly dispensed by Acutus to R.C. on January 29, 2020 (after it was discontinued as a pharmacy).

506.   On February 6, 2020, R.C. was examined by another Metro Pain provider who documented in the report of this visit that R.C. denied taking any daily medications, despite having purportedly received diclofenac sodium 3% gel approximately 1 week prior:

> ## Daily Medications:
>
> Denies

507.   R.C. was re-examined at Metro Pain by various providers and specialties on February 17, 2020, February 18, 2020, February 26, 2020, March 9, 2020, March 25, 2020, April 23, 2020, April 29, 2020, May 19, 2020, May 29, 2020, and July 2, 2020.  None of the reports of these visits discuss the diclofenac sodium 3% gel prescribed to R.C. at his initial examination at Metro Pain, such as any beneficial effects or side effects.

508.  Moreover, R.C.'s reported complaints of pain remained constant through these follow-up visits; on July 2, 2020, he still complained of moderate to severe pain to the spinal axis, right shoulder, and right knee.

509.  Likewise, on August 5, 2020, Elton re-examined R.C. at Metro Pain's 90-16 Sutphin Boulevard clinic for continued complaints of moderate to severe pain in the spinal axis, right shoulder, and right knee.

510.  The report of Elton's August 5, 2020 examination of R.C. does not indicate that Elton prescribed any drugs or medications.

511.  However, Elton again prescribed 200 grams of diclofenac sodium 3% gel to R.C. on August 5, 2020, which medication continued to be unnecessary to treat R.C.'s complaints of musculoskeletal pain.

512.  Elton re-examined R.C. again on September 17, 2020 and the report of this examination did not indicate that R.C. was taking any medication despite having been prescribed diclofenac sodium 3% gel the month prior:

Current Medication:

513.  Elton's report of the September 17, 2020 follow-up examination did not discuss the effects of the diclofenac sodium 3% gel prescribed to R.C. or indicate that any further medications were being prescribed.

514.  Nonetheless, Elton purported to prescribe yet another 200 grams of diclofenac sodium 3% gel to R.C. on September 17, 2020 through a telephone prescription transmitted to John Street Pharmacy by "Oksana":



515. As noted above, Oksana was the manager of the Metro Pain clinic at 90-16 Sutphin Boulevard.

516. Upon information and belief, based on Elton's testimony that unauthorized prescriptions for diclofenac sodium 3% gel were submitted without his consent while he was employed at Metro Pain, this prescription for diclofenac sodium 3% gel to R.C. transmitted to John Street Pharmacy by telephone by Oksana was not authorized by Elton and was not a valid prescription.

517. There was no indication in the prescription or Elton's September 17, 2020 report that he was unable to prescribe medications electronically at that time and thus there was no legitimate reason to bypass applicable electronic prescribing requirements.

518.    Rather, upon information and belief, Oksana transmitted this prescription to John Street Pharmacy pursuant to an unlawful referral relationship between John Street Pharmacy and Metro Pain.

519.    John Street Pharmacy did not dispense the diclofenac sodium 3% gel to R.C. purportedly prescribed by Elton on September 17, 2020 until nearly 1 month later on October 15, 2020, thus again revealing that this medication was not medically unnecessary to treat R.C.'s complaints of musculoskeletal pain.

520.    Elton examined R.C. at Metro Pain's 90-16 Sutphin Boulevard clinic on October 21, 2020 and again did not document that R.C. was using any medications despite purportedly prescribing diclofenac sodium 3% gel to R.C. the prior month:

Current Medication:

521.    Elton's report of the October 21, 2020 follow-up examination does not indicate that any medications were being prescribed, yet another prescription for diclofenac sodium 3% gel was transmitted by telephone under Elton's name and credentials on October 21, 2020:

522.    Again, upon information and belief, Oksana, or someone else working at Metro Pain, transmitted this prescription for diclofenac sodium 3% gel to John Street Pharmacy by telephone without Elton's knowledge or consent pursuant to an unlawful referral relationship between John Street Pharmacy and Metro Pain.

523.    John Street Pharmacy, however, did not dispense this diclofenac sodium 3% gel purportedly prescribed by Elton on October 21, 2020 until December 3, 2020.

524.    The significant weeks-long delay in filling the prescription emphasizes that R.C. did not need this Topical Pain Product and there was no urgency to filling the prescription because it would have no effect on R.C.'s condition and was not validly prescribed.

525.    Indeed, R.C. was re-examined at Metro Pain on December 30, 2020 for continued complaints of "severe" pain to the spinal axis, right shoulder, and right knee.

526.    The report of this follow-up visit indicates that R.C. did not have any "current medications" despite the previous prescriptions for diclofenac sodium 3% gel:

93



527.    R.C. again underwent a follow-up examination at Metro Pain on February 4, 2021 that was silent regarding any current medications or the diclofenac sodium 3% gel purportedly prescribed to R.C. on several occasions.

528.    At this February 4, 2021 visit, R.C. was prescribed another unnecessary Topical Pain Product, lidocaine 5% ointment by Metro Pain provider non-party Suresh Paulus, D.O. ("Paulus"). Paulus did not prescribe diclofenac sodium 3% gel, according to the report of this February 4, 2021 follow-up examination of R.C.:

> Medication Prescribed:   Lidocaine 5% Ointment
>                    QTY: 250 grams
>              Apply TWICE DAILY to the AA BID
> Flexeril  Skelaxin  Ibuprofen 800 mg  Celecoxib Capsules 200 mg  Naprosyn 500 mg
>
> LIDOCAINE/LIDODERM 5 % PATCHES or OITMENT 5 %    100-GRAMS/200-GRAMS
> 1 patch transdermally daily remove after 12 hours to most painful area
>
> DICLOFENAC 3% GEL   Qty: ____  (1 application topically to affected area 2 times per day)
> AAA 3-4 TIMES DAILY  100-Grams  200-Grams  300-Grams

529.    However, an entirely different Metro Pain provider, Metro Pain's nominal owner non-party Leonid Shapiro, M.D. ("Shapiro"), purportedly prescribed diclofenac sodium 3% gel to R.C. on February 4, 2021 despite not personally examining R.C. and despite no indication in Paulus's report that diclofenac sodium 3% gel was prescribed.

530.    Oksana transmitted the prescription for diclofenac sodium 3% gel for R.C. to John Street Pharmacy by telephone on February 4, 2021 under Shapiro's name and credentials:



531.    Upon information and belief, Oksana transmitted this unauthorized and invalid prescription for diclofenac sodium 3% gel to John Street Pharmacy by telephone pursuant to an unlawful referral relationship between Metro Pain and John Street Pharmacy.

532.    There was no legitimate need to transmit this prescription for diclofenac sodium 3% gel on February 4, 2021 by telephone rather than electronically in compliance with New York's electronic prescribing mandate.

533.    Indeed, the prescription for lidocaine 5% ointment was transmitted to John Street Pharmacy by Paulus electronically at 5:26pm on February 4, 2021, soon after Oksana telephoned the diclofenac sodium 3% gel prescription at 4:00pm thus evidencing that Metro Pain's electronic prescribing capabilities were functioning on February 4, 2021.

534.    However, John Street Pharmacy delayed in dispensing this diclofenac sodium 3% gel purportedly prescribed to R.C. on February 4, 2021 until 20 days later on February 24, 2021, thus again revealing that this medication was not necessary to treat R.C.'s complaints of musculoskeletal pain.

535.    On March 24, 2021, R.C. presented to Metro Pain for a follow-up evaluation, at which time he was discharged from treatment.

536.    However, just 2 days prior to R.C.'s discharge on March 22, 2021, John Street Pharmacy purportedly dispensed a refill of the diclofenac sodium 3% gel prescribed by Shapiro on February 4, 2021 to R.C.

537.    In light of R.C.'s subsequent discharge days later, the refill of the diclofenac sodium 3% gel billed to Allstate by John Street Pharmacy was unwarranted and unneeded, in addition to being dispensed pursuant to an invalid prescription.

538.    In reliance on this false and fraudulent claim documentation, Allstate paid John Street Pharmacy over $12,000.00 for medically unnecessary Topical Pain Products, including diclofenac sodium 3% gel and lidocaine 5% ointment, purportedly dispensed to R.C. by John Street Pharmacy between August 2020 and February 2021.

539.    To the extent that Allstate paid Acutus and John Street Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for R.C., Allstate is entitled to recover all payments made to Acutus and John Street Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibits 5-6.

540.    To the extent that any of Acutus's and John Street Pharmacy's charges for the drugs and medications for R.C. remain unpaid, Allstate has no further obligation to make payment because R.C.'s charges are not compensable under New York's No-Fault laws.

### g.    *Exemplar Claim—D.A. (0600455398)*

541.    Claimant D.A. purportedly was involved in a motor vehicle accident on September 16, 2020.

542.    D.A. underwent a neurological consultation with non-party Ranga Krishna, M.D. ("Krishna") on August 24, 2021 at Krishna's PC, Total Neuro.

543.    Krishna has been sanctioned by 4 state medical boards as a result of a criminal conviction, including the New York State Board for Professional Medical Conduct.

544.    Krishna's examination and recommendations explicitly were limited to D.A.'s head injury complaints.

545.    The report of Krishna's August 24, 2021 examination of D.A. does not indicate that any drugs or medications were recommended or prescribed.

546.    Despite failing to document any medical justification for Topical Pain Products for D.A., on August 30, 2021, Krishna prescribed D.A. with Flector 1.3% diclofenac epolamine transdermal patches with 2 refills and transmitted this prescription to John Street Pharmacy.

547.    Krishna also prescribed 2 other medically unnecessary Topical Pain Products to D.A. on August 30, 2021, including a compounded product and 1st Medx patches with lidocaine. However, Krishna sent each of these prescriptions to a different pharmacy: the compounded product prescription to non-party Bay Rx, Inc. ("Bay Rx") in Staten Island, NY and the prescription for 1st Medx patches with lidocaine to non-party True Health Pharmacy, Inc. ("True Health") in Brooklyn, NY.

548.    Upon information and belief, Krishna intentionally transmitted 3 prescriptions for unnecessary Topical Pain Products issued regarding D.A. on the same day to 3 different pharmacies to conceal that he was prescribing multiple ineffective and duplicative products that

were charged to Allstate at inflated prices while allowing him to cultivate multiple unlawful referral relationships with pharmacies, including John Street Pharmacy.

549.    John Street Pharmacy, however, did not process this prescription until December 17, 2021 when a John Street Pharmacy pharmacist purportedly contacted Krishna for authorization to switch the prescribed Flector patches to diclofenac sodium 1.5% solution due to supposed "ins[urance] plan limitations."

550.    John Street Pharmacy preferred to dispense diclofenac sodium 1.5% solution over Flector patches because the solution (NDC No. 51021-0250-05) had an AWP of $1,459.52 while the Flector patches (NDC No. 71858-0405-05) only had an AWP of $358.80.

551.    John Street Pharmacy did not switch the medication due to any insurance plan limitations or any legitimate reason. John Street Pharmacy placed profit over patient care.

552.    Neither of the Flector patches nor the diclofenac sodium 1.5% solution were necessary to treat D.A.'s purported head injury being treated by Krishna, particularly in light of the significant delay in processing and dispensing the medication.

553.    Indeed, John Street Pharmacy did not dispense the diclofenac sodium 1.5% solution to D.A. until on or about January 13, 2022.

554.    John Street Pharmacy then proceeded to refill the prescription for medically unnecessary diclofenac sodium 1.5% solution and submitted charges to Allstate 2 more times on February 24, 2022 and March 24, 2022.

555.    To the extent that Allstate paid John Street Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for D.A., Allstate is entitled to recover all payments made to John Street Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

556.    To the extent that any of John Street Pharmacy's charges for the drugs and medications for D.A. remain unpaid, Allstate has no further obligation to make payment because D.A.'s charges are not compensable under New York's No-Fault laws.

### h.    Exemplar Claim—L.N. (0605524628)

557.    Claimant L.N. reportedly was involved in a motor vehicle accident on November 1, 2020.

558.    L.N. was examined by non-party Jonathan Simhaee, M.D. ("Simhaee") through "Brooklyn Premier Orthopedics" on November 12, 2020 for an initial evaluation of neck and mid-back pain.

559.    Simhaee has a history of participation in alleged No-Fault schemes, including a scheme involving prescriptions for medically unnecessary DME pursuant to unlawful referral relationships. *See Allstate Ins. Co. v. Advanced Recovery Equipment & Supplies, LLC*, No. 22-cv-05232-HG (E.D.N.Y.).

560.    Simhaee diagnosed L.N. with cervical and lumbar radiculopathy.

561.    Simhaee prescribed "a muscle relaxer, pain cream, [and] pain patch" at this initial evaluation of L.N. despite specifically indicating that L.N. should be prescribed no NSAIDs "due to ulcer history."

562.    Through a pre-printed checklist of medications, Simhaee prescribed L.N. with Flector 1.3% patches, which medication was substituted by John Street Pharmacy for lidocaine 4% patches.

563.    However, Simhaee also purportedly prescribed diclofenac sodium 3% gel according to a telephone prescription submitted to John Street Pharmacy.

564.    Diclofenac sodium 3% gel contains topical diclofenac, which is an NSAID.

565. There was no clinical justification for the prescription of the lidocaine 4% patches because Simhaee did not diagnose L.N. with any minor sprains, strains or contusions, and the patches would be ineffective to treat L.N.'s complaints of radiating pain.

566. Likewise, there was no clinical justification for the prescription of the diclofenac sodium 3% gel because there was no indication that L.N. suffered from actinic keratosis, the skin condition for which diclofenac sodium 3% gel is FDA-approved.

567. Additionally, topical diclofenac, an NSAID, carries an increased risk for gastrointestinal side effects, including ulcers.

568. Therefore, Simhaee disregarded L.N.'s safety when prescribing the medically unnecessary topical NSAID containing diclofenac to L.N. despite her history of ulcers.

569. John Street Pharmacy charged Allstate over $3,000.00 for these unnecessary Topical Pain Products prescribed by Simhaee for L.N. and dispensed by John Street Pharmacy on or about November 18, 2020.

570. Simhaee re-examined L.N. over the course of several additional follow-up visits on December 3, 2020, December 17, 2020, and January 14, 2021 at which he consistently reported L.N.'s pain at the same level. Simhaee's reports of these follow-up visits for L.N. do not indicate whether the prescribed medications were effective or whether L.N. experienced any side effects other than merely recommending that she "continue muscle relaxer, pain cream, pain patch."

571. During this time, John Street Pharmacy refilled Simhaee's prescription for lidocaine 4% patches (substituted for Flector 1.3% patches) 4 times on December 14, 2020, December 29, 2020, January 11, 2021 and February 10, 2021—even though the November 12, 2020 prescription only called for 2 refills—for a total charge of $4,436.00 for this wholly unnecessary Topical Pain Product that had no impact whatsoever on L.N.'s complaints of pain.

572.    L.N. also was examined by other providers with "Brooklyn Premier Orthopedics," including non-party Marc Cohen, M.D. who evaluated L.N.'s complaints of headaches on January 15, 2021 and February 5, 2021 and specifically noted that L.N. had a history of gastric ulcers and should not be prescribed NSAIDs.

573.    Nonetheless, when Simhaee re-evaluated L.N. on February 11, 2021, he reported that L.N.'s pain level remained unchanged and that she should "continue muscle relaxer, pain cream, [and] pain patch."

574.    In continued disregard of L.N.'s medical history and risk of serious gastrointestinal side effects due to ulcer history, Simhaee again prescribed L.N. with a topical NSAID, diclofenac sodium 1.5% topical solution, as well as lidocaine 5% topical ointment.

575.    Both of these Topical Pain Products were entirely unnecessary and ineffective in the treatment of L.N.'s cervical and lumbar radiculopathy as diagnosed by Simhaee.

576.    To the extent that Allstate paid John Street Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for L.N., Allstate is entitled to recover all payments made to John Street Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

577.    To the extent that any of John Street Pharmacy's charges for the drugs and medications for L.N. remain unpaid, Allstate has no further obligation to make payment because L.N.'s charges are not compensable under New York's No-Fault laws.

### i.    *Exemplar Claim—P.R. (0608850129)*

578.    Claimant P.R. purportedly was involved in a motor vehicle accident on December 5, 2020.

579.    P.R. was examined by non-party Colin Clarke, M.D. ("Clarke") on December 9, 2020 for complaints of spinal axis pain, bilateral shoulder pain, and left knee pain.

580.    Clarke has been linked to other No-Fault fraud schemes.

581.    Clarke prescribed P.R. with diclofenac sodium 3% gel, lidocaine patches, cyclobenzaprine tablets, and meloxicam tablets at this initial visit just days after the underlying motor vehicle accident.

582.    However, John Street Pharmacy purportedly contacted Clarke for authorization to substitute the prescribed lidocaine 5% patches with lidocaine 5% ointment.

583.    Both the diclofenac gel and lidocaine ointment were not necessary or effective to treat P.R.'s complaints of musculoskeletal pain to multiple areas, including deep joint injuries of the spine and shoulders.

584.    There also was no indication in Clarke's initial examination report that P.R. suffered from actinic keratosis, the skin condition that diclofenac sodium 3% gel is FDA-approved to treat and which would not be causally related to the underlying motor vehicle accident.

585.    Clarke's prescriptions for both an oral NSAID (i.e., meloxicam) and a topical NSAID (i.e., diclofenac sodium 3% gel) represented therapeutic duplication that placed P.R. at increased risk of complications arising from the use of 2 NSAIDs, including serious cardiovascular risks.

586.    John Street Pharmacy purportedly dispensed these medications to P.R. on December 15, 2020; however, according to the delivery receipt, there is no indication that P.R. was offered any counseling by John Street Pharmacy regarding these risks of therapeutic duplication.

587. John Street Pharmacy charged Allstate over $1,800.00 for these medically unnecessary medications prescribed by Clarke at P.R.'s initial visit.

588. Clarke's prescriptions for lidocaine 5% patches (substituted by John Street Pharmacy with lidocaine 5% ointment), cyclobenzaprine tablets, and meloxicam tablets each called for 5 refills, which were filled by John Street Pharmacy on several dates including January 12, 2021, February 8, 2021, March 9, 2021, April 5, 2021, and May 3, 2021.

589. However, Clarke was not monitoring P.R.'s use of these medications and their effects. Clarke did not examine P.R. again until August 6, 2021 at which visit he recorded that P.R. "takes no medications on a regular basis."

590. Clarke again prescribed medically unnecessary medications to P.R. at this follow-up visit, including lidocaine 5% patches, diclofenac sodium 3% gel, cyclobenzaprine tablets, and meloxicam tablets. Clarke's August 6, 2021 prescriptions again each called for 5 refills.

591. John Street Pharmacy again substituted the prescribed lidocaine 5% patches with lidocaine 5% ointment.

592. John Street Pharmacy charged Allstate over $1,800.00 for the medically unnecessary medications, including lidocaine 5% ointment and diclofenac sodium 3% gel, purportedly dispensed to P.R. on August 10, 2021.

593. Clarke next examined P.R. on September 3, 2021.

594. Despite John Street Pharmacy's regular refills of Clarke's prescriptions, including lidocaine 5% ointment, Clarke's report for the September 3, 2021 follow-up visit again indicated that P.R. took no medications on a regular basis in connection with P.R.'s continuing reported complaints of spinal axis pain, bilateral shoulder pain, and left knee pain.

595.    John Street Pharmacy charged Allstate over $800.00 for these medications again on September 7, 2021.

596.    In reliance on this false and fraudulent claim documentation, Allstate paid John Street Pharmacy over $4,000.00 for medically unnecessary Topical Pain Products, including diclofenac sodium 3% gel and lidocaine 5% ointment, purportedly dispensed to P.R. by John Street Pharmacy between December 2020 and September 2021.

597.    To the extent that Allstate paid John Street Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for P.R., Allstate is entitled to recover all payments made to John Street Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

598.    To the extent that any of John Street Pharmacy's charges for the drugs and medications for P.R. remain unpaid, Allstate has no further obligation to make payment because P.R.'s charges are not compensable under New York's No-Fault laws.

### j.    *Exemplar Claim—P.D. (0632043824)*

599.    Claimant P.D. purportedly was involved in a motor vehicle accident on July 4, 2021.

600.    P.D. was transported to the emergency department after the accident and underwent CT imaging of the head and neck based on his complaints of neck pain, which imaging did not reveal any fracture or acute injury.

601.    On January 6, 2022, P.D. underwent a neurological consultation with Krishna at Total Neuro for complaints including neck and low back pain and headaches.

602.    Krishna's report of this consultation does not recommend or prescribe any medications.

603.    However, on January 14, 2022, Krishna transmitted 3 different prescriptions for medically unnecessary Topical Pain Products for P.D. to 3 different pharmacies, including John Street Pharmacy.

604.    Krishna prescribed diclofenac epolamine 1.3% patches to P.D., which product was substituted by John Street Pharmacy for diclofenac sodium 1.5% solution.

605.    Krishna also prescribed a neuropathic compounded product, which prescription was filled by Bay Rx, and 1st Medx patches with lidocaine, which prescription was filled by True Health.

606.    Krishna's report of this January 6, 2022 consultation does not explain, or even reference, the purpose of these 3 Topical Pain Products for P.D.'s diagnoses of concussions, traumatic brain injury, cervical and lumbar radiculopathy, and neuropathic pain syndrome.

607.    Krishna prescribed these 3 Topical Pain Products to P.D. as part of a predetermined medication protocol that he followed for other Allstate claimants who underwent neurological consultations with Krishna.

608.    There was no legitimate reason for Krishna to transmit the prescriptions for the medications ordered on January 14, 2022 to 3 pharmacies; upon information and belief, Krishna split the prescriptions among multiple pharmacies to conceal the volume of unnecessary Topical Pain Products that he was prescribing and to maintain unlawful referral relationships with several pharmacies, including John Street Pharmacy.

609.    John Street Pharmacy did not dispense the diclofenac sodium 1.5% topical solution to P.D. until on or about February 28, 2022, more than a month after Krishna's neurological consultation of P.D., which emphasizes the lack of medical necessity for this Topical Pain Product to treat P.D.'s complaints of pain.

610.    John Street Pharmacy charged Allstate $1,168.20 for this unnecessary diclofenac sodium 1.5% topical solution.

611.    To the extent that Allstate paid John Street Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for P.D., Allstate is entitled to recover all payments made to John Street Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

612.    To the extent that any of John Street Pharmacy's charges for the drugs and medications for P.D. remain unpaid, Allstate has no further obligation to make payment because John Street Pharmacy's charges are not compensable under New York's No-Fault laws.

### k.    Exemplar Claims—P.F. and G.F. (0719811191)

613.    Claimants P.F. and G.F. purportedly were involved in a motor vehicle accident on June 27, 2023.

614.    Both P.F. and G.F. underwent a neurological consultation with Krishna on July 25, 2023.

615.    Krishna's reports of these consultations for P.F. and G.F. do not recommend or prescribe any specific medications.

616.    On August 11, 2023—seventeen days after the July 25 consultations—Krishna purportedly transmitted prescriptions for both P.F. and G.F. to Alight Rx; Krishna prescribed lidocaine 4% topical patches for P.F. and lidocaine 4%-menthol 4% patches for G.F.

617.    Alight Rx purportedly contacted Krishna to substitute the lidocaine 4%-menthol 4% patches prescribed to G.F. with the same lidocaine 4% patches prescribed to P.F., which he purportedly authorized.

106

618. On August 14, 2023, Alight Rx submitted 2 bills to Allstate for $1,109.00 for the lidocaine 4% film (NDC No. 50488-2004-01) purportedly dispensed to both P.F. and G.F.

619. However, this medication, lidocaine 4% film (NDC No. 50488-2004-01), is classified as over the counter and is not covered under New York's No-Fault laws.

620. Krishna's reports of the July 25, 2023 consultations do not explain, or even reference, the purpose of this Topical Pain Product for P.F.'s and G.F.'s diagnoses, including cervical and lumbar strain, cervical and lumbar radiculopathy, concussion, traumatic brain injury, and headaches.

621. The lidocaine 4% patches were not medically necessary or effective to treat P.F.'s and G.F.'s body areas being treated by Krishna (i.e., the spine), which are deep joints covered by large muscle masses and are not amenable to treatment with Topical Pain Products. The patches also would be ineffective to treat radiating pain.

622. Moreover, there is no evidence that P.F. or G.F. even used the lidocaine 4% patches purportedly delivered by Alight Rx.

623. Indeed, on August 23, 2023, P.F. was examined by another provider who noted that injuries to P.F.'s neck and back were being followed by Krishna, but the medical history recorded by this provider did not identify the lidocaine 4% patches prescribed by Krishna and purportedly dispensed to P.F. the week prior.

624. The following date, on August 24, 2023, P.F. and G.F. both underwent electrodiagnostic testing with Krishna who, purportedly based on the results of the testing, rendered identical recommendations to P.F. and G.F., including to "continue medications."

625.    However, on August 24 and August 25, 2023, Krishna prescribed numerous new medications to both P.F. and G.F. that were dispensed by Alight Rx and another pharmacy, non-party Emuna Inc. d/b/a Navar Pharmacy ("Navar").

626.    On August 24, 2023, Krishna transmitted prescriptions for meloxicam (an NSAID) and topiramate (migraine and seizure medication) to Alight Rx for both P.F. and G.F.

627.    The following day, on August 25, 2023, Krishna transmitted prescriptions for both P.F. and G.F. to Navar for diclofenac sodium 2% solution, lidocaine 4%-menthol 5% patches, and Duexis (ibuprofen with antacid) even though Alight Rx purportedly had dispensed lidocaine 4% patches to P.F. and G.F. pursuant to Krishna's prescriptions less than 2 weeks prior.

628.    Alight Rx and Navar purported to dispense these 5 medications prescribed by Krishna to G.F. and P.F. on August 30, 2023 and August 26, 2023, respectively. Upon information and belief, based on Alight Rx's and Navar's delivery receipts regarding these medications purportedly dispensed to P.F. and G.F., P.F. and G.F. did not actually sign for these medications:





629.    Krishna also prescribed a neuropathic compounded product for both P.F. and G.F., which prescriptions were filled by Bay Rx.

630.    There was no legitimate reason for Krishna to transmit the prescriptions to multiple pharmacies; upon information and belief, Krishna split the prescriptions among multiple pharmacies to conceal the volume of unnecessary Topical Pain Products that he was prescribing and to maintain unlawful referral relationships with several pharmacies, including Alight Rx.

631.    Further, Krishna's prescription of the same 5 medications to both P.F. and G.F. that were transmitted to Alight Rx and another pharmacy a day apart, including multiple NSAIDs and topical products, demonstrates that Krishna was not prescribing the medication pursuant to any clinically valid treatment plan.

632.     To the extent that Allstate paid Alight Rx in reliance on the documents created and submitted in connection with the drugs and medications for P.F. and/or G.F., Allstate is entitled to recover all payments made to Alight Rx in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

633.     To the extent that any of Alight Rx's charges for the drugs and medications for P.F. and/or G.F. remain unpaid, Allstate has no further obligation to make payment because Alight Rx's charges are not compensable under New York's No-Fault laws.

*l.*        ***Exemplar Claim—A.M. (0723681680)***

634.     Claimant A.M. purportedly was involved in a motor vehicle accident on July 30, 2023.

635.     A.M. was examined by Musarrat Iqbal, M.D. ("Iqbal") on August 2, 2023 with complaints of pain to the neck, shoulders, and lower back.

636.     Iqbal prescribed A.M. with ibuprofen, "diclofenac gel to use on the shoulder," and "lidocaine patches to use on the back."  However, topical diclofenac gel and lidocaine patches are not necessary or effective to treat musculoskeletal spinal pain. A non-party pharmacy purportedly dispensed the prescribed lidocaine 5% patches, diclofenac sodium 3% gel, and ibuprofen to A.M. on August 4, 2023.

637.     A.M. was reexamined by Iqbal on October 11, 2023 where she reported that her neck, shoulder, and low back pain were getting worse, thus demonstrating that the previously prescribed medications, including Topical Pain Products, were ineffective at treating A.M.'s pain. Nonetheless, Iqbal recommended in his report of the follow-visit that A.M. continue to use the ineffective and unnecessary lidocaine patches.

110

638.    On October 11, 2023, Iqbal prescribed A.M. with 1st Medx patches with lidocaine, diclofenac sodium 3% gel, and cyclobenzaprine tablets (muscle relaxer), even though these medications were not effective to treat A.M.'s complaints of pain to her spine, and transmitted these 3 prescriptions to Alight Rx.

639.    Additionally, there is no indication that A.M. suffered from actinic keratosis, the particular skin condition for which diclofenac sodium 3% gel is proven effective to treat.

640.    On October 12, 2023, November 29, 2023, and December 26, 2023, Alight Rx charged Allstate $943.57 for the diclofenac sodium 3% gel purportedly dispensed to A.M. However, Alight Rx refilled A.M.'s original medically unnecessary prescription for diclofenac sodium 3% gel twice even though the prescription did not call for refills:



641.    On October 12, 2023 and October 31, 2023, Alight Rx charged Allstate $1,085.00 for the 1st Medx patches with lidocaine purportedly dispensed to A.M. However, Alight Rx refilled A.M.'s original medically unnecessary prescription for 1st Medx patches even though the prescription did not call for refills:

642.    By dispensing refills of medications pursuant to prescriptions that did not authorize refills, Alight Rx failed to dispense the medications pursuant to a valid prescription.

643.    Alight Rx's repeated unauthorized refills placed patients at risk and revealed that the prescriptions were not a part of any legitimate treatment plan in the patient's best interests, but merely a vehicle to generate billing opportunities for Alight Rx.

644.    On September 14, 2023, another provider at the same clinic as Iqbal prescribed A.M. with lidocaine 5% topical pain patches, diclofenac sodium 3% gel, and ibuprofen, which prescriptions were transmitted to another pharmacy, non-party County Line Pharmacy.

645.    On November 8, 2023, and December 6, 2023, Iqbal himself prescribed A.M. with diclofenac sodium 3% gel, which prescriptions were transmitted to County Line Pharmacy.

646.    Meanwhile, Alight Rx continued to refill Iqbal's October 11, 2023 prescription for diclofenac sodium 3% gel for A.M. on November 29, 2023 and December 26, 2023 even though County Line Pharmacy had already dispensed diclofenac sodium 3% gel to A.M.

647.    Even if the diclofenac sodium 3% gel was medically necessary to treat A.M.'s musculoskeletal injuries (it was not), Alight Rx improperly continued to charge Allstate for 3 refills of this medication purportedly dispensed to A.M. This therapeutic duplication placed A.M.

112

at risk of overuse of this medication without the knowledge or oversight of her physician who continued to prescribe the medication to A.M. through another pharmacy.

648.     In reliance on this false and fraudulent claim documentation, Allstate paid Alight Rx $2,038.66 for the medically unnecessary diclofenac sodium 3% gel and 1st Medx patches purportedly dispensed by Alight Rx to A.M.

649.     To the extent that Allstate paid Alight Rx in reliance on the documents created and submitted in connection with the drugs and medications for A.M., Allstate is entitled to recover all payments made to Alight Rx in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

650.     To the extent that any of Alight Rx's charges for the drugs and medications for A.M. remain unpaid, Allstate has no further obligation to make payment because A.M.'s charges are not compensable under New York's No-Fault laws.

### m.     Exemplar Claim—N.H. (0736816356)

651.     Claimant N.H. purportedly was involved in a motor vehicle accident on November 18, 2023.

652.     On December 7, 2023, N.H. underwent a neurological consultation with Krishna who reported N.H.'s complaints as consistent with headache, neck and back strain, radiculopathy, and left shoulder derangement.

653.     Krishna re-examined N.H. on December 29, 2023 and prescribed N.H. with lidocaine 4% topical gel, topiramate (headache and seizure medication), meclizine (nausea and vertigo medication), and Flector 1.3% patches, which prescriptions were transmitted to Alight Rx.

654.     Alight Rx substituted the prescribed lidocaine 4% gel with lidocaine 5% ointment and the prescribed Flector 1.3% patches with diclofenac 1.5% solution.

655.    However, none of these Topical Pain Products were necessary or effective to treat N.H.'s complaints of pain over large areas of the neck, back, and shoulder and also were ineffective to treat radiating pain.

656.    Alight Rx purportedly delivered these 4 medications to N.H. at home on January 4, 2024; however, that same day, another pharmacy purportedly delivered additional Topical Pain Products to N.H.'s home, including diclofenac 1% topical gel and lidocaine 4%-menthol 5% patches, which also were prescribed by Krishna.

657.    Moreover, Krishna also prescribed N.H. with a compounded topical product containing lidocaine on December 12, 2023, which was dispensed by a third pharmacy.

658.    Krishna thus prescribed duplicative Topical Pain Products containing lidocaine and diclofenac to N.H., which not only were redundant and unnecessary but placed N.H. at risk of overdosing on these products and experiencing serious side effects.

659.    Upon information and belief, Krishna generated numerous prescriptions for unnecessary Topical Pain Products to multiple pharmacies, including Alight Rx, pursuant to unlawful referral relationships without regard for patient care.

660.    Indeed, on January 4, 2024, Krishna inexplicably prescribed N.H. with lidocaine 4% patches and transmitted this prescription to Alight Rx.

661.    Alight Rx purportedly delivered this unnecessary Topical Pain Product to N.H. on January 16, 2024 even though Alight Rx had previously filled Krishna's prescription for lidocaine 5% ointment for N.H. less than 2 weeks prior.

662.    However, a pharmacist must conduct a prospective drug review before a drug is delivered to a patient off of pharmacy premises, which includes screening for therapeutic duplication. 8 N.Y.C.R.R. § 63.6(b)(7).

114

663.    Here, an Alight Rx pharmacist should have personally contacted N.H. to offer counseling regarding the therapeutic duplication presented by Krishna's prescriptions for 2 different lidocaine-containing products, which were in addition to the other lidocaine-containing product prescribed by Krishna and delivered to N.H. by another pharmacy. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(1).

664.    There is no evidence that an Alight Rx pharmacist personally contacted N.H. to offer counseling, only that N.H. purportedly did not "request" counseling at the time that the medications were delivered:



665.    Krishna never justified, or even discussed, the necessity for several different forms of topical lidocaine and diclofenac in his treatment records for N.H. and N.H. did not need or even want these medications.

666.    Indeed, another provider examining N.H. on February 1, 2024 reported that N.H. did not have any "current medications":



667.    In reliance on this false and fraudulent claim documentation, Allstate paid Alight Rx $1,109.00 for the medically unnecessary lidocaine 5% ointment purportedly dispensed by Alight Rx to N.H.

668. To the extent that Allstate paid Alight Rx in reliance on the documents created and submitted in connection with the drugs and medications for N.H., Allstate is entitled to recover all payments made to Alight Rx in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

669. To the extent that any of Alight Rx's charges for the drugs and medications for N.H. remain unpaid, Allstate has no further obligation to make payment because N.H.'s charges are not compensable under New York's No-Fault laws.

### n.  Exemplar Claim—M.E. (0710335027)

670. Claimant M.E. purportedly was involved in a motor vehicle accident on April 15, 2023.

671. M.E. was examined on June 2, 2023 for complaints of spine pain and prescribed 1st Medx patches with lidocaine, which prescription was transmitted to Alight Rx. The prescription authorized 4 refills.

672. According to a note on the prescription, on June 6, 2023, the Alight Rx pharmacist obtained authorization from the prescriber to switch the medication from 1st Medx patches with lidocaine to lidocaine 4% patches supposedly "due to ins[urance] plan limitations."

673. However, in the notes of a June 15, 2023 follow-up visit, the prescribing provider still reported 1st Medx patches—and not lidocaine 4% patches—as M.E.'s prescribed medication:

**Medications**
Reviewed and no changes noted June 15, 2023.
1st Medx-Patch With Lidocaine 4-20-0.025-5 % Topical - adhesive patch,medicated diclofenac sodium 50 mg Oral - tablet,delayed release (DR/EC) ibuprofen 600 mg Oral - tablet

674.     The lidocaine 4% patches (NDC No. 50488-2004-01) billed to Allstate by Alight Rx were not covered drug items under New York No-Fault laws because lidocaine 4% patches are available over the counter.

675.     Moreover, the lidocaine patches billed to Allstate by Alight Rx were ineffective and unnecessary for the treatment of M.E.'s reported spine pain because the drug is not proven effective or safe for treating deep joint pain in areas such as back.

676.     Alight Rx charged Allstate $741.00 each of the 5 times that it purported to dispense these unnecessary, ineffective, and noncompensable lidocaine 4% patches to M.E. on June 7, 2023, June 21, 2023, July 10, 2023, July 24, 2023, and August 7, 2023.

677.     In all, Alight Rx charged Allstate over $3,700 for the lidocaine 4% patches even though such patches are available over the counter at a fraction of the price (e.g., Salonpas patches).

678.     Additionally, M.E. stopped treating with the prescribing provider on June 15, 2023 after only 2 visits.  Therefore, Alight Rx continued refilling M.E.'s prescription by delivering the lidocaine 4% patches to M.E.'s home several additional times even though M.E.'s use of this Topical Pain Product was no longer under review and supervision by the prescribing provider.

679.     In reliance on this false and fraudulent claim documentation, Allstate paid Alight Rx $5,301.11 for the medically unnecessary lidocaine 4% patches purportedly dispensed by Alight Rx to M.E.

680.     To the extent that Allstate paid Alight Rx in reliance on the documents created and submitted in connection with the drugs and medications for M.E., Allstate is entitled to recover all payments made to Alight Rx in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

681.    To the extent that any of Alight Rx's charges for the drugs and medications for M.E. remain unpaid, Allstate has no further obligation to make payment because M.E.'s charges are not compensable under New York's No-Fault laws.

### C.    PREDETERMINED PROTOCOL OF MEDICALLY UNNECESSARY DRUGS AND MEDICATIONS

#### 1.    Defendants Steered Prescribing Providers to Particular Topical Pain Products

682.    The Defendants worked closely with No-Fault clinics to ensure that the prescriptions funneled to the Pharmacy Defendants complied with the predetermined prescription protocol.

683.    The Defendants engaged in several tactics to ensure a steady stream of prescriptions for the most profitable drugs and medications, including billing for particular Topical Pain Products pursuant to prescriptions not authorized by the provider and routinely substituting prescribed medications with predetermined Topical Pain Products.

#### a.    Unauthorized and Forged or Altered Prescriptions

684.    In certain instances, the No-Fault clinics bypassed the prescribing provider entirely to ensure that invalid and unauthorized prescriptions for Topical Pain Products under the prescribing provider's name and credentials were transmitted to the Pharmacy Defendants.

685.    Several providers employed by Metro Pain and/or Tri-borough have testified that unauthorized prescriptions were routinely submitted under their name and credentials.

686.    Elton, a former Metro Pain provider, testified in December 2020 that he resigned from Metro Pain when he "found that unauthorized prescriptions were being sent under [his] name" for "topical…Diclofenac":

Q    Why did you stop working for Metro Pain in 2020?

A    I believe it was -- I have -- I do have documents pertaining.  I believe it was December 2020.  I did resign after I found that unauthorized prescriptions were being sent under my name to the pharmacy.

Q    Okay.  And do you know, do you recall the name of the pharmacy those prescriptions were being sent to?

A    No, although I did have it written down.  I can make that available.

Q    And do you know what the unauthorized prescriptions were for?

A    Yes, it was for a topical medication called Diclofenac.

687.    Other Metro Pain and Tri-borough providers reportedly have stated under oath that unauthorized prescriptions under their name and credentials actually were forged or altered and then sent to pharmacies or DME providers without the prescribing provider's consent or knowledge, which corroborates Elton's testimony regarding the practices at Metro Pain. *GEICO v. SMS Therapy Supply, Inc.*, No. 1:23-cv-07862 (E.D.N.Y.) (citing affidavit of Metro Pain and Tri-borough provider Patricia Kelly, M.D. ("Kelly") affirming that she did not authorize the prescriptions for DME billed by SMS Therapy Supply, Inc. and alleging that SMS Therapy Supply, Inc. submitted forged and unauthorized rebuttal reports in the name of Kelly and Metro Pain provider Michael Alleyne, M.D. ("Alleyne") based on their sworn affidavits); *Liberty Mut. Ins. Co. v. Nu Age Med Solutions, Inc.*, No. 1:23-cv-07985 (E.D.N.Y.) (citing affidavit of Kelly affirming that she did not authorize the prescriptions for DME billed by Nu Age Med Solutions, Inc. and alleging that Nu Age Med Solutions, Inc. submitted forged and unauthorized rebuttal reports in the name of Kelly and Alleyne based on their sworn affidavits); *GEICO v. Avonora, Inc.*

*d/b/A Avonora Pharmacy*, No. 23-cv-03409 (E.D.N.Y.) (citing Alleyne's testimony under oath regarding unauthorized prescriptions submitted under his name that were forged and/or altered without his knowledge in support of allegations of unlawful referral relationships between illegitimate pharmacies and Metro Pain clinics); *GEICO v. Orthopain Supply, Inc.*, No. 1:23-cv-03413 (E.D.N.Y.) (citing to statements under oath of Alleyne and Kelly regarding unauthorized prescriptions for DME with copies or forgeries of their signature used without their consent in support of allegations of unlawful referral relationships between illegitimate DME providers and Metro Pain and Tri-borough clinics).

688.    As noted above, a person named Oksana, the manager of the clinic at 90-16 Sutphin Boulevard, Jamaica, NY was one such individual working on behalf of Metro Pain who transmitted unauthorized prescriptions under the names of Elton and other physicians treating patients of Metro Pain.

689.    John Street Pharmacy billed for Topical Pain Products, including diclofenac sodium 3% gel purportedly prescribed by Elton and other Metro Pain/Tri-borough providers, that were noted to have been authorized via telephone by "Oksana":

## Claimant R.C. (claim no. 0575054985)





## Claimant W.P. (claim no. 0606582310)



## Claimant R.M. (claim no. 0606591519)



**Claimant P.J. (claim no. 0607025582)**



**Claimant A.B. (claim no. 0609334994)**



## Claimant M.B. (claim no. 0609336994)



## Claimant D.W. (claim no. 0616660767)





**Claimant A.M. (claim no. 0622440089)**



690.    Oksana transmitted prescriptions to John Street Pharmacy under Elton's name and credentials even when he specifically did not indicate that the particular Topical Pain Product was to be prescribed in his initial examination report.

125

691.    For example, on October 8, 2020, Elton examined claimant M.T. (claim no. 0602158362) at Metro Pain's 90-16 Sutphin Boulevard, Jamaica, NY location. In the report of this initial exam of M.T., Elton circled a pre-printed menu of medications for lidocaine 5% ointment, but appears to have crossed out a prescription for diclofenac sodium 3% gel:

692.    On October 8, 2020 at 12:41 p.m., Elton electronically prescribed lidocaine 5% ointment for M.T. and transmitted the prescription for this medically unnecessary Topical Pain Product to John Street Pharmacy.

693.    However, at 1 p.m. on October 8, 2020, less than 20 minutes after Elton electronically prescribed lidocaine 5% ointment, Oksana transmitted a second prescription for diclofenac sodium 3% gel to John Street Pharmacy by telephone under Elton's name:



694.    Elton did not authorize a prescription for diclofenac sodium 3% gel as illustrated by the initial exam report for M.T. and thus Oksana transmitted the prescription for this second unnecessary Topical Pain Product by telephone without Elton's knowledge or consent.

695.    Oksana even transmitted prescriptions to John Street Pharmacy under Elton's name and credentials for patients that he did not examine.

696.    For example, claimant M.B. (claim no. 0609336994) was examined at Metro Pain's 90-16 Sutphin Boulevard, Jamaica, NY location on December 11, 2020 by Camari Wallace, M.D. ("Wallace"):

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 12/11/20 | 9016 SUTPHIN BLVD Jamaica NY 11435 | OFFICE OR OTHER OUTPATIENT VISIT FOR EVALUATION AND MANAGEMENT OF A NEW PATIENT | 99204 | 203.76 |
| | | | TOTAL CHARGES TO DATE$ | $ 203.76 |

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | | |
|---|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) | |
| WALLACE, CAMARI | MD | 279402 | ✓ | ☐ | | |

697.    According to the report of this initial examination, Wallace prescribed M.B. with both lidocaine 5% patches and diclofenac sodium 3% gel by circling a pre-printed menu of medications:

**Medication Prescribed:**

Flexeril  Skelaxin  Ibuprofen 800 mg  Celecoxib Capsules 200 mg  Naprosyn 500 mg

LIDOCAINE/LIDODERM 5 % PATCHES or OITMENT 5 %    100-GRAMS/200-GRAMS
1 patch transdermally daily remove after 12 hours to most painful area

DICLOFENAC 3% GEL   Qty:_____ (1 application topically to affected area 2 times per day)
AAA 3-4 TIMES DAILY  100-Grams  200-Grams  300-Grams
Flector 1.3 % Transdermal Patch_____Dispense_____ Days Supply
1 patch transdermally 2 times per day to most painful area

698.    On December 11, 2020, Oksana transmitted a prescription for diclofenac sodium 3% gel under Wallace's credentials, but a prescription for lidocaine 5% ointment under Elton's credentials:



699. However, Elton **did not** treat M.B. or assess whether he needed lidocaine 5% ointment on December 11, 2020, which was just a day after the underlying motor vehicle accident, and thus could not have personally prescribed M.B. with this medication or authorized this prescription.

700. Upon information and belief, consistent with Elton's testimony that Metro Pain submitted prescriptions for Topical Pain Products that he did not authorize, all telephone prescriptions transmitted to the Pharmacy Defendants by Oksana purportedly on behalf of a physician working for Metro Pain or Tri-borough were unauthorized and invalid.

701. There is no indication in the patients' medical records from these prescribing providers that any exceptional circumstances existed that prevented the providers from complying with New York's mandatory electronic prescribing requirements in effect during the relevant period.

702.    For example, Elton electronically prescribed lidocaine 5% ointment to claimant W.P. (claim no. 0606582310) on October 21, 2020 at his initial examination of W.P. at Metro Pain.

703.    Likewise, Elton also purportedly prescribed diclofenac sodium 3% gel to W.P. on October 21, 2020, which prescription was transmitted via telephone to John Street Pharmacy by "Oksana."

704.    There was no indications in W.P.'s records that Elton was unable to electronically prescribe medications on October 21, 2020.

705.    Indeed, Elton's electronic prescription for lidocaine 5% ointment on October 21, 2020 for W.P. has a timestamp of 12:33 p.m. while the telephone prescription for diclofenac sodium 3% gel indicates that it was communicated to John Street Pharmacy by Oksana at 12:45 p.m. on October 21, 2020.

706.    As further evidence of Metro Pain's unlawful referral relationship with John Street Pharmacy, the form purporting to assign W.P.'s No-Fault benefits—aside from assigning the benefits to Acutus, and not John Street Pharmacy—is dated October 21, 2020, the day of W.P.'s initial examination at Metro Pain.

707.    Upon information and belief, the Defendants supplied Metro Pain with assignment of benefit forms to complete at the clinic at the time of the prescription to facilitate referrals to the Pharmacy Defendants.

708.    As for claimant W.P., Metro Pain used an old form tailored to Acutus rather than John Street Pharmacy and pre-signed, but not dated, by Patel:



709.    Upon information and belief, the telephone prescription for diclofenac sodium 3% gel on October 21, 2020 was not authorized by Elton and was not a valid prescription.

710.    Rather, Oksana transmitted this and other unauthorized prescriptions for diclofenac sodium 3% gel by telephone to the Pharmacy Defendants in furtherance of the unlawful referral relationships between the Pharmacy Defendants and Metro Pain/Tri-borough.

711.    The diclofenac sodium 3% gel purportedly prescribed by Elton on October 21, 2020 was not dispensed to W.P. until on or about December 2, 2020 and Elton resigned shortly thereafter on or about December 10, 2020.

712.    Without Elton's credentials available for Oksana's use in transmitting telephone prescriptions for diclofenac sodium 3% gel, Oksana began submitting invalid telephone prescriptions for diclofenac sodium 3% gel under the name of Leonid Shapiro, M.D., the record owner of Metro Pain, including the below prescription submitted by telephone to John Street Pharmacy for W.P. on February 11, 2021:

131



713.    John Street Pharmacy also billed for diclofenac sodium 3% gel pursuant to telephone prescriptions transmitted under Simhaee's credentials.

714.    The evidence shows that the telephone prescriptions purportedly submitted to John Street Pharmacy on Simhaee's behalf actually were unauthorized and unsigned prescriptions in furtherance of an unlawful referral relationship between John Street Pharmacy and FJ Ortho.

715.    For example, John Street Pharmacy purportedly received a prescription for diclofenac sodium 3% gel by telephone on behalf of Simhaee for claimants R.N. (claim no. 0605524628) and L.N. (claim no. 0605524628) on November 12, 2020:





716.    There is no indication in Simhaee's reports for R.N. and L.N. that any exceptional circumstances existed that prevented him from complying with New York's mandatory electronic prescribing requirement on November 12, 2020.

717.    Indeed, as evidence of Simhaee's electronic prescribing abilities on November 12, 2020, Simhaee transmitted several additional electronic prescriptions for both R.N. and L.N. on that same day.

134

718.    According to a checklist of prescriptions ordered by Simhaee at R.N.'s initial examination on November 12, 2020, he specifically **did** **not** prescribe diclofenac sodium 3% gel:



719.    Likewise according to a checklist of prescriptions ordered by Simhaee at L.N.'s initial examination on November 12, 2020, he specifically **did** **not** prescribe diclofenac sodium 3% gel:



720.    The checklist of prescriptions for L.N. and R.N. accompanying Simhaee's initial examination of L.N. and R.N. on November 12, 2020 also specifically identify "Acutus," which was John Street Pharmacy's trade name. The identification of Acutus shows that it was a foregone conclusion that the prescriptions would be sent to John Street Pharmacy.

721. Therefore, upon information and belief, FJ Ortho submitted unauthorized telephone prescriptions to John Street Pharmacy for diclofenac sodium 3% gel under Simhaee's name in the same unlawful manner that Metro Pain transmitted unauthorized prescriptions for diclofenac sodium 3% gel to John Street Pharmacy.

722. Similarly, John Street Pharmacy also billed for diclofenac sodium 1.5% solution pursuant to a "Telephone Rx" from Krishna for claimant R.K. (claim no. 0672513397) on June 30, 2022:



723. However, there is no indication in Krishna's report of his neurological exam of R.K. on June 30, 2022 at Total Neuro that diclofenac sodium 1.5% solution was being prescribed to R.K. or that any exceptional circumstances existed that prevented Krishna from complying with New York's mandatory electronic prescribing requirement.

724. Therefore, upon information and belief, Krishna, or someone else working on behalf of Total Neuro/Krishna, submitted unauthorized telephone prescriptions to John Street

Pharmacy for diclofenac sodium 1.5% solution under Krishna's name in furtherance of John Street Pharmacy's unlawful referral relationship with Total Neuro.

725.     Patients of another Krishna-owned PC, Westchester Medical Care, P.C. ("Westchester Medical"), also were prescribed unnecessary Topical Pain Products via telephone.

726.     For example, claimant B.G. (claim no. 0668373707) underwent an initial neurological consultation with Anamika Jain, M.D. ("Jain") at Westchester Medical on July 21, 2022 specifically for "head symptoms only," including headaches and dizziness.

727.     The report of this initial consultation of B.G. does not reference any prescribed medications.

728.     That same day, Jain prescribed topiramate (a migraine medication) and diclofenac sodium 3% gel for B.G.

729.     The prescription for diclofenac sodium 3% gel for B.G. was transmitted to John Street Pharmacy via telephone:



730.    There also was no evidence that Jain was unable to transmit prescriptions electronically at this time; at 3:13 p.m. on July 21, 2022, Jain electronically prescribed the topiramate and transmitted the prescription to John Street Pharmacy:



731.    According to the report of the follow-up consultation of B.G. at Westchester Medical on August 22, 2022, B.G. was only taking Lyrica and the topiramate and the report was silent regarding diclofenac sodium 3% gel.

732.    Therefore, upon information and belief, Westchester Medical submitted unauthorized telephone prescriptions to John Street Pharmacy for diclofenac sodium 3% gel under Krishna's employee's name in furtherance of John Street Pharmacy's unlawful referral relationship with Westchester Medical.

733. Non-party Lam Quan, M.D. ("Quan") frequently referred prescriptions for unnecessary lidocaine 5% ointment to Alight Rx without complying with electronic prescribing requirements.

734. Quan has been linked to other No-Fault fraud schemes. *See Liberty Mut. Ins. Co. v. Woodside Chemists, Inc.*, No. 1:17-cv-06313 (E.D.N.Y.).

735. On many occasions, Quan has prescribed the same unnecessary and ineffective Topical Pain Product, lidocaine 5% ointment, to claimants using prescriptions purportedly submitted to Alight Rx by telephone or fax despite no indication that Quan had technical issues or other legitimate reasons excusing the use of electronic prescribing:

| Claimant | Date of Rx | Method of Rx |
|---|---|---|
| G.U. (claim no. 0709919574) | 6/6/2023 | Telephone |
| A.C. (claim no. 0700062649) | 7/20/2023 | Telephone |
| B.R. (claim no. 0707960555) | 8/3/2023 | Fax |
| J.L. (claim no. 0723713995) | 8/3/2023 | Fax |
| G.C. (claim no. 0719752742) | 7/28/2023 | Telephone |
| O.T. (claim no. 0720783364) | 8/29/2023 | Fax |

736. Rather, these prescriptions transmitted to Alight Rx by or on behalf of Quan by telephone and/or fax represented unsigned copies that were susceptible to alteration and forgery.

737. Upon information and belief, the prescriptions for lidocaine 5% ointment under Quan's credentials transmitted to Alight Rx by telephone or fax were not properly authorized and were funneled to Alight Rx as part of an unlawful referral relationship.

### b.    Substitutions with More Expensive Products

738.    John Street Pharmacy and Alight Rx also steered prescribing providers to prescribe certain medications consistent with the Defendants' predetermined protocol of drugs and medications.

739.    John Street Pharmacy and Alight Rx required that prescribing providers, including, but not limited to, Simhaee, Krishna, and Clarke, approve the dispensing of drugs and medications other than those originally prescribed.

i.    Fenoprofen Calcium 200 mg Substituted with Fenoprofen 400 mg

740.    Simhaee prescribed claimant S.S. (claim no. 0563236629) with 60 capsules of NSAID fenoprofen calcium (200 mg) on September 30, 2020.

741.    However, a handwritten note on the prescription indicates that John Street Pharmacy substituted the prescribed medication with 60 capsules of fenoprofen calcium (400 mg)—double the prescribed strength—because the 200 mg capsules were "not in stock":



742.    The prescribed fenoprofen calcium 200 mg capsules with NDC No. 54288-0131-10 have an AWP of $480 per 100 capsules.

743.    The substituted fenoprofen calcium 400 mg capsules with NDC No. 15014-0400-60 have an AWP of $1,495.09 per 60 capsules.

744.    Upon information and belief, the Defendants purposely did not stock fenoprofen calcium 200 mg capsules under NDC No. 54288-0131-10 because it was more profitable to dispense the more expensive 400 mg capsules with NDC No. 15014-0400-60.

745.    Therefore, when John Street Pharmacy received prescriptions for fenoprofen calcium 200 mg from prescribing providers, the Defendants intentionally steered the provider to a more potent dose for the sole purpose of increasing profits at the expense of patient care and contrary to the prescribing provider's treatment plan.

ii.    Diclofenac Epolamine 1.3% Patches Substituted with Lidocaine 4% Patches and Diclofenac Sodium 1.5% Solution

746.    On November 12, 2020, Simhaee prescribed claimant L.N. (claim no. 0605524628) Flector 1.3% patches under NDC No. 33261-0711-30, which contain diclofenac epolamine and are available only by prescription. This prescription for Flector 1.3% patches was transmitted to John Street Pharmacy.

747.    However, John Street Pharmacy substituted the prescribed Flector 1.3% patches with lidocaine 4% patches, which are available over the counter, because the Flector 1.3% patches were "not in stock":



748.    Flector 1.3% patches under NDC No. 33261-0711-30 had an AWP of $265 per 30 patches during the relevant period.

749.    Lidocaine 4% patches, which John Street Pharmacy billed for under NDC No. 50488-2004-01, have an AWP of $460 per 10 patches.

750.    Upon information and belief, the Defendants purposely did not stock Flector 1.3% patches under NDC No. 33261-0711-30 because the lidocaine 4% patches under NDC No. 50488-2004-01 have a much higher AWP even though these over-the-counter patches are not covered drug items under New York's No-Fault laws.

751.    Similarly, Krishna regularly prescribed diclofenac epolamine 1.3% transdermal patches, including Flector 1.3% patches, to Allstate claimants and transmitted these prescriptions to John Street Pharmacy and Alight Rx.

752.    However, upon receipt of these prescriptions for diclofenac epolamine 1.3% patches from Krishna, John Street Pharmacy and Alight Rx substituted diclofenac sodium 1.5% solution under NDC Nos. 51021-0250-05, 65162-0911-74, or 70512-0025-05.

753.    For example, Krishna prescribed claimant L.L. (claim no. 0598424588) with 30 Flector 1.3% patches, but John Street Pharmacy switched the medication to diclofenac sodium 1.5% solution under the pretext of "ins[urance] plan limitations":



754.    As illustrated by the notation, "NF claim" on the prescription, John Street Pharmacy recognized that it could inflate its charges to Allstate by substituting the prescribed medication (i.e., Flector 1.3% patches) with diclofenac sodium 1.5% solution, which has a higher AWP than Flector 1.3% patches.

755.    John Street Pharmacy billed Allstate for diclofenac sodium 1.5% solution dispensed to L.L. under NDC No. 51021-0250-05, which had an AWP of $1,459.52 per 150 ml package.

756. John Street Pharmacy charged Allstate over $1,170.00 for 150 ml of diclofenac sodium 1.5% solution under NDC No. 51021-0250-05 purportedly dispensed to L.L. in place of the originally prescribed Flector 1.3% patches.

757. Below are representative examples of John Street Pharmacy's repeated financially motivated substitution of the diclofenac epolamine 1.3% patches prescribed by Krishna with diclofenac sodium 1.5% solution:

| Claimant | Date of Prescription(s) | Prescribed Medication | Billed-For Medication |
|---|---|---|---|
| P.D. (claim no. 0632043824) | 1/14/2022 | Diclofenac epolamine 1.3% transdermal patch | Diclofenac sodium 1.5% solution |
| O.S. (claim no. 0632473970) | 7/25/2022 | Flector 1.3% transdermal patch | Diclofenac sodium 1.5% solution |
| E.F. (claim no. 0618233233) | 3/19/2021 | Flector 1.3% transdermal patch | Diclofenac sodium 1.5% solution |
| D.A. (claim no. 0600455398) | 8/30/2021 | Flector 1.3% transdermal patch | Diclofenac sodium 1.5% solution |
| L.J. (claim no. 0580272698) | 1/29/2021 | Flector 1.3% transdermal patch | Diclofenac sodium 1.5% solution |
| J.P. (claim no. 0628250649) | 6/16/2021 | Flector 1.3% transdermal patch | Diclofenac sodium 1.5% solution |
| R.M. (claim no. 0615378619) | 3/10/2021 | Flector 1.3% transdermal patch | Diclofenac sodium 1.5% solution |

758. Likewise, Alight Rx also substituted Flector 1.3% patches prescribed by Krishna with diclofenac sodium 1.5% solution.

759. For example, on December 29, 2023, Krishna prescribed claimant N.H. (claim no. 0736816356) with Flector 1.3% patches, but a notation on the prescription indicates that, several

144

days later, Alight Rx purportedly obtained authorization from Krishna to substitute with diclofenac sodium 1.5% solution:

760. Alight Rx billed Allstate for diclofenac sodium 1.5% solution under NDC No. 65162-0911-74 using the AWP of $689.77 per 150mL package, which is greater than the AWP for 30 Flector 1.3% patches (NDC No. 71858-0405-05) of $358.80. Therefore, Alight Rx was financially motivated to substitute the prescribed medication for a more profitable product.

761. The Defendants also squashed Clarke's prescription for 60 diclofenac epolamine 1.3% patches as to claimant P.R. (claim no. 0624612297) on August 27, 2021.

762. There is a note from the John Street Pharmacy pharmacist on this prescription that the diclofenac epolamine 1.3% patches were switched to diclofenac sodium 1.5% solution "due to ins[urance] plan limitations":





Drug Name    Diclofenac Epolamine 1.3 % External Patch

Prescribed NDC  59762070702         Quantity       60.00
Potency UnitCd                                     (Sixty)
Form Code     Patch                  Written Date   08/27/2021
Refill         0                     Eff. Date
Strength       1.3                   DAW            N
Days Supply    30                    DX:
Drug Class     0
Direction  APPLY PATCH TO AFFECTED AREA TWICE DAILY.

Notes    Diclofenac Epolamine 1.3 % External Patch

PH/TH;  SJQ/YE

RPh Note:

SPOKE TO (dr. clarke) 8/27 @ 3:00pm  AS PER MD DUE TO INS PLAN
LIMITATIONS MD AUTHORIZED SWITCH TO

MEDICATION: diclofenac sod 1.5% drops
QTY:150ml
DAY SUPPLY: 30
SIG:40 gtts (2ml) to aa 3-4 times a day externally

763.    Even if these Topical Pain Products were medically necessary and eligible for No-Fault reimbursement in the first instance (they were not), there was no "insurance plan limitation" requiring the prescription of diclofenac sodium 1.5% solution versus diclofenac epolamine 1.3% patches.

764.    John Street Pharmacy's excuse that the insurance plan precluded dispensing the diclofenac epolamine 1.3% patches was a cover concocted to permit John Street Pharmacy to bill for the more expensive medication, the diclofenac sodium 1.5% solution.

765.    The billed-for diclofenac sodium 1.5% solution under NDC No. 51021-0250-05 has an AWP of $1,459.52 for 150ml while the prescribed diclofenac epolamine 1.3% patches have an AWP of only $402.80 for a package of 30 patches.

766.    Therefore, John Street Pharmacy could bill over $500 more for the diclofenac 1.5% solution compared to the 60 prescribed patches, thus motivating the Defendants to steer Clarke to substitute for the more expensive medication.

767.    Therefore, when John Street Pharmacy and Alight Rx received prescriptions for diclofenac epolamine 1.3% patches from prescribing providers, the Defendants intentionally steered the provider to a different product for the sole purpose of increasing profits at the expense of patient care and contrary to the prescribing provider's treatment plan.

iii.    <u>Lidocaine Patches Substituted with Lidocaine 5% Ointment</u>

768.    John Street Pharmacy did not bill for lidocaine 5% patches because this product was not as profitable as lidocaine 5% ointment.

769.    Therefore, John Street Pharmacy pushed lidocaine 5% ointment as a substitute whenever lidocaine 5% patches were prescribed to take advantage of the difference between the AWP and WAC for lidocaine 5% ointment, which was greater than the difference between the AWP and WAC for the originally prescribed lidocaine 5% patches.

770.    For example, Clarke prescribed 30 lidocaine 5% patches under NDC No. 00378-9055-93 to claimant P.R. (claim no. 0608850129) on December 9, 2020.

771.    John Street Pharmacy did not dispense the prescribed lidocaine 5% patches; rather, according to a handwritten note on the prescription, John Street Pharmacy dispensed 50 grams of lidocaine 5% ointment instead under NDC No. 52565-0008-55:



147

772.    The reason for this substitution is simple: the prescribed lidocaine 5% patches under NDC No. 00378-9055-93 have an AWP of $308.27 for 30 patches with a WAC of $246.61 while the billed-for lidocaine 5% ointment under NDC No. 52565-0008-55 has an AWP of $380.93 per 50 grams and a WAC of just $25.00.

773.    Similarly, Simhaee purportedly examined claimant R.C. (claim no. 0538218017) on November 9, 2020 and reported that R.C. had "no current medications" while also including the instruction "continue current meds" in the treatment plan.

774.    The following day, November 10, 2020, Simhaee transmitted a prescription for Ztlido 1.8% lidocaine patches prescribed for claimant R.C. to John Street Pharmacy despite the inconsistencies regarding R.C.'s medications in the report of the November 9 exam.

775.    However, the Defendants also steered Simhaee to switch the prescribed medication, Ztlido 1.8% lidocaine patches, for R.C. to lidocaine 5% ointment, which was an entirely different delivery mechanism than the originally prescribed medication (patch v. ointment) at a higher concentration of lidocaine (1.8% v. 5%).

776.    The purported reason for the switch was that John Street Pharmacy did not stock Ztlido 1.8% patches "due to ins[urance] plan limitations" because they were "too expensive":

148



777.    However, in November 2020, Ztlido 1.8% patches had an AWP of $342.00 per 30 patches while the billed-for lidocaine 5% ointment under NDC No. 52565-0008-55 has an AWP of $380.93 per 50 grams.

778.    John Street Pharmacy billed Allstate $1,219.04 for 200 grams of lidocaine 5% ointment (NDC No. 52565-0008-55) dispensed to R.C. on or about November 12, 2020.

779.    The permissible charge for 60 Ztlido 1.8% patches under the Fee Schedule was $547.20 (after the required 20% deduction).

780.    Therefore, John Street Pharmacy could charge significantly more for 200 grams of lidocaine 5% ointment than the originally prescribed 60 Ztlido 1.8% patches.

781.    The Defendants thus steered Simhaee to their preferred Topical Pain Product—lidocaine 5% ointment—as opposed to the originally prescribed medication on the pretext that the prescribed medication was "too expensive" when, in actuality, the Defendants were merely seeking to inflate the charged amounts without regard to patient care.

782.    The Defendants improperly influenced prescribing providers to authorize specific Topical Pain Products and other unnecessary drugs and medications so that John Street Pharmacy could bill for the most expensive products possible.

### 3.    Prescribing Providers Failed to Document That the Topical Pain Products Were Medically Necessary or Warranted

783.    The prescribed Topical Pain Products had no documented utility in the treatment of the patients' musculoskeletal injuries.

784.    The prescribing providers' failure to document any justification for these prescriptions for Topical Pain Products referred to the Pharmacy Defendants demonstrates that the providers ordered these medications by default as part of a pre-arranged plan with Defendants.

785.    Topical diclofenac and lidocaine are not indicated to treat musculoskeletal pain, and the prescription of such medications as an early course of treatment was medically unnecessary and deviated from the standard of care.

786.    Topical lidocaine ointment is indicated for minor skin conditions like insect bites, burns, and irritation.

787.    Topical lidocaine patches are indicated to treat pain resulting from post-herpetic neuralgia.

788.    Topical diclofenac is indicated for actinic keratosis, a skin condition that affects the surface level of the skin.

789. Despite these distinct indications, there is no documentation that any claimant prescribed topical lidocaine or diclofenac suffered from any of the conditions for which the Topical Pain Products are indicated.

790. Therefore, the prescribing providers had no legitimate, medically necessary basis to prescribe the Topical Pain Products billed to Allstate by the Pharmacy Defendants.

791. There also was no documentation that claimants had a special sensitivity or vulnerability to standard oral NSAIDs or over-the-counter pain relieving NSAIDs requiring the prescription of a topical alternative.

792. The prescribing providers did not document the impact or effects of the prescribed drugs and medications, including Topical Pain Products, on the patients.

793. Rather, the prescribing providers reported that the patients' pain persisted at essentially the same level despite the duplicative topical and oral NSAID drugs and medications dispensed to the patients by the Pharmacy Defendants.

794. Additionally, there was no documented justification for the duplicative prescriptions of both oral and topical NSAIDs for the same patient.

795. Topical medications should only substitute for oral NSAIDs when a patient is truly intolerant of oral medication.

796. However, the Pharmacy Defendants' patients were prescribed a topical diclofenac product simultaneously with oral NSAIDs, which shows that the patient did not actually suffer any sensitivity or intolerance to oral NSAIDs requiring a topical NSAID.

797. Rather, the concurrent prescriptions for both oral and topical NSAIDs represented duplicative therapeutic treatment that Pharmacy Defendants should have refused to dispense out of concern for patient care and safety.

798. Instead, the Defendants took financial advantage of the duplicative treatment and caused the Pharmacy Defendants to bill for all prescribed medications despite the clear lack of justification.

799. The Pharmacy Defendants also billed for drugs and medications prescribed weeks before they were purportedly dispensed to claimants, which is further evidence that the products were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits.

800. For example, Elton initially examined claimant D.R. (claim no. 0580870004) on March 17, 2020 and prescribed D.R. with medically unnecessary diclofenac sodium 3% gel at this visit.

801. John Street Pharmacy did not dispense or submit charges for this diclofenac sodium 3% gel until May 5, 2020—49 days after the March 17 prescription.

802. The report of a follow-up examination of D.R. on May 26, 2020, following the purported delivery of the diclofenac sodium 3% gel, does not identify any current medications.

803. Similarly, Elton purportedly prescribed both lidocaine 5% ointment and diclofenac sodium 3% gel to claimant W.P. (claim no. 0606582310) on October 21, 2020 following his initial examination of W.P. at Metro Pain.

804. These medically unnecessary Topical Pain Products purportedly prescribed by Elton on October 21, 2020 were not delivered by John Street Pharmacy to W.P. until 42 days later on December 2, 2020.

805. Moreover, this prescription for lidocaine 5% ointment called for 1 refill, which was delivered to W.P. on December 30, 2020 and billed to Allstate by John Street Pharmacy.

806.    However, there is no evidence that W.P. was even using the lidocaine 5% ointment and diclofenac sodium 3% gel delivered on December 2, 2020; the report of a follow-up examination of W.P. at Metro Pain on December 20, 2020 identified only ibuprofen as part of W.P.'s current medications.

807.    The significant lapse of time between the prescription and dispensing of the prescribed medication shows that the lidocaine 5% ointment and diclofenac sodium 3% gel was not medically necessary to treat any injuries causally related to the underlying motor vehicle accident on October 16, 2020.

808.    On August 30, 2021, Krishna prescribed Flector 1.3% patches, including 2 refills, to claimant D.A. (claim no. 0600455398):

809.    However, John Street Pharmacy did not process this prescription until <u>109 days</u> later on December 17, 2021, when John Street Pharmacy contacted Krishna to switch to diclofenac sodium 1.5% solution:



810.    John Street Pharmacy billed Allstate for dispensing the diclofenac sodium 1.5% solution to D.A. on January 12, 2022—an additional 26 days later—in addition to charges for 2 refills on February 24, 2022 and March 24, 2022.

811.    John Street Pharmacy charged Allstate a total of over $3,500 for this unnecessary diclofenac sodium 1.5% solution that was not dispensed to D.A.—if at all—until months after Krishna transmitted the prescription to John Street Pharmacy.

812.    Similarly, Krishna prescribed unnecessary diclofenac sodium 3% gel to claimants S.T. and O.T. on the same day, June 9, 2024, which prescriptions were transmitted to Alight Rx.

813.    However, Alight Rx did not dispense these medications to S.T. and O.T. until July 11, 2023 and July 13, 2023, respectively, which was more than 30 days after the date of the prescriptions:

| Fill Date | Rx # | Rx. Barcode |
|---|---|---|
| 07/10/2023 | 1003910-0 | |

| Packages | Pres. Addr |
|---|---|
| 1 | ███████████████ |

Total Rx Count: 1     Copay paid -

Counseling Requested: Yes _____ No ✓ Receiver's Name: S████     Date: 07/11/2023

I certify that I requested and received delivery of my medication(s) listed above from Alight Rx LLC. I certify that I have paid the total Co-pay due amount. I acknowledge that I have received Alight Rx LLC Notice of HIPPA Privacy Rules and additional copies are available upon request.
Receiver's Signature:     Time: 17:01     Delivered By: Alight Rx

| Fill Date | Rx # | Rx. Barcode |
|---|---|---|
| 7/11/2023 | 1003912-0 | |

| Packages | Pres. Addr |
|---|---|
| | ███████████████ |

otal Rx Count: 1     Copay paid -

ounseling Requested: Yes _____ No ✓ Receiver's Name: Q████     Date: 07/13/2023

certify that I requested and received delivery of my medication(s) listed above from Alight Rx LLC. I rtify that I have paid the total Co-pay due amount. I acknowledge that I have received Alight Rx _C Notice of HIPPA Privacy Rules and additional copies are available upon request.     Time: 17:55     Delivered By: Alight Rx

814. Even if the diclofenac sodium 3% gel was necessary or effective to treat S.T. and O.T.'s complaints of musculoskeletal pain following a motor vehicle accident (it was not), S.T. and O.T. had already been deemed to have reached maximal medical improvement by another provider on June 6, 2023. The delay in prescribing and dispensing the diclofenac sodium 3% gel to S.T. and O.T. until after S.T. and O.T. had ceased treatment relating to the underlying motor vehicle accident on March 11, 2023 highlights that this Topical Pain Product was prescribed and dispensed as a matter of course without any regard for actual patient need.

815.    The chart below illustrates additional representative examples of instances where many weeks elapsed between the prescription and the purported delivery of the prescribed medication as evidence that these medications were not part of a legitimate treatment plan, but rather, were prescribed as a matter of course to patients who did not need—or want—these medications:

| Claimant | Prescribing Provider | Billed For Drug | Pharmacy Defendant | Date of Prescription | Date First Dispensed | Days Elapsed |
|---|---|---|---|---|---|---|
| M.B. (claim no. 0609336994) | Camari Wallace, M.D.; William Elton, M.D. | Diclofenac sodium 3% gel; lidocaine 5% ointment | John Street Pharmacy | 12/11/2020 | 2/2/2021 | 53 |
| P.J. (claim no. 0607025582) | William Elton, M.D. | Diclofenac sodium 3% gel | John Street Pharmacy | 10/28/2020 | 12/1/2020 | 34 |
| P.J. (claim no. 0607025582) | Leonid Shapiro, M.D. | Diclofenac sodium 3% gel | John Street Pharmacy | 1/14/2021 | 2/24/2021 | 41 |
| P.D. (claim no. 0632043824) | Ranga Krishna, M.D. | Diclofenac sodium 1.5% solution | John Street Pharmacy | 1/14/2022 | 2/22/2022 | 39 |
| O.S. (claim no. 0632473970) | Ranga Krishna, M.D. | Diclofenac sodium 1.5% solution | John Street Pharmacy | 7/25/2022 | 8/24/2022 | 30 |
| E.L. (claim no. 0523641462) | William Elton, M.D. | Diclofenac sodium 3% gel | Acutus | 11/6/2018 | 11/30/2018 | 24 |
| C.B. (claim no. 0555868462) | William Elton, M.D. | Diclofenac sodium 3% gel | Acutus | 7/30/2019 | 8/28/2019 | 29 |
| J.G. (claim no. 0553466632) | William Elton, M.D. | Diclofenac sodium 3% gel | Acutus | 7/23/2019 | 8/19/2019 | 27 |
| D.R. (claim no. 0555868462) | William Elton, M.D. | Diclofenac sodium 3% gel | Acutus | 7/30/2019 | 8/28/2019 | 29 |
| C.A. (claim no. 0715162806) | Kevin Frison, M.D. | Duexis 800mg-26.6mg; Lidocaine 4% patch; | Alight Rx | 5/30/2023 | 6/29/2023 | 30 |

| Claimant | Prescribing Provider | Billed For Drug | Pharmacy Defendant | Date of Prescription | Date First Dispensed | Days Elapsed |
|---|---|---|---|---|---|---|
| | | Cyclobenzaprine 10mg | | | | |
| J.P. (claim no. 0715162806) | Kevin Frison, M.D. | Duexis 800mg-26.6mg; Lidocaine 4% patch; Cyclobenzaprine 10mg | Alight Rx | 5/30/2023 | 6/29/2023 | 30 |
| T.M. (claim no. 0707763249) | Ranga Krishna, M.D. | Diclofenac sodium 3% gel | Alight Rx | 4/8/2023 | 5/10/2023 | 32 |
| T.M. (claim no. 0707763249) | Ranga Krishna, M.D. | Diclofenac sodium 3% gel | Alight Rx | 4/12/2023 | 8/3/2023 | 113 |

816. The prescribing providers' treatment records evidence that the Topical Pain Products billed to Allstate by the Pharmacy Defendants were not medically necessary and were not a legitimate part of the patients' treatment plans, but, rather, were merely vehicles to generate opportunities for the Pharmacy Defendants to submit inflated charges to Allstate.

**4.      The Pharmacy Defendants' Claimants Were Denied Choice of Pharmacy to Fill Prescriptions for Topical Pain Products**

817. The Defendants and referring providers ensured that prescriptions were funneled exclusively to the Pharmacy Defendants to permit the Defendants to bill for the prescribed drugs and medications.

818. The Pharmacy Defendants used a courier service to deliver medications to claimants.

819. In certain instances, the claimants received the medications billed to Allstate by the Pharmacy Defendants directly at the No-Fault clinic.

820.    According to delivery receipts, the courier service delivered drugs and medications dispensed by Acutus to patients at the No-Fault clinics, including Metro Pain's clinic at 90-16 Sutphin Boulevard, Jamaica, NY, as illustrated by the representative examples below:

*E.L. (claim no. 0523641462)*

Update On: 05/08/2019 11:05:30

Delivery Address:

90-16 SUTPHIN BLVD
JAMAICA,NY, 11435

Pickup Address:
Acutus Rx. LLC.
385 W John St
Hicksville,NY, 11801

Rx: 151159-0

*S.W. (claim no. 0562263186)*

Update On: 10/21/2019 11:18:49

Delivery Address:

90-16 SUTPHIN BLVD
JAMAICA,NY, 11435

Pickup Address:
Acutus Rx. LLC.
385 W John St
Hicksville,NY, 11801

Rx: 160913-0

158

821.    Likewise, John Street Pharmacy also dispensed medications directly to claimants at the Metro Pain clinic located at 90-16 Sutphin Blvd, Jamaica, NY according to "delivery verification" forms:

*C.B. (claim no. 0599349339)*



\* \* \*



*P.J. (claim no. 0607025582)*



\* \* \*

```
Date:    12/30/2020                     Time:    12/30/2020 9:10:48 AM

Verified By: ████████                   X_____████████
                                         Signature
```

822.   In certain instances, the delivery receipt was signed at the Metro Pain clinic by someone other than the claimant, and thus there is no proof that the claimant actually received the prescribed drug or medication.

823.   The drugs were delivered directly to the clinics in many cases because the claimants lived far away from the Pharmacy Defendants' location in Nassau County.

824.   The chart below contains representative examples illustrating the considerable distance between the Pharmacy Defendants' physical locations and the residences of many of their claimants:

| Claimant | Pharmacy Defendant | Claimant's Residence | Approximate Miles from Hicksville, NY |
|---|---|---|---|
| T.M. (claim no. 0707763249) | Alight Rx | Staten Island, NY 10301 | 46 |
| J.C. (claim no. 0714436607) | Alight Rx | Brooklyn, NY 11220 | 43 |
| N.R. (claim no. 0721330520) | Alight Rx | Brooklyn, NY 11235 | 35 |
| P.F. (claim no. 0719811191) | Alight Rx | Brooklyn, NY 11235 | 34 |
| R.N. (claim no. 0565145216) | John Street Pharmacy | Brooklyn, NY 11226 | 34 |
| A.B. (claim no. 0696686336) | Alight Rx | Brooklyn, NY 11234 | 32 |
| H.K. (claim no. 0555868462) | Acutus | Brooklyn, NY 11215 | 28 |
| C.H. (claim no. 0721629459) | Alight Rx | Brooklyn, NY 11216 | 28 |
| E.B. (claim no. 0516914942) | Acutus | Brooklyn, NY 11207 | 27 |
| K.S. (claim no. 0578444713) | John Street Pharmacy | Ozone Park, NY 11417 | 27 |

| Claimant | Pharmacy Defendant | Claimant's Residence | Approximate Miles from Hicksville, NY |
|---|---|---|---|
| G.A.A. (claim no. 0620232355) | John Street Pharmacy | Ozone Park, NY 11417 | 27 |
| G.I.A. (claim no. 0620232355) | John Street Pharmacy | Ozone Park, NY 11417 | 27 |
| D.K. (claim no. 0580870004) | John Street Pharmacy | Queens, NY 11417 | 26 |
| J.B. (claim no. 0550550727) | Acutus | Astoria, NY 11102 | 25 |
| W.P. (claim no. 0606582310) | John Street Pharmacy | Queens, NY 11435 | 25 |
| C.B. (claim no. 0599349339) | John Street Pharmacy | Jamaica, NY 11436 | 24 |
| C.M. (claim no. 0606591519) | John Street Pharmacy | Woodside, NY 11377 | 24 |
| M.B. (claim no. 0609336994) | John Street Pharmacy | Jamaica, NY 11434 | 24 |
| R.M. (claim no. 0606591519) | John Street Pharmacy | Far Rockaway, NY 11691 | 23 |
| C.L. (claim no. 0497564047) | Acutus | Richmond Hill, NY 11418 | 23 |
| T.H. (claim no. 0518597199) | Acutus | Rockaway, NY 11691 | 22 |

825.    Indeed, several Alight Rx claimants have testified that they were given no choice of pharmacy when prescribed medications that were ultimately delivered to the claimant at the clinic or their home.

826.    For example, claimant S.D. (claim no. 0713913846) testified that Alight Rx delivered prescribed cyclobenzaprine tablets to her home, but the prescribing provider did not give her a choice of where to fill the prescription.

827.    Likewise, claimant B.H. (claim no. 0707960555) was prescribed lidocaine 5% ointment by Lam Quan, M.D. ("Quan"), which medication was billed to Allstate by Alight Rx. However, B.H. denied being given a choice to fill the prescription at her own pharmacy and did not know the name of the pharmacy that delivered the medication to her home.

828.    Similarly, Alight Rx billed for several medications prescribed by a provider with Metro Healthcare Partners to claimant K.B. (claim no. 0698794500), including naproxen tablets and lidocaine patches. K.B. could not recall being asked the name of her own pharmacy, but was delivered the medications by a pharmacy "that the Metro Health used."

829.    Therefore, the prescribing providers, No-Fault clinics, and the Defendants eliminated any option of pharmacy by choosing the Pharmacy Defendants for the patients and immediately filling and directly dispensing the drugs and medications to the claimants at the No-Fault clinics or their residences.

**5.    Pharmacy Defendants Submitted Bogus Peer-Review Rebuttals in Support of Unnecessary Claims for Topical Pain Products**

830.    Where the report of a peer review performed at the request of Allstate refuted the medical necessity of the drugs and medications billed by the Pharmacy Defendants, the Pharmacy Defendants submitted peer-review rebuttals in support of the prescription drugs and medications.

831.    The Pharmacy Defendants submitted these letters in support of actions filed against Allstate to collect payment for these drugs and medications.

832.    The rebuttal letters were false and fraudulent because they materially misrepresented the medical necessity of the billed-for drugs and medications.

833.    Additionally, many of these letters are virtually identical and use verbatim language and references repeatedly cited for different patients regarding different drugs and medications.

834.    For instance, Allstate received numerous peer-review rebuttals purportedly authored by non-party Mohamed Nour, M.D. ("Nour") in support of the medical necessity of the drugs and medications charged to Allstate by Acutus.

835.    Acutus retained Nour to lend his name and credentials to these letters to make it appear that a licensed physician was independently reviewing the billed-for drugs and medications

162

and finding them to be medically necessary to treat the patients' injuries as a result of a motor vehicle accident.

836.    Upon information and belief, however, Nour did not actually author any of these peer-review rebuttals, which were actually created by one or more of the Defendants to foster the false appearance that a physician endorsed the dispensing of the drugs and medications.

837.    Upon information and belief, Nour was amenable to facilitating the false and fraudulent charges submitted by Acutus because he faced difficulties obtaining legitimate employment as a physician following serious allegations of medical malpractice, negligence, and participation in No-Fault schemes to defraud.  *See, e.g.*, *De La Cruz v. Nour*, Index No. 500078/2008 (N.Y. Sup. Ct., Kings Cty.); *Allstate Ins. Co. v. Dynasty Med. Care P.C.*, No. 15-cv-03644-JBW-MDG (E.D.N.Y.) (alleging that Nour was the record owner of a professional corporation that submitted false and fraudulent charges for medically unnecessary tests that were not rendered as billed); *GEICO v. Personal Touch Med., P.C.*, No. 11-cv-01493-JO (E.D.N.Y.) (alleging that Nour served as the nominal owner of a fraudulently incorporated professional corporation used to submit charges for services that were not performed or were not performed as represented).

838.    Moreover, Nour previously was disciplined by the New York State Board of Professional Medical Conduct in 1996 arising from charges of practicing the profession with negligence and incompetence. Nour admitted to engaging in professional negligence and agreed to a penalty of a stayed 1-year suspension of his medical license and a 5-year term of probation.

839.    Therefore, upon information and belief, Nour was willing to lend his signature to Acutus's peer-review rebuttals, but did not generate the substance of the letters or conduct any meaningful review or research in connection with the letters.

840.    Rather, these letters signed by Nour consisted of templates citing identical references and containing repetitive errors that failed to provide any legitimate support for the medications that they purported to address.

841.    For example, in numerous letters under Nour's name purporting to establish the medical necessity of diclofenac sodium 3% gel, after reciting copied-and-pasted passages of disjointed quotations and citations having no specific application to this particular product, the letters inserted the same paragraph purporting to address the product's medical necessity, as illustrated by the excerpt of the letter pertaining to the diclofenac sodium 3% gel prescribed to claimant Y.M. (claim no. 0497022772) by Elton, below:

**Medical Necessity:**

Below is a description of all the ingredients in the topical compound cream and how they are effective:

**Diclofenac powder/solution**: Diclofenac potassium powder for oral solution is a non-steroidal anti-inflammatory drug (NSAID), and is indicated for the acute treatment of migraine. This article reviews the pharmacological properties of diclofenac potassium powder and its efficacy and tolerability in patients with acute migraine. Diclofenac potassium powder was clinically efficacious and generally well tolerated in placebo-controlled trials in patients with this indication; it was more effective than diclofenac potassium tablets with regard to the primary endpoint of 2-h pain relief as well as in several important secondary endpoints, such as time to onset of analgesic action. The oral powder-for-solution formulation of diclofenac potassium is a useful option in the acute treatment of migraine with or without aura

842.    This paragraph is wholly inapplicable to the diclofenac sodium 3% gel at issue whereas it pertains to diclofenac potassium powder for oral solution for use in patients with migraines—not musculoskeletal injuries.

843.    The paragraph contained in Nour's letters regarding diclofenac potassium powder is lifted nearly verbatim from the abstract of a journal article—without attribution:

Review  > CNS Drugs. 2014 Aug;28(8):761-8. doi: 10.1007/s40263-014-0186-y.

## Diclofenac potassium powder for oral solution: a review of its use in patients with acute migraine

Karly P Garnock-Jones [1]

Affiliations  + expand

PMID: 25034250   DOI: 10.1007/s40263-014-0186-y

### Abstract

Diclofenac potassium powder for oral solution (Voltfast(®), Catafast(®), Cambia(®); hereafter referred to as diclofenac potassium powder) is a non-steroidal anti-inflammatory drug (NSAID), and is indicated for the acute treatment of migraine. This article reviews the pharmacological properties of diclofenac potassium powder and its efficacy and tolerability in patients with acute migraine. Diclofenac potassium powder was clinically efficacious and generally well tolerated in placebo-controlled trials in patients with this indication; it was more effective than diclofenac potassium tablets with regard to the primary endpoint of 2-h pain relief as well as in several important secondary endpoints, such as time to onset of analgesic action. The oral powder-for-solution formulation of diclofenac potassium is a useful option in the acute treatment of migraine with or without aura.

844.    Nour's letters thus plainly fail to provide any relevant support for the diclofenac sodium 3% gel and the treatment of musculoskeletal injuries, including, but not necessarily limited to, those letters submitted on behalf of Acutus identified in the chart below:

| Claimant | Date of Letter | Author of Letter | Medication at Issue |
|---|---|---|---|
| S.T. (claim no. 0484474077) | 7/3/2019 | Mohamed K. Nour, M.D. | Diclofenac sodium 3% gel |
| J.I. (claim no. 0539057422) | 6/11/2019 | Mohamed K. Nour, M.D. | Diclofenac sodium 3% gel |
| W.C. (claim no. 0534862586) | 6/6/2019 | Mohamed K. Nour, M.D. | Diclofenac sodium 3% gel |
| E.P. (claim no. 0404461949) | 6/6/2019 | Mohamed K. Nour, M.D. | Diclofenac sodium 3% gel |

845.    Nour's letters repeatedly referenced compounded topical products and their ingredients even though diclofenac sodium 3% gel is not compounded by the pharmacy.

846.    Indeed, the same paragraph regarding diclofenac potassium powder is contained in letters submitted by Sunquest under Nour's name in support of Sunquest's charges for a compounded topical pain product containing diclofenac powder.

847.    For example, the letter relating to Sunquest claimant N.P. (claim no. 0438055394) in connection with a compounded topical product includes the following paragraph regarding diclofenac identical to that contained in Nour's letters on behalf of Acutus:

> **Diclofenac powder/solution:** Diclofenac potassium powder for oral solution is a non-steroidal anti-inflammatory drug (NSAID), and is indicated for the acute treatment of migraine. This article reviews the pharmacological properties of diclofenac potassium powder and its efficacy and tolerability in patients with acute migraine. Diclofenac potassium powder was clinically efficacious and generally well tolerated in placebo-controlled trials in patients with this indication; it was more effective than diclofenac potassium tablets with regard to the primary endpoint of 2-h pain relief as well as in several important secondary endpoints, such as time to onset of analgesic action. The oral powder-for-solution formulation of diclofenac potassium is a useful option in the acute treatment of migraine with or without aura.

848.    Likewise, the letters under Nour's name in support of Acutus's charges for lidocaine 5% ointment likewise repeatedly reproduce a paragraph referencing compounding in the discussion of lidocaine, such as that contained in the letter regarding claimant J.M. (claim no. 0483434726):

> **Lidocaine:** Lidocaine is a local anesthetic, which applied topically is able to numb the affected area. Combining Lidocaine with Ketamine in topical formulation shows to be effective in patients with acute neuropathic pain and may be good alternative to oral medication. Systemic administration of lidocaine is an effective treatment of acute neuropathic pain of peripheral and central origin; due to its anti-inflammatory effect, it might also be useful adjuvant for perioperative pain treatment with benefits for analgesia and outcome. (clinical Pain management second edition, Andrew SC Rice er al.)

849.    This same paragraph—including identical typographical errors—is also found in Nour's letters in support of Sunquest's charges for a compounded pain products containing lidocaine powder, such as that paragraph below from the letter regarding Sunquest claimant L.G. (claim no. 0439267626):

166

**Lidocaine Hydrochloride powder**: Lidocaine is a local anesthetic, which applied topically is able to numb the affected area. Combining Lidocaine with Ketamine in topical formulation shows to be effective in patients with acute neuropathic pain and may be good alternative to oral medication. Systemic administration of lidocaine is an effective treatment of acute neuropathic pain of peripheral and central origin; due to its anti-inflammatory effect, it might also be useful adjuvant for perioperative pain treatment with benefits for analgesia and outcome. (clinical Pain management second edition, Andrew SC Rice er al.)

850.    The letters purportedly authored by Nour regarding drugs and medications billed to Allstate by Sunquest also set forth the same identical citations and quotations that were later copied in the letters under Nour's name submitted by Acutus in support of its false and fraudulent charges.

851.    The letters under Nour's name regarding lidocaine 5% ointment billed to Allstate by Acutus, including, but not necessarily limited to, those identified in the chart below, also contain paragraphs of citations to articles that intended to create the impression that Nour's conclusions were well-supported, but, in actuality, were boilerplate paragraphs from other letters submitted by Sunquest and/or Acutus and inserted into the letters regardless of the specific patient needs or particular drug or medication at issue:

| Claimant | Date of Letter | Purported Author of Letter | Medication at Issue |
|---|---|---|---|
| J.R. (claim no. 0449233550) | 9/27/2017 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |
| J.B. (claim no. 0483434726) | 7/3/2018 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |
| M.S. (claim no. 0524385606) | 6/28/2019 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |
| L.T. (claim no. 0443580048) | 8/30/2017 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |
| L.T. (claim no. 0443580048) | 9/15/2017 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |
| J.M. (claim no. 0483434726) | 7/11/2018 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |
| Z.J. (claim no. 04827331852) | 7/24/2018 | Mohamed K. Nour, M.D. | Lidocaine 5% ointment |

852.    Likewise, John Street Pharmacy submitted peer-review rebuttals under the name and credentials of 2 physicians—non-parties Denny X. Rodriguez, M.D. ("Rodriguez") and Arun Agrawal, M.D. ("Agrawal")—purportedly in support of Topical Pain Products billed to Allstate by John Street Pharmacy.

853.    The rebuttal letters purportedly authored by Rodriguez and Agrawal were intended to create the false appearance that the letters were the unique work product of these physicians.

854.    Upon information and belief, however, these rebuttals under Rodriguez and Agrawal's names were shams provided by (or on behalf of) one or more of the Defendants to give the appearance that John Street Pharmacy's charges had the imprimatur of licensed physicians.

855.    For instance, like the letters under Nour's name submitted in support of Acutus's charges for Topical Pain Products, the letters under Rodriguez and Agrawal's names likewise contained patchworks of verbatim language copied and pasted into the letters.

856.    For example, John Street Pharmacy submitted a letter dated June 28, 2021 purportedly authored by Rodriguez in support of medically unnecessary diclofenac sodium 3% gel prescribed under Elton's credentials to claimant D.V. (claim no. 0603786757); this letter contained paragraphs and citations identical to those set forth in a separate letter dated February 1, 2021 purportedly authored by Agrawal and submitted in support of John Street Pharmacy's charges for medically unnecessary diclofenac sodium 3% gel prescribed by Simhaee to claimant H.W. (claim no. 0597667518).

857.    Likewise, John Street Pharmacy submitted a letter dated August 2, 2021 that was purportedly authored by Rodriguez in support of charges for lidocaine 5% ointment prescribed to claimant J.P. (claim no. 0589061795) for a date of service of October 19, 2020; this letter also contained paragraphs and citations identical to those contained in a different letter dated August 9,

2021 purportedly authored by Agrawal and submitted in support of John Street Pharmacy's charges for medically unnecessary lidocaine 5% ointment dispensed to the same claimant, J.P., for dates of service of August 28, 2020 and September 22, 2020.

858.    Upon information and belief, these peer-review rebuttal letters under Rodriguez and Agrawal's names for Topical Pain Products billed by John Street Pharmacy were not truly authored by these physicians and were shams intended to create false support for John Street Pharmacy's charges to induce an arbitrator to render an award in John Street Pharmacy's favor.

859.    Indeed, these letters contain identical passages and citations also contained in numerous other rebuttal letters under Agrawal's name that were submitted to Allstate by (or on behalf of) other No-Fault pharmacies in support of charges for Topical Pain Products, including those representative examples in the chart below:

| Claimant | Date of Letter | Purported Author of Letter | Medication at Issue | Non-Party Pharmacy |
|---|---|---|---|---|
| B.P. (claim no. 0570369470) | 2/6/2021 | Arun Agrawal, M.D. | Lidocaine 5% ointment | Astoria Drugs, Inc. d/b/a Strand Pharmacy |
| C.R. (claim no. 0570797323) | 5/7/2021 | Arun Agrawal, M.D. | Lidocaine 5% ointment | Samantha's Pharmacy, Inc. d/b/a Grace Pharmacy |
| R.K. (claim no. 0572018745) | 5/21/2021 | Arun Agrawal, M.D. | Diclofenac sodium 3% gel | Astoria Drugs, Inc. d/b/a Strand Pharmacy |
| A.B. (claim no. 0599539920) | 6/24/2021 | Arun Agrawal, M.D. | Lidocaine 5% ointment | Nats NY, Inc. d/b/a EZ Pharmacy |
| Y.D. (claim no. 0594651218) | 6/24/2021 | Arun Agrawal, M.D. | Lidocaine 5% ointment | Ready Rx, LLC |
| R.W. (claim no. 0591120274) | 12/9/2020 | Arun Agrawal, M.D. | Lidothol patch | Ready Rx, LLC |

860.    Alight Rx also submitted peer-review rebuttals that contained verbatim paragraphs identical to rebuttals purportedly authored by the same provider on behalf of another No-Fault pharmacy with a history of engaging in fraud.

861.    Alight Rx submitted peer-review rebuttals purportedly authored by non-party Ashraf Salem, M.D. ("Salem").

862.    Salem has been accused of participating in similar No-Fault schemes involving the prescription of medically unnecessary drugs, medications, and durable medical equipment in exchange for kickback payments. *See GEICO v. American Kinetics Labs, Inc.*, No. 19-cv-02947 (E.D.N.Y.) (alleging that Salem generated fraudulent prescriptions for unnecessary DME and orthotic devices at the direction of layperson clinic controllers who entered into unlawful kickback arrangements with a DME company); *see also GEICO v. Q Pharmacy Rx, Inc.*, No. 1:23-cv-09085 (E.D.N.Y.) (alleging that Salem's PC was the significant source of fraudulent prescriptions for medically unnecessary medications steered to Q Pharmacy Rx, Inc. pursuant to collusive referral relationships).

863.    Salem's peer-review rebuttals submitted in support of Alight Rx's fraudulent No-Fault claims contain several passages of language identical to that contained in other peer-review rebuttals submitted by Salem in support of No-Fault claims submitted by another No-Fault pharmacy, SMK Pharmacy Corp. d/b/a Nature's Choice Long Term Care and Compounding ("SMK Pharmacy").

864.    SMK Pharmacy also has been accused of executing a No-Fault fraud scheme through billing for medically unnecessary and ineffective drugs and medications prescribed pursuant to unlawful referral relationships with prescribing providers. *Allstate Ins. Co. v. SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care and Compounding*, No. 1:24-cv-04627

(E.D.N.Y.); *GEICO v. SMK Pharmacy Corp. d/b/a Nature's First Long Term Care and Compounding*, No. 1:21-cv-03247 (E.D.N.Y.).

865.    Upon information and belief, these peer-review rebuttal letters under Salem's name for Topical Pain Products billed by Alight Rx were not truly authored by Salem and were shams intended to create false support for Alight Rx's charges to induce an arbitrator to render an award in Alight Rx's favor.

866.    The Defendants used Nour, Rodriguez, Agrawal, and Salem to lend false legitimacy to their charges for Topical Pain Products billed for by the Pharmacy Defendants by causing these providers to sign templated letters that were not tailored to the particular patients or medications that the letters were supposedly intended to support.

### D.    FAILURE TO LAWFULLY OVERSEE DISPENSING OF DRUGS AND MEDICATIONS

867.    Pharmacists and their interns have a duty under New York law to conduct a review before each medication is dispensed or delivered to the patient to avoid therapeutic duplication and drug-drug interactions that may cause drug therapy problems and harm the patient. 8 N.Y.C.R.R. § 63.6(b)(7).

868.    Using their professional judgment, a pharmacist or pharmacy intern may refuse to dispense a medication that could endanger the health of the patient through "potential adverse effects, interactions or other therapeutic complications." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(e), § 63.6(b)(8)(ii)(d)(5).

869.    For a drug or medication that is delivered on the pharmacy's premises, before dispensing a medication to a new patient or a new medication to an existing patient, the pharmacist or pharmacy intern must personally counsel the patient by telephone or in person on appropriate

matters, including known indications, common severe adverse side effects or interactions, and therapeutic contraindications. 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)-(b).

870.    When dispensing a drug or medication to a patient off of pharmacy premises, the pharmacist or pharmacy intern must "include with each prescription a written offer to counsel the patient" regarding the drug or medication, including its "known indications" and "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)(1), (4), § 63.6(b)(8)(ii)(a).

871.    The written offer of counseling for drugs dispensed off of pharmacy premises "shall provide a telephone number at which a licensed pharmacist or pharmacy intern may be readily reached." 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(a).

872.    For a drug or medication that is delivered off of pharmacy premises, if the pharmacist or pharmacy intern "determines that there are potential drug therapy problems which could endanger the health of a patient," "the pharmacist or pharmacy intern **shall personally contact the patient…via telephone or through an in-person face-to-face meeting**" prior to dispensing the medication to offer counseling on the identified potential problems and any other appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(1) (emphasis added).

873.    The responsibility of offering counseling to patients in these situations "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit." 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(2).

874.    If the patient refuses to accept counseling, such refusal must be documented.  8 N.Y.C.R.R. § 63.6(b)(8)(c); 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

875. Many claimants were prescribed the Topical Pain Products containing diclofenac in addition to oral NSAIDs, such as naproxen and meloxicam.

876. Topical diclofenac, and NSAIDs in general, may cause side-effects, including damage to the intestines, the lining of the stomach, and other serious medical problems.

877. Therefore, when an oral NSAID, such as naproxen, is taken in conjunction with a topical NSAID, like diclofenac, there are certain health risks to the patient.

878. The providers at the No-Fault clinics prescribed both oral and topical NSAIDs to the same patient without properly considering the potential hazardous effects.

879. The Pharmacy Defendants dispensed patients with both the oral and topical NSAIDs without conducting a proper review to avoid therapeutic duplication presenting a risk to the health and safety of the claimants.

880. An individual who is not a licensed pharmacist is not authorized to perform functions requiring professional judgment, including receiving oral prescriptions from prescribers, evaluating prescriptions for drug interactions and counseling patients. 8 N.Y.C.R.R. § 29.7(21)(ii)(b)(1), (2), (6), (7).

881. Based on documentation provided to Allstate, a written offer of counseling was not always included with the drugs and medications dispensed off of the Pharmacy Defendants' premises to Allstate claimants.

882. Upon information and belief, even when such a written "offer" of counseling was included with the drugs and medications, the offer was hollow and patients were not given a meaningful opportunity to consider whether they needed or wanted counseling.

883. Alight Rx purportedly had claimants complete a "counseling offer acknowledgement" upon receipt of their medications; however, this acknowledgement pertained

to "compounded medication" even though Alight Rx dispensed Topical Pain Products and other medications that were not compounded.

884.   For example, claimant A.C. (claim no. 0700062649) purportedly received lidocaine 5% ointment from Alight Rx and was asked to complete the following acknowledgement upon delivery:

## Alight Rx

1.   **Counseling Offer Acknowledgement (Full counseling fact sheet enclosed with medication)**

Dear Patient:
Alight Rx would like to inform you that you have the right to receive counseling for your compounded medication. If you would like to receive counseling, one of our pharmacists will contact you within 24 hours. Please choose one of the options below. Thank you.

[    ] **Yes -** I would like to receive counseling on my compounded medication.   [ ✓ ] **No -** I decline the counseling.

885.   In nearly every, if not all, instances that this form was purportedly presented to an Allstate claimant, the claimant reportedly declined counseling; however, upon information and belief, the box on this form was pre-checked to indicate "No – I decline counseling" and patients did not make any meaningful choice regarding whether or not to request counseling.

886.   Based on the Pharmacy Defendants' delivery receipts, a courier service delivered drugs and medications, including Topical Pain Products, to the Pharmacy Defendants' claimants off of the Pharmacy Defendants' premises.

887.   Upon information and belief, the Pharmacy Defendants' patients were not personally offered counseling on the issues raised by the prescriptions for both oral and topical NSAIDs, including therapeutic duplication, by a pharmacist or pharmacy intern over the phone or in person before the courier service delivered the drugs and medications to the patients off of the Pharmacy Defendants' premises.

888. In many instances, the receipts purporting to confirm delivery of medications to claimants, including simultaneous delivery of both topical and oral NSAIDS, fail to document whether the claimant requested counseling or was offered counseling.

889. Acutus billed Allstate for both topical and oral NSAID medications prescribed by Elton on February 5, 2019 to claimant D.H. (claim no. 0524691318), including diclofenac sodium 3% gel and ibuprofen 600mg tablets, as well as cyclobenzaprine tablets.

890. The delivery receipt purporting to confirm that D.H. received these medications on February 6, 2019 does not indicate whether D.H. requested counseling or was offered counseling by a pharmacist regarding the therapeutic duplication underlying these billed-for medications:

**Delivery Status Update**

Please see the Notes and Proof of Delivery information below

OrderNumber: 6365905

Order was placed by: EDI

Acutus Rx Reference: ACT116910024747

Notes: CALL UPON ARRIVAL 929-228-3040 IF NO ANSWER, GO TO APT L209 WED 02/06/18 (9AM-3PM) SIG REQUIRED

**Proof of Delivery:**

Update On: 02/06/2019 12:01

Delivery Address:

Pickup Address:
Acutus Rx. LLC,
365 W John St
Hicksville, NY, 11801

Rx: 142666-0-142665-0-142664-0

891. Likewise, Acutus billed Allstate for both diclofenac sodium 3% gel and ibuprofen 600mg tablets prescribed to claimant C.L. (claim no. 0497564047) by Elton on February 7, 2019.

892.    However, the courier's tracking information purporting to confirm delivery of these topical and oral NSAIDs to C.L. on March 7, 2019 does not indicate whether C.L. requested counseling or was offered counseling by a pharmacist regarding therapeutic duplication:



893.    John Street Pharmacy billed Allstate for a combination of topical and oral NSAID medications prescribed by a provider with a PC owned by Krishna and dispensed to claimant T.W. (claim no. 0537816992) on July 22, 2022, including diclofenac sodium 1.5% solution and meloxicam tablets.

894.    The delivery receipt purporting to confirm that T.W. received these medications is undated and does not indicate whether or not T.W. requested counseling:

| Date Filled | Rx# | Rf# | Rx. Barcode | Qty | Pres. Addr | RPh./Tech |
|---|---|---|---|---|---|---|
| 07/22/2022 | 236513 | 0 | | 150.000 | 3262 Westchester Ave, , Bronx , NY 10461 | KP |
| 07/22/2022 | 236514 | 0 | | 30.000 | 3262 Westchester Ave, , Bronx , NY 10461 | KP |
| 07/22/2022 | 236515 | 0 | | 30.000 | 3262 Westchester Ave, , Bronx , NY 10461 | KP |
| 07/22/2022 | 236516 | 0 | | 30.000 | 3262 Westchester Ave, , Bronx , NY 10461 | KP |

Total Rx Count:  4

Patient is requesting Counseling:   Yes __     No __

********* PLEASE SIGN DELIVERY SLIP AND SEND BACK TO ACUTUS RX*********
BY SIGNING THIS SLIP I ACKNOWLEDGE THAT I HAVE AUTHORIZED AND  RECEIVED DELIVERY
OF MEDICATION AND ACUTUS RX PHARMACY'S NOTICE OF HIPPA PRIVACY RULES & COPIES
ARE AVAILABLE UPON REQUEST
TO SEND TO ACUTUS OPTIONS BELOW:

*TEXT PICTURE MESSAGE: 516-209-4124 (KLARA)
*FAX: 855-444-0059
*EMAIL: INFO@ACUTUSRX.COM

OR SIMPLY MAIL TO
ACUTUS RX
290 DUFFY AVE SUITE F
HICKSVILLE NY 11801

***************** DUE TO COVID-19 YOU HAVE AN OPTION TO REQUEST DRIVER TO LEAVE BY
DOOR; DELIVERY SLIP MUST BE SIGNED AND RETURNED TO PHARMACY***********

Receiver's Name _____        Date: _____     Time: _____

Receiver's Signa[redacted]               Delivered By: _____

895.    Likewise, John Street Pharmacy filled Clarke's prescriptions dated December 9, 2020 for several medications for claimant P.R. (claim no. 0608850129), including cyclobenzaprine tablets, meloxicam tablets, diclofenac sodium 3% gel, and lidocaine 5% ointment.

896.    The delivery receipt purporting to verify delivery of these 4 medications, including a topical NSAID (diclofenac sodium 3% gel) along with an oral NSAID (meloxicam) does not indicate whether P.R. requested or refused counseling or whether P.R. was personally offered counseling by a pharmacist regarding the therapeutic duplication underlying these billed-for medications.

897.    Clarke's December 9, 2020 prescriptions for lidocaine 5% ointment, cyclobenzaprine, and meloxicam called for 5 refills each, which also were purportedly dispensed

177

to P.R. by John Street Pharmacy on or about January 12, 2021, February 8, 2021, March 9, 2021, April 5, 2021, and May 3, 2021.

898.    There is no evidence that P.R. actually used these billed-for medications despite the regular refills or that she even received these refills.

899.    Indeed, another provider examining P.R. on January 11, 2021 and March 8, 2021 did not report that P.R. was taking any medication.

900.    Moreover, Clarke stated in a report of an August 6, 2021 follow-up visit, after P.R. had purportedly received 5 refills of the lidocaine 5% ointment, cyclobenzaprine, and meloxicam prescribed on December 9, 2020 by Clarke, that "patient takes no medications on a regular basis."

901.    Simhaee performed an initial examination of claimant M.P. (claim no. 0610306409) on August 30, 2021 and that same day prescribed M.P. with both oral and topical NSAIDs, including naproxen tablets and Flector 1.3% patches (which were substituted by John Street Pharmacy with diclofenac sodium 1.5% solution pursuant to their predetermined prescription protocol), as well as lidocaine 5% ointment and cyclobenzaprine, a muscle relaxant.

902.    These drugs and medications purportedly were delivered to M.P. by a courier, but John Street Pharmacy's delivery receipt for these medications, including both oral and topical NSAIDs, fails to specify the medications delivered, the location of delivery, and whether M.P. was offered or requested counseling:

178



903.    The Defendants and the prescribing providers disregarded patient safety when prescribing, dispensing, and delivering duplicative and medically unnecessary topical medications with oral NSAIDs in furtherance of their scheme to prescribe and bill for as many drugs and medications as possible.

904.    The Defendants violated their duty to the Pharmacy Defendants' patients to identify risks posed by the therapeutic duplication of topical and oral NSAIDs and to provide an offer of appropriate counseling personally from a licensed pharmacist or pharmacy intern over the telephone or in person before the NSAIDs were delivered off of the Pharmacy Defendants' premises.

905.    Thus, the Pharmacy Defendants violated New York law governing pharmacies and the dispensation of medications when it billed Allstate for duplicative and medically unnecessary topical medications that were purportedly delivered off premises by a non-pharmacist who could not lawfully offer or provide counseling to patients regarding the risks posed by the drugs and medications.

## VI.    SPECIFIC ALLEGATIONS OF MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

906.    The Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property using false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud), and by the interstate wires, in violation of 18 U.S.C. § 1343 (wire fraud), to execute, or attempt, such fraudulent schemes.

907.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the interstate wires or the U.S. Mail.

908.    All medical records and bills submitted through interstate wires by the Defendants were faxed from the Defendants in New York to Allstate in Illinois and Ohio.

180

909.    Allstate received all medical records and bills faxed to it by the Defendants in Illinois and Ohio.

910.    Every automobile insurance claim detailed within this Complaint involved at least one use of the interstate wires and the U.S. Mail, including the mailing and faxing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

**A.    ACUTUS ENTERPRISE**

911.    Duggal, Sharma, Firstserv, and Patel either personally used (or caused the use of) the interstate wires and U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from Acutus to be mailed or faxed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the interstate wires and the U.S. Mail would follow in the ordinary course of business.

912.    Duggal, Sharma, Firstserv, and Patel caused Acutus to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that Acutus faxed or mailed (or was caused to fax or mail) a demand for payment (i.e., invoice or bill) to Allstate.

913.    Duggal, Sharma, Firstserv, and Patel's participation in the operation and management of Acutus, which included, among other things, (a) owning Acutus, (b) profiting from the operation of Acutus, (c) entering into agreements with Acutus, (d) facilitating unlawful prescriptions between Acutus and prescribers, (e) dispensing drugs and medications to Acutus patients, and (f) causing Acutus to submit false and fraudulent No-Fault benefit claims to Allstate, rendered Acutus completely ineligible for No-Fault reimbursement under New York law.

914.    As a result of the above-described conduct, Duggal, Sharma, Firstserv, and Patel purposely caused Acutus to make a misrepresentation every time that Acutus faxed or mailed (or was caused to fax or mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

915.    Moreover, because (a) Duggal, Sharma, Firstserv, and Patel engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of Acutus, (b) Duggal, Sharma, Firstserv, and Patel caused Acutus to seek No-Fault reimbursement from Allstate (even though Acutus was not lawfully entitled to such reimbursement), and (c) Acutus used (or was caused to use) the interstate wires and the U.S. Mail to seek reimbursement, it is clear that Duggal, Sharma, Firstserv, and Patel committed mail and wire fraud.

916.    At all relevant times, Duggal, Sharma, Firstserv, and Patel knew that Acutus (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the interstate wires and the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation faxed or mailed by (or on behalf of) Acutus.

917.    Allstate estimates that the unlawful operation of the Acutus enterprise generated hundreds of faxes and mailings. A table highlighting selected examples of faxes and mailings made in furtherance of this scheme is annexed at Exhibit 8 and incorporated herein by reference as if outlined in its entirety.

### B.    JOHN STREET PHARMACY ENTERPRISE

918.    Duggal, Sharma, Patel, Firstserv, and Kapree either personally used (or caused the use of) the interstate wires and the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills

from John Street Pharmacy to be mailed or faxed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the interstate wires and the U.S. Mail would follow in the ordinary course of business.

919. Kapree, Patel, Duggal, Sharma, and Firstserv caused John Street Pharmacy to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that John Street Pharmacy faxed or mailed (or was caused to fax or mail) a demand for payment (i.e., invoice or bill) to Allstate.

920. Kapree, Patel, Duggal, Sharma, and Firstserv's participation in the operation and management of John Street Pharmacy, which included, among other things, (a) owning John Street Pharmacy, (b) profiting from the operation of John Street Pharmacy, (c) entering into agreements with John Street Pharmacy, (d) facilitating unlawful prescriptions between John Street Pharmacy and prescribers, (e) dispensing drugs and medications to John Street Pharmacy patients, and (f) causing John Street Pharmacy to submit false and fraudulent No-Fault benefit claims to Allstate, rendered John Street Pharmacy completely ineligible for No-Fault reimbursement under New York law.

921. As a result of the above-described conduct, Kapree, Patel, Duggal, Sharma, and Firstserv purposely caused John Street Pharmacy to make a misrepresentation every time that John Street Pharmacy faxed or mailed (or was caused to fax or mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

922. Moreover, because (a) Kapree, Patel, Duggal, Sharma, and Firstserv engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of John Street Pharmacy, (b) Kapree, Patel, Duggal, Sharma, and Firstserv caused John Street Pharmacy to seek No-Fault reimbursement from Allstate (even though John Street

Pharmacy was not lawfully entitled to such reimbursement), and (c) John Street Pharmacy used (or was caused to use) the interstate wires and the U.S. Mail to seek reimbursement, it is clear that Kapree, Patel, Duggal, Sharma, and Firstserv committed mail and wire fraud.

923. At all relevant times, Kapree, Patel, Duggal, Sharma, and Firstserv knew that John Street Pharmacy (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the interstate wires and the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation faxed or mailed by (or on behalf of) John Street Pharmacy.

924. Allstate estimates that the unlawful operation of the John Street Pharmacy enterprise generated hundreds of faxes and mailings. A table highlighting selected examples of faxes and mailings made in furtherance of this scheme is annexed at Exhibit 9 and incorporated herein by reference as if outlined in its entirety.

## C. **ALIGHT RX ENTERPRISE**

925. Duggal, Sharma, Firstserv, and Walsh either personally used (or caused the use of) the interstate wires and the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from Alight Rx to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the interstate wires and the U.S. Mail would follow in the ordinary course of business.

926. Walsh, Duggal, Sharma, and Firstserv caused Alight Rx to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that Alight Rx faxed or mailed (or was caused to fax or mail) a demand for payment (i.e., invoice or bill) to Allstate.

927.    Walsh, Duggal, Sharma, and Firstserv's participation in the operation and management of Alight Rx, which included, among other things, (a) owning Alight Rx, (b) profiting from the operation of Alight Rx, (c) entering into agreements with Alight Rx, (d) facilitating unlawful prescriptions between Alight Rx and prescribers, (e) dispensing drugs and medications to Alight Rx patients, and (f) causing Alight Rx to submit false and fraudulent No-Fault benefit claims to Allstate, rendered Alight Rx completely ineligible for No-Fault reimbursement under New York law.

928.    As a result of the above-described conduct, Walsh, Duggal, Sharma, and Firstserv purposely caused Alight Rx to make a misrepresentation every time that Alight Rx faxed or mailed (or was caused to fax or mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

929.    Moreover, because (a) Walsh, Duggal, Sharma, and Firstserv engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of Alight Rx, (b) Walsh, Duggal, Sharma, and Firstserv caused Alight Rx to seek No-Fault reimbursement from Allstate (even though Alight Rx was not lawfully entitled to such reimbursement), and (c) Alight Rx used (or was caused to use) the interstate wires and the U.S. Mail to seek reimbursement, it is clear that Walsh, Duggal, Sharma, and Firstserv committed mail and wire fraud.

930.    At all relevant times, Walsh, Duggal, Sharma, and Firstserv knew that Alight Rx (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the interstate wires and the U.S. Mail in connection with each of the fraudulent claims,

185

including issuing payments based upon the documentation faxed or mailed by (or on behalf of) Alight Rx.

931. Allstate estimates that the unlawful operation of the Alight Rx enterprise generated hundreds of mailings and faxes. A table highlighting selected examples of mailings and faxes made in furtherance of this scheme is annexed at Exhibit 10 and incorporated herein by reference as if outlined in its entirety.

### D.    FIRSTSERV ENTERPRISE

932. Duggal, Sharma, Patel, Walsh, Acutus, John Street Pharmacy, Alight Rx, and Kapree participated in the operation and management of the Firstserv enterprise.

933. Duggal, Sharma, Acutus, John Street Pharmacy, Alight Rx, Kapree, Patel, and Walsh used Firstserv to effectuate the illegal operation of Acutus, John Street Pharmacy, and Alight Rx.

934. Sharma used Firstserv to conceal his controlling interests in Acutus, John Street Pharmacy, and Alight Rx and the siphoning of the Pharmacy Defendants' unlawfully obtained fees and profits for his and Duggal's personal benefit.

935. Duggal, Sharma, Acutus, John Street Pharmacy, Alight Rx, Kapree, Patel, and Walsh caused Firstserv to use the interstate wires and the U.S. Mail in furtherance of a scheme to submit false and fraudulent No-Fault claims to Allstate.

936. Firstserv used (or caused the use of) the interstate wires and the U.S. Mail to submit Acutus's, John Street Pharmacy's, and Alight Rx's No-Fault claims to Allstate even though the Pharmacy Defendants were not eligible for No-Fault payments under New York law.

937. Duggal, Sharma, Kapree, Patel, and Walsh knew that Acutus's, John Street Pharmacy's, and Alight Rx's No-Fault claims were fraudulent because they were comprised of

186

bills for unnecessary drugs and medications prescribed pursuant to unlawful referral relationships with prescribing providers who funneled prescriptions to the Pharmacy Defendants according to a predetermined prescription protocol intended to enrich the Defendants at the expense of patient care.

938.   Duggal, Sharma, Acutus, John Street Pharmacy, Alight Rx, Kapree, Patel, and Walsh committed wire and mail fraud because they used, or caused the use of, the interstate wires and the U.S. Mail to submit false and fraudulent No-Fault claims to Allstate.

939.   Duggal, Sharma, Acutus, John Street Pharmacy, Alight Rx, Kapree, Patel, and Walsh knew that Firstserv's employees and agents would use the interstate wires and the U.S. Mail in the course of conducting its business of providing management services (or in the course of purporting to provide management or other services) to the Pharmacy Defendants even though any such services were, in reality, a means to funnel the Pharmacy Defendants' unlawful No-Fault proceeds to Sharma and Duggal and perpetuate the Defendants' scheme to defraud through the operation of the Pharmacy Defendant enterprises.

940.   Duggal, Sharma, Acutus, John Street Pharmacy, Alight Rx, Kapree, Patel, and Walsh also knew that claimants, attorneys, and Allstate would use the interstate wires and the U.S. Mail in the course of processing No-Fault claims submitted by the Pharmacy Defendants.

941.   Allstate estimates that the unlawful operation of the Firstserv enterprise generated hundreds of faxes and mailings, which are comprised of false and fraudulent No-Fault claims submitted on behalf of the Pharmacy Defendants.  A table highlighting selected examples of faxes and mailings made in furtherance of this scheme is annexed at Exhibit 8-10 and incorporated by reference as if set forth in its entirety.

E.      **KAPREE ENTERPRISE**

942.    Duggal, Sharma, Patel, John Street Pharmacy, and Firstserv participated in the operation and management of the Kapree enterprise.

943.    Patel, Duggal, Sharma, John Street Pharmacy, and Firstserv used Kapree to effectuate the illegal operation of John Street Pharmacy as its sole member.

944.    Patel, Duggal, Sharma, John Street Pharmacy, and Firstserv caused Kapree to use the interstate wires and the U.S. Mail in furtherance of a scheme to submit false and fraudulent No-Fault claims to Allstate.

945.    Kapree used (or caused the use of) the interstate wires and the U.S. Mail to submit John Street Pharmacy's No-Fault claims to Allstate even though John Street Pharmacy was not eligible for No-Fault payments under New York law.

946.    Patel, Duggal, Sharma, John Street Pharmacy, and Firstserv knew that John Street Pharmacy's No-Fault claims were fraudulent because they were comprised of bills for unnecessary drugs and medications prescribed pursuant unlawful referral relationships with prescribing providers who funneled prescriptions to John Street Pharmacy according to a predetermined prescription protocol intended to enrich the Defendants at the expense of patient care.

947.    Patel, Duggal, Sharma, John Street Pharmacy, and Firstserv committed wire and mail fraud because they used, or caused the use of, the interstate wires and the U.S. Mail to submit false and fraudulent No-Fault claims to Allstate.

948.    Patel, Duggal, Sharma, John Street Pharmacy, and Firstserv knew that Kapree's employees and agents would use the interstate wires and the U.S. Mail in the course of conducting its business of conducting management services (or in the course of purporting to provide management or other services) through John Street Pharmacy even though any such services were,

in reality, a means to perpetuate the Defendants' scheme to defraud through the operation of the John Street Pharmacy enterprise.

949.    Patel, Duggal, Sharma, John Street Pharmacy, and Firstserv also knew that claimants, attorneys, and Allstate would use the interstate wires and the U.S. Mail in the course of processing No-Fault claims submitted by John Street Pharmacy.

950.    Allstate estimates that the unlawful operation of the Kapree enterprise generated hundreds of faxes and mailings, which are comprised of false and fraudulent No-Fault claims submitted on behalf of John Street Pharmacy.  A table highlighting selected examples of faxes and mailings made in furtherance of this scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    ACUTUS ENTERPRISE

951.    At all relevant times during the operation of the Acutus enterprise, Duggal, Sharma, Firstserv, and Patel purposely caused Acutus to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Acutus.

952.    During the relevant period, Duggal, Sharma, Firstserv, and Patel directly participated in the operation and management of Acutus.

953.    Because Duggal, Sharma, Firstserv, and Patel were responsible for causing Acutus's (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with

189

the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by Acutus, Acutus was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Acutus sought No-Fault reimbursement from Allstate.

954.    As alleged above, Duggal, Sharma, Firstserv, and Patel caused Acutus to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

955.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

956.    Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

957.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

958.    Thus, every time that Duggal, Sharma, Firstserv, and Patel caused Acutus to submit No-Fault reimbursement demands to Allstate, Duggal, Sharma, Firstserv, and Patel necessarily certified that Acutus was eligible to be reimbursed under New York's No-Fault laws.

959. The full extent of Duggal, Sharma, Firstserv, and Patel's fraudulent and unlawful acts relative to their participation in the Acutus enterprise was not known to Allstate until shortly before it commenced this action.

## B.    JOHN STREET PHARMACY ENTERPRISE

960. At all relevant times during the operation of the John Street Pharmacy enterprise, Kapree, Patel, Duggal, Sharma, and Firstserv purposely caused John Street Pharmacy to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of John Street Pharmacy.

961. At all relevant times, Kapree, Patel, Duggal, Sharma, and Firstserv directly participated in the operation and management of John Street Pharmacy.

962. Because Kapree, Patel, Duggal, Sharma, and Firstserv were responsible for causing John Street Pharmacy's (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by John Street Pharmacy, John Street Pharmacy was caused to falsely claim eligibility for No-Fault reimbursement each and every time that John Street Pharmacy sought No-Fault reimbursement from Allstate.

963.    As alleged above, Kapree, Patel, Duggal, Sharma, and Firstserv caused John Street Pharmacy to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

964.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

965.    Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

966.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

967.    Thus, every time that Kapree, Patel, Duggal, Sharma, and Firstserv caused John Street Pharmacy to submit No-Fault reimbursement demands to Allstate, Kapree, Patel, Duggal, Sharma, and Firstserv necessarily certified that John Street Pharmacy was eligible to be reimbursed under New York's No-Fault laws.

968.    The full extent of Kapree, Patel, Duggal, Sharma, and Firstserv's fraudulent and unlawful acts relative to their participation in the John Street Pharmacy enterprise was not known to Allstate until shortly before it commenced this action.

C.    **ALIGHT RX ENTERPRISE**

969.    At all relevant times during the operation of the Alight Rx enterprise, Walsh, Duggal, Sharma, and Firstserv purposely caused Alight Rx to falsely certify that it was eligible to

be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Alight Rx.

970.    At all relevant times, Walsh, Duggal, Sharma, and Firstserv directly participated in the operation and management of Alight Rx.

971.    Because Walsh, Duggal, Sharma, and Firstserv were responsible for causing Alight Rx's (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by Alight Rx, Alight Rx was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Alight Rx sought No-Fault reimbursement from Allstate.

972.    As alleged above, Walsh, Duggal, Sharma, and Firstserv caused Alight Rx to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

973.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

974.    Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

975.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

976.    Thus, every time that Walsh, Duggal, Sharma, and Firstserv caused John Street Pharmacy to submit No-Fault reimbursement demands to Allstate, Walsh, Duggal, Sharma, and Firstserv necessarily certified that Alight Rx was eligible to be reimbursed under New York's No-Fault laws.

977.    The full extent of Walsh, Duggal, Sharma, and Firstserv's fraudulent and unlawful acts relative to their participation in the Alight Rx enterprise was not known to Allstate until shortly before it commenced this action.

## VIII.    ALLSTATE'S JUSTIFIABLE RELIANCE

978.    The Defendants' pattern of submitting and prosecuting baseless and repetitive claims has helped perpetuate their RICO violations.

979.    Each claim submitted to Allstate by the Pharmacy Defendants was verified according to Insurance Law § 403.

980.    Duggal, as the owner of Acutus, was responsible for the proper conduct of Acutus in accordance with New York law.

981.    Patel, as Acutus's supervising pharmacist, was responsible for the proper conduct of Acutus in accordance with New York law.

194

982.    Kapree, as the sole member of John Street Pharmacy, was responsible for the proper conduct of John Street Pharmacy in accordance with New York law.

983.    Patel, as the sole member of Kapree and as a supervising pharmacist, was responsible for the proper conduct of John Street Pharmacy in accordance with New York law.

984.    Walsh, as the sole member of Alight Rx, was responsible for the proper conduct of Alight Rx in accordance with New York law.

985.    To induce Allstate to promptly pay the Pharmacy Defendants' patient invoices, the Defendants submitted (or caused to be submitted) to Allstate CMS-1500 bills certifying that the Pharmacy Defendants were eligible to be reimbursed under New York's No-Fault Laws.

986.    Further, to induce Allstate to promptly pay the fraudulent charges for prescription drug and other pharmacy services purportedly provided to Allstate Claimants, the Defendants hired attorneys to collect payment from Allstate on the Pharmacy Defendants' fraudulent No-Fault claims. These attorneys routinely demand payment and file collection actions against Allstate.

987.    The Defendants monetized their fraudulent conduct through the collection actions, which generated revenue that helped perpetuate the scheme.

988.    Specifically, the Defendants routinely commence arbitrations and civil actions after Allstate denies the Pharmacy Defendants' claims to fraudulently obtain No-Fault payments, and the proceeds of these actions are used to finance the RICO scheme.

989.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) the Pharmacy Defendants in support of the fraudulent and/or non-compensable charges at issue, combined with the material misrepresentations described above, were designed to and did, cause Allstate to justifiably rely on them.

990.    The Defendants concealed from Allstate the truth regarding the Pharmacy Defendants' reimbursement eligibility under New York law.

991.    In reasonable reliance on these misrepresentations, Allstate paid money to the Pharmacy Defendants to its detriment.

992.    Allstate would not have paid these monies had the Defendants provided true and accurate information about the Pharmacy Defendants' reimbursement eligibility under New York law, including (a) the Pharmacy Defendants' No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq.*, and (b) the fact and necessity of the services purportedly provided to those Allstate Claimants and customers of the Pharmacy Defendants eligible for insurance coverage under an automobile insurance policy issued by Allstate.

993.    As a result, Allstate was caused to pay the Pharmacy Defendants over $525,188.00 in reasonable reliance on the Pharmacy Defendants' false No-Fault claim reimbursement documentation and the Defendants' false representations regarding the Pharmacy Defendants' eligibility for reimbursement under New York's No-Fault Laws.

## IX.    DAMAGES

994.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments in connection with first-party claims in excess of $525,188.00, the exact amount to be determined at trial, including:

(a)    Payments made to Acutus Rx, LLC in connection with first-party claims in excess of $177,830.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 5, and incorporated herein as if set forth in its entirety, identifies Allstate's

payments to Acutus Rx, LLC in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b)     Payments made to John Street Pharmacy, LLC d/b/a Acutus Rx in connection with first-party claims in excess of $168,954.00, the exact amount to be determined at trial. The chart annexed at Exhibit 6, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to John Street Pharmacy, LLC d/b/a Acutus Rx in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(c)     Payments made to Alight Rx LLC in connection with first-party claims in excess of $178,403.00, the exact amount to be determined at trial. The chart annexed at Exhibit 7, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Alight Rx LLC in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## X.     CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ACUTUS RX, LLC ENTERPRISE
### (Against Harpreet K. Duggal, Atul K. Sharma, Firstserv Healthcare Management, Inc., and Ketuben Ravji Patel a/k/a Ketu Patel)

995.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

996.    In furtherance of their operation and management of Acutus Rx, LLC, Defendants Harpreet K. Duggal, Atul K. Sharma, Firstserv Healthcare Management, Inc., and Ketuben Ravji Patel a/k/a Ketu Patel (collectively, "Count I Defendants") intentionally prepared and faxed or mailed (or caused to be prepared and faxed or mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

997.    The Count I Defendants employed one or more faxes and mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8.

197

998.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the interstate wires and the U.S. Mail.

999.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1000.    Payments made by Allstate to Acutus Rx, LLC were delivered through the U.S. Mail.

1001.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, CMS-1500 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by Acutus Rx, LLC to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1002.    When the Count I Defendants faxed or mailed (or caused the faxing or mailing of) CMS-1500 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count I Defendants materially misrepresented Acutus Rx, LLC's No-Fault reimbursement eligibility under New York law.

1003.    As a result of, and in reasonable reliance upon, the mailing, faxing, and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Acutus Rx, LLC for the benefit of one or more of the Count I Defendants that would not otherwise have been paid.

1004.    The Count I Defendants' pattern of preparing and faxing or mailing (or causing/directing the preparation and faxing or mailing of) these documents and other claim-

related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count I Defendants to continue this scheme without being detected.

1005.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

1006.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1343 (wire fraud).

1007.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Acutus Rx, LLC for the benefit of the Count I Defendants.

1008.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1009.    Acutus Rx, LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1010.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1011.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count I Defendants' conduct.

1012.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1013.    Because of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## ACUTUS RX, LLC ENTERPRISE
**(Against Harpreet K. Duggal, Atul K. Sharma, Firstserv Healthcare Management, Inc., and Ketuben Ravji Patel a/k/a Ketu Patel)**

1014.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1015.   Through their participation in the operation and management of Acutus Rx, LLC, Defendants Harpreet K. Duggal, Atul K. Sharma, Firstserv Healthcare Management, Inc., and Ketuben Ravji Patel a/k/a Ketu Patel (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

1016.   The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Acutus Rx, LLC through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud as outlined in Exhibit 8, and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Allstate.

1017.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Acutus Rx, LLC, even though Acutus Rx, LLC, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1018.   The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

200

1019.   Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1020.   Because of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**JOHN STREET PHARMACY, LLC D/B/A ACUTUS RX ENTERPRISE**
**(Against Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K.**
**Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc.)**

1021.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

1022.   In furtherance of their operation and management of John Street Pharmacy, LLC d/b/a Acutus Rx, Defendants Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc. (collectively, "Count III Defendants") intentionally prepared and faxed or mailed (or caused to be prepared and faxed or mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1023.   The Count III Defendants employed one or more faxes and mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

1024.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the interstate wires and the U.S. Mail.

1025.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1026.    Payments made by Allstate to John Street Pharmacy, LLC d/b/a Acutus Rx were delivered through the U.S. Mail.

1027.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, CMS-1500 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by John Street Pharmacy, LLC d/b/a Acutus Rx to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1028.    When the Count III Defendants faxed or mailed (or caused the faxing or mailing of) CMS-1500 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count III Defendants materially misrepresented John Street Pharmacy, LLC d/b/a Acutus Rx's No-Fault reimbursement eligibility under New York law.

1029.    As a result of, and in reasonable reliance upon, the mailing, faxing, and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to John Street Pharmacy, LLC d/b/a Acutus Rx for the benefit of one or more of the Count III Defendants that would not otherwise have been paid.

1030.    The Count III Defendants' pattern of preparing and faxing or mailing (or causing/directing the preparation and faxing or mailing of) these documents and other claim-

related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count III Defendants to continue this scheme without being detected.

1031.   The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

1032.   The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1343 (wire fraud).

1033.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to John Street Pharmacy, LLC d/b/a Acutus Rx for the benefit of the Count III Defendants.

1034.   Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1035.   John Street Pharmacy, LLC d/b/a Acutus Rx constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1036.   The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1037.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count III Defendants' conduct.

1038.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1039.   Because of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**JOHN STREET PHARMACY, LLC D/B/A ACUTUS RX ENTERPRISE**
**(Against Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc.)**

1040.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1041.   Through their participation in the operation and management of John Street Pharmacy, LLC d/b/a Acutus Rx, Defendants Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc. (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

1042.   The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of John Street Pharmacy, LLC d/b/a Acutus Rx through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud as outlined in Exhibit 9, and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Allstate.

1043.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of John Street Pharmacy, LLC d/b/a Acutus Rx, even though John Street Pharmacy, LLC d/b/a Acutus Rx, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1044.   The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1045.   Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1046.   Because of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ALIGHT RX LLC ENTERPRISE
### (Against Laura Walsh, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc.)

1047.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

1048.   In furtherance of their operation and management of Alight Rx LLC, Defendants Laura Walsh, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc. (collectively, "Count V Defendants") intentionally prepared and faxed or mailed (or caused to be prepared and faxed or mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1049. The Count V Defendants employed one or more faxes and mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 10.

1050. Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the interstate wires and the U.S. Mail.

1051. Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1052. Payments made by Allstate to Alight Rx LLC were delivered through the U.S. Mail.

1053. As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, CMS-1500 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by Alight Rx LLC to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1054. When the Count V Defendants faxed or mailed (or caused the faxing or mailing of) CMS-1500 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count V Defendants materially misrepresented Alight Rx LLC's No-Fault reimbursement eligibility under New York law.

1055. As a result of, and in reasonable reliance upon, the mailing, faxing, and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Alight Rx LLC for the benefit of one or more of the Count V Defendants that would not otherwise have been paid.

206

1056. The Count V Defendants' pattern of preparing and faxing or mailing (or causing/directing the preparation and faxing or mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count V Defendants to continue this scheme without being detected.

1057. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

1058. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1343 (wire fraud).

1059. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Alight Rx LLC for the benefit of the Count V Defendants.

1060. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1061. Alight Rx LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1062. The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1063. Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count V Defendants' conduct.

1064. The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1065. Because of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ALIGHT RX LLC ENTERPRISE**
**(Against Laura Walsh, Harpreet K. Duggal, Atul K. Sharma,**
**and Firstserv Healthcare Management, Inc.)**

1066. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1067. Through their participation in the operation and management of Alight Rx LLC, Defendants Laura Walsh, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc. (collectively, "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

1068. The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Alight Rx LLC through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud as outlined in Exhibit 10, and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Allstate.

1069. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Alight Rx LLC, even though Alight Rx LLC, as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

208

1070.   The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1071.   Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1072.   Because of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### FIRSTSERV HEALTHCARE MANAGEMENT, INC. ENTERPRISE
**(Against Harpreet K. Duggal, Atul K. Sharma, Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, Alight Rx LLC, Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, and Laura Walsh)**

1073.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

1074.   In furtherance of their operation and management of Firstserv Healthcare Management, Inc., Defendants Harpreet K. Duggal, Atul K. Sharma, Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, Alight Rx LLC, Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, and Laura Walsh (collectively, "Count VII Defendants") intentionally prepared and faxed or mailed (or caused to be prepared and faxed or mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1075. The Count VII Defendants employed one or more faxes and mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8-10.

1076. Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the interstate wires and the U.S. Mail.

1077. Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1078. Payments made by Allstate to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC—the proceeds of which were, in part, diverted to Firstserv Healthcare Management, Inc. for the benefit of one or more of the Count VII Defendants—were delivered through the U.S. Mail.

1079. As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, CMS-1500 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1080. The use of Firstserv Healthcare Management, Inc.'s agreements with and/or relationship to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC allowed one or more of the Count VII Defendants to exercise control over the operation and management of Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx

LLC, and further permitted one or more of the Count VII Defendants to benefit from the pharmacy fees and profits unlawfully collected by Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC.

1081.   When the Count VII Defendants faxed or mailed (or caused the faxing or mailing of) CMS-1500 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count VII Defendants materially misrepresented Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC's No-Fault reimbursement eligibility under New York law.

1082.   As a result of, and in reasonable reliance upon, the faxing or mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC for the benefit of one or more of the Count VII Defendants that would not otherwise have been paid.

1083.   The Count VII Defendants' pattern of preparing and faxing or mailing (or causing/directing the preparation and faxing or mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count VII Defendants to continue this scheme without being detected.

1084.   The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

1085.   The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1343 (wire fraud).

1086.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC for the benefit of one or more of the Count VII Defendants.

1087.   The unlawful activities alleged in this case also had the direct effect of causing these funds to be channeled to Firstserv Healthcare Management, Inc. for the personal use and financial gain of one or more of the Count VII Defendants.

1088.   Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1089.   Firstserv Healthcare Management, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1090.   The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1091.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count VII Defendants' conduct.

1092.   The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1093.   Because of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, on behalf of Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### FIRSTSERV HEALTHCARE MANAGEMENT, INC. ENTERPRISE
**(Against Harpreet K. Duggal, Atul K. Sharma, Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, Alight Rx LLC, Kapree Holdings, LLC, and Ketuben Ravji Patel a/k/a Ketu Patel)**

1094. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1095. Through their participation in the operation and management of Firstserv Healthcare Management, Inc., Defendants Harpreet K. Duggal, Atul K. Sharma, Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, Kapree Holdings, LLC, and Ketuben Ravji Patel a/k/a Ketu Patel (collectively, "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

1096. The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud as outlined in Exhibit 8-10, and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Allstate.

1097. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC, even though Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC, as a result of the Count VIII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1098. The purpose of the conspiracy was also to cause pharmacy fees and profits unlawfully collected by Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight

Rx LLC to be channeled to Firstserv Healthcare Management, Inc. for the benefit of one or more of the Count VIII Defendants.

1099.    The Count VIII Defendants' use of Firstserv Healthcare Management, Inc. to funnel pharmacy fees and profits from Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC to one or more of the Count VIII Defendants allowed the Count VIII Defendants to exercise control over the unlawful management of Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC.

1100.    The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1101.    Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1102.    Because of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**KAPREE HOLDINGS, LLC ENTERPRISE**
**(Against Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, John Street Pharmacy, LLC d/b/a Acutus Rx, and Firstserv Healthcare Management, Inc.)**

1103.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

214

1104.  In furtherance of their operation and management of Kapree Holdings, LLC, Defendants Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, John Street Pharmacy, LLC d/b/a Acutus Rx, and Firstserv Healthcare Management, Inc. (collectively, "Count IX Defendants") intentionally prepared and faxed or mailed (or caused to be prepared and faxed or mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1105.  The Count IX Defendants employed one or more faxes and mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

1106.  Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the interstate wires and the U.S. Mail.

1107.  Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1108.  Payments made by Allstate to John Street Pharmacy, LLC d/b/a Acutus Rx—the proceeds of which were, in part, diverted to Firstserv Healthcare Management, Inc. for the benefit of one or more of the Count IX Defendants—were delivered through the U.S. Mail.

1109.  As documented above, the Count IX Defendants repeatedly and intentionally submitted, or caused to be submitted, CMS-1500 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by John Street Pharmacy, LLC d/b/a Acutus Rx to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

215

1110. The use of Kapree Holdings, LLC's agreements with and/or relationship to John Street Pharmacy, LLC d/b/a Acutus Rx allowed one or more of the Count IX Defendants to exercise control over the operation and management of John Street Pharmacy, LLC d/b/a Acutus Rx, and further permitted one or more of the Count IX Defendants to benefit from the pharmacy fees and profits unlawfully collected by John Street Pharmacy, LLC d/b/a Acutus Rx.

1111. When the Count IX Defendants faxed or mailed (or caused the faxing or mailing of) CMS-1500 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count IX Defendants materially misrepresented John Street Pharmacy, LLC d/b/a Acutus Rx's No-Fault reimbursement eligibility under New York law.

1112. As a result of, and in reasonable reliance upon, the mailing, faxing, and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to John Street Pharmacy, LLC d/b/a Acutus Rx for the benefit of one or more of the Count IX Defendants that would not otherwise have been paid.

1113. The Count IX Defendants' pattern of preparing and faxing or mailing (or causing/directing the preparation and faxing or mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count IX Defendants to continue this scheme without being detected.

1114. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

1115. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1343 (wire fraud).

216

1116. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to John Street Pharmacy, LLC d/b/a Acutus Rx for the benefit of one or more of the Count IX Defendants.

1117. The unlawful activities alleged in this case also had the direct effect of causing these funds to be channeled to Kapree Holdings, LLC for the personal use and financial gain of one or more of the Count IX Defendants.

1118. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1119. Kapree Holdings, LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1120. The Count IX Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1121. Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count IX Defendants' conduct.

1122. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1123. Because of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, on behalf of John Street Pharmacy, LLC d/b/a Acutus Rx, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**KAPREE HOLDINGS, LLC ENTERPRISE**
**(Against Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, John Street Pharmacy, LLC d/b/a Acutus Rx, and Firstserv Healthcare Management, Inc.)**

1124.  Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1125.  Through their participation in the operation and management of Kapree Holdings, LLC, Defendants Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, John Street Pharmacy, LLC d/b/a Acutus Rx, and Firstserv Healthcare Management, Inc. (collectively, "Count X Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

1126.  The Count X Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of John Street Pharmacy, LLC d/b/a Acutus Rx through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud as outlined in Exhibit 9, and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Allstate.

1127.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of John Street Pharmacy, LLC d/b/a Acutus Rx, even though John Street Pharmacy, LLC d/b/a Acutus Rx, as a result of the Count X Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1128.  The purpose of the conspiracy was also to cause pharmacy fees and profits unlawfully collected by John Street Pharmacy, LLC d/b/a Acutus Rx to be channeled to Kapree Holdings, LLC for the benefit of one or more of the Count X Defendants.

1129.  The Count X Defendants' use of Kapree Holdings, LLC to funnel pharmacy fees and profits from John Street Pharmacy, LLC d/b/a Acutus Rx to one or more of the Count X

218

Defendants allowed the Count X Defendants to exercise control over the unlawful management of John Street Pharmacy, LLC d/b/a Acutus Rx.

1130.  The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1131.  Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

1132.  Because of this violation of 18 U.S.C. § 1962(d), the Count X Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**COMMON LAW FRAUD**
**(Against All Defendants)**

1133.  Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1134.  The Defendants schemed to defraud Allstate by, among other things, (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with

prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC.

1135.    The Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC's eligibility for and entitlement to No-Fault reimbursement under New York law.

1136.    The misrepresentations of fact by the Defendants included, but were not limited to, material misrepresentations of fact made in Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC's CMS-1500 forms, prescription forms, patient treatment records, delivery receipts, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or payment requests.

1137.    The Defendants' representations were false or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

1138.    The misrepresentations were intentionally made by the Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC demanding payment of No-Fault insurance benefits.

1139.    The Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate Claimants were false, and were made to induce Allstate to make payments for claims that were not legitimate or lawfully compensable.

1140.    Allstate reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and

Alight Rx LLC's eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drugs and other pharmacy expenses according to New York's No-Fault insurance laws.

1141.  Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC—totaling more than $525,188.00—for prescription drug and other pharmacy expenses and services rendered to Allstate Claimants, even though Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XII
## UNJUST ENRICHMENT
### (Against All Defendants)

1142.  Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 994 as if fully set forth herein.

1143.  As alleged herein, the Defendants, through various means, conspired to induce Allstate to make numerous and substantial payments to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC in connection with claims made under New York's No-Fault Laws.

1144.  When Allstate paid Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made (or were caused to make) concerning Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC's reimbursement eligibility under New York's No-Fault Laws.

221

1145.   Every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC during this scheme constitutes a benefit that the Defendants aggressively caused Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC to seek and voluntarily accept.

1146.   Throughout their scheme, the Defendants caused Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC to wrongfully obtain a multitude of payments from Allstate—totaling over $525,188.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1147.   Under New York law, the Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims submitted by (or on behalf of) the Defendants because Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC (a) billed Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC.

1148.   As a direct and proximate result of this unlawful conduct relating to the billing for fraudulent, unnecessary, and ineffective drugs with respect to Allstate Claimants, at no point was

Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC ever eligible for reimbursement under New York's No-Fault Laws.

1149.  Throughout this scheme, the Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC.

1150.  Retention of those benefits by any of the Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Acutus Rx, LLC)**

1151.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

1152.  To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1153.  In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs, Acutus Rx, LLC was, at all relevant times, completely ineligible for No-Fault

reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1154. Acutus Rx, LLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1155. Acutus Rx, LLC continues to challenge Allstate's prior claim denials.

1156. Acutus Rx, LLC continues to commence legal actions against Allstate in the form of arbitrations and civil court lawsuits. The scheme is being monetized through Acutus Rx, LLC's collection actions because they enable the Defendants to fraudulently obtain No-Fault payments, which are used to finance the RICO scheme.

1157. A justifiable controversy exists between Allstate and Acutus Rx, LLC because Acutus Rx, LLC rejects Allstate's ability to deny such claims.

1158. Allstate has no adequate remedy at law.

1159. Acutus Rx, LLC also will continue to bill Allstate for No-Fault payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Acutus Rx, LLC.

1160. Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that (a) that Acutus Rx, LLC has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Acutus Rx, LLC.

## COUNT XIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against John Street Pharmacy, LLC d/b/a Acutus Rx)

1161.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

1162.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1163.   In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs, John Street Pharmacy, LLC d/b/a Acutus Rx was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1164.   John Street Pharmacy, LLC d/b/a Acutus Rx continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1165.   John Street Pharmacy, LLC d/b/a Acutus Rx continues to challenge Allstate's prior claim denials.

1166.   John Street Pharmacy, LLC d/b/a Acutus Rx continues to commence legal actions against Allstate in the form of arbitrations and civil court lawsuits.  The scheme is being monetized through John Street Pharmacy, LLC d/b/a Acutus Rx's collection actions because they enable the Defendants to fraudulently obtain No-Fault payments, which are used to finance the RICO scheme.

1167.   A justifiable controversy exists between Allstate and John Street Pharmacy, LLC d/b/a Acutus Rx because John Street Pharmacy, LLC d/b/a Acutus Rx rejects Allstate's ability to deny such claims.

1168.   Allstate has no adequate remedy at law.

1169.   John Street Pharmacy, LLC d/b/a Acutus Rx also will continue to bill Allstate for No-Fault payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by John Street Pharmacy, LLC d/b/a Acutus Rx.

1170.   Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that (a) that John Street Pharmacy, LLC d/b/a Acutus Rx has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, John Street Pharmacy, LLC d/b/a Acutus Rx.

**COUNT XV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Alight Rx LLC)**

1171.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 994 as if set forth fully herein.

226

1172. To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1173. In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and/or No-Fault clinics and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs, Alight Rx LLC was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1174. Alight Rx LLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1175. Alight Rx LLC continues to challenge Allstate's prior claim denials.

1176. Alight Rx LLC continues to commence legal actions against Allstate in the form of arbitrations and civil court lawsuits. The scheme is being monetized through Alight Rx LLC's collection actions because they enable the Defendants to fraudulently obtain No-Fault payments, which are used to finance the RICO scheme.

1177. A justifiable controversy exists between Allstate and Alight Rx LLC because Alight Rx LLC rejects Allstate's ability to deny such claims.

1178. Allstate has no adequate remedy at law.

1179.    Alight Rx LLC also will continue to bill Allstate for No-Fault payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Alight Rx LLC.

1180.    Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that (a) that Alight Rx LLC has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Alight Rx LLC.

## XI.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company, (collectively, "Allstate"), respectfully pray that judgment to enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ACUTUS RX, LLC ENTERPRISE**
**(Against Harpreet K. Duggal, Atul K. Sharma, Firstserv Healthcare Management, Inc., and Ketuben Ravji Patel a/k/a Ketu Patel)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

228

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ACUTUS RX, LLC ENTERPRISE
**(Against Harpreet K. Duggal, Atul K. Sharma, Firstserv Healthcare Management, Inc., and Ketuben Ravji Patel a/k/a Ketu Patel)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### JOHN STREET PHARMACY, LLC D/B/A ACUTUS RX ENTERPRISE
**(Against Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### JOHN STREET PHARMACY, LLC D/B/A ACUTUS RX ENTERPRISE
**(Against Kapree Holdings, LLC, Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, and Firstserv Healthcare Management, Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

229

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ALIGHT RX LLC ENTERPRISE**
**(Against Laura Walsh, Harpreet K. Duggal, Atul K. Sharma,**
**and Firstserv Healthcare Management, Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ALIGHT RX LLC ENTERPRISE**
**(Against Laura Walsh, Harpreet K. Duggal, Atul K. Sharma,**
**and Firstserv Healthcare Management, Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### FIRSTSERV HEALTHCARE MANAGEMENT, INC. ENTERPRISE
**(Against Harpreet K. Duggal, Atul K. Sharma, Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, Alight Rx LLC, Kapree Holdings, LLC, and Ketuben Ravji Patel a/k/a Ketu Patel)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### FIRSTSERV HEALTHCARE MANAGEMENT, INC. ENTERPRISE
**(Against Harpreet K. Duggal, Atul K. Sharma, Acutus Rx, LLC, John Street Pharmacy, LLC d/b/a Acutus Rx, Alight Rx LLC, Kapree Holdings, LLC, and Ketuben Ravji Patel a/k/a Ketu Patel)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### KAPREE HOLDINGS, LLC ENTERPRISE
**(Against Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, John Street Pharmacy, LLC d/b/a Acutus Rx, and Firstserv Healthcare Management, Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

231

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and

attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count IX Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### KAPREE HOLDINGS, LLC ENTERPRISE
**(Against Ketuben Ravji Patel a/k/a Ketu Patel, Harpreet K. Duggal, Atul K. Sharma, John Street Pharmacy, LLC d/b/a Acutus Rx, and Firstserv Healthcare Management, Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and

attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count X Defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XI
### COMMON LAW FRAUD
**(Against All Defendants)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the

detection of the Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Acutus Rx, LLC,

John Street Pharmacy, LLC d/b/a Acutus Rx, and Alight Rx LLC seeking payment of false

and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XII
## UNJUST ENRICHMENT
### (Against All Defendants)

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Acutus Rx, LLC)

(a) DECLARE that Acutus Rx, LLC, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering Acutus Rx, LLC completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Acutus Rx, LLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Acutus Rx, LLC; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against John Street Pharmacy, LLC d/b/a Acutus Rx)

(a) DECLARE that John Street Pharmacy, LLC d/b/a Acutus Rx, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering John Street Pharmacy, LLC d/b/a Acutus Rx completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that John Street Pharmacy, LLC d/b/a Acutus Rx's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by John Street Pharmacy, LLC d/b/a Acutus Rx; and

233

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Alight Rx LLC)

(a) DECLARE that Alight Rx LLC, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering Alight Rx LLC completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Alight Rx LLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Alight Rx LLC; and

(d) GRANT all other relief this Court deems just and appropriate.

## XIV.    JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Michael W. Whitcher*

_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Michael W. Whitcher (MW 7455)
mwhitcher@ktmpc.com
100 Ring Road, Suite 211
Garden City, NY 11530
Ph:  347-710-0050
Fax: 347-710-0055

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Fire & Casualty Insurance Company*

Dated:  December 11, 2024

235